**NO. 00-755C**
**(JUDGE ALLEGRA)**

---

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**SOUTHERN COMFORT BUILDERS, INC.**

**Plaintiff,**

**v.**

**THE UNITED STATES,**

**Defendant.**

---

# DEFENDANT'S POST-TRIAL BRIEF

---

**PETER D. KEISLER**
**Assistant Attorney General**

**DAVID M. COHEN**
**Director**

**JAMES M. KINSELLA**
**Deputy Director**

**DAVID R. FENIGER**
**Trial Attorney**
**Commercial Litigation Branch**
**Civil Division**
**Department of Justice**
**Attn: Classification Unit**
**8th Floor**
**1100 L Street, N.W.**
**Washington, D.C. 20005**
**Tel. (202) 307-3390**
**Fax (202) 305-2118**
**Attorneys for Defendant**

**OF COUNSEL:**

**JOHN LAURO**
**Trial Attorney**
**Contract Litigation Division**
**Air Force Legal Services Agency**

**June 4, 2004**

# TABLE OF CONTENTS

**PAGE(S)**


DEFENDANT'S POST-TRIAL BRIEF . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . 1

ARGUMENT . . . . . 3

I. Because The Contract Required Southern Comfort To Provide VFDs, And Because Southern Comfort Knew That VFDs Were Required, Southern Comfort Committed Fraud When It Submitted A Certified Claim Alleging That VFDs Were Not Required . . . . . 3

A. The Contract Required Southern Comfort To Install VFDs . . . . . 3

1. Randy Thron Testified That "Absolutely [VFDs] Were Required By The Project. Absolutely." . . . . . 3

2. Herb Blauel, The Mechanical Engineer For Johnson Controls, Testified That The Contract Explicitly Required VFDs . . . . . 4

3. Richard Paullin, An Expert In Mechanical Engineering, Testified That The Contract Unambiguously Required VFDs . . . . . 6

4. Independent Estimator Acknowledges VFD Requirement . . . . . 9

5. Independent General Contractor Acknowledges VFD Requirement . . . . . 10

6. Issue Relating To Which Subcontractor Was Contractually Required To Provide VFDs Is Irrelevant To Southern Comfort's Claim . . . . . 11

**TABLE OF CONTENTS (con't)**

**PAGE(S)**


B. Mr. Ellis Knew That VFDs Were Required By The Contract . . . . . . . . . . 12

1. Mr. Ellis' First Communication Regarding VFDs Was To Direct His Electrical Subcontractor To Supply The VFDs Pursuant To The Contract . . . . . . . . . . 12

2. Nearly Two Years After Mr. Ellis' First Communication Directing Chrome Electric To Provide VFDs, Mr. Ellis Consulted With Randy Thron, A Neutral Third Party, Again Acknowledging That VFDs Were Contractually Required . . . . . . . . . . 13

3. Mr. Ellis, In Communications With Chrome Electric In 1997, Acknowledged That VFDs Were Required . . . . . . . . . . 14

4. Chrome Electric's Attorney Informed Mr. Ellis That VFDs Were Unambiguously Required . . . . . . . . . . 15

5. Mr. Ellis Informed Mechanical Contractor And The Government That VFDs Were Required . . . . . . . . . . 16

6. Mr. Ellis Acknowledged, In At Least Two Separate Meetings, That He Knew VFDs Were Contractually Required . . . . . . . . . . 17

a. Meeting Of May 8, 1996 . . . . . . . . . . 17

b. Meeting of July 3, 1996 . . . . . . . . . . 18

**TABLE OF CONTENTS (con't)**

**PAGE(S)**

C. Because Mr. Ellis Knew That VFDs Were Required, And Nevertheless Filed A Certified Claim Stating That VFDs Were Not Required, Southern Comfort Violated Fraud Statutes . . . . . . . . . . . . . . . . . . . . . . . 18

D. Even If The Court Were To Find That Mr. Ellis Believed VFDs Were Not Contractually Required, The Government Still Prevails Upon The Fraud Statutes Because Southern Comfort's Belief Was Unreasonable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

E. Even If The Court Were To Find That The VFD Requirement Was Ambiguous, The Ambiguity Was Patent And Southern Comfort Waived Its Right To Challenge The Alleged Ambiguities By Failing To Inquire Prior To Submitting Its Bid . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

II. The Contract Clearly Required Southern Comfort To Install Electrical Grounding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

III. Because Southern Comfort's Delay In Providing The VFDs Was Concurrent With The Government's Delay In Providing The UPS, Southern Comfort Is Not Entitled to Any Compensation . . . . . . . . . . . . . . . . . . . 27

A. Although The UPS And The VFDs Both Became Critical Path Items On May 9, 1996, The UPS Issue Was Resolved On October 23, 1998 And The VFDs Remained On The Critical Path Until February 12, 1999 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

B. Southern Comfort, By Failing To Perform A Critical Path Method Analysis, Is Unable To Prove Its Damages Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

C. Even If Southern Comfort Were Permitted To Neglect Conducting A Critical Path Analysis, It Still Failed To Demonstrate Entitlement To Damages Based Upon Delay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**TABLE OF CONTENTS (con't)**

**PAGE(S)**


1. VFD Installation Was Not Dependent Upon UPS . . . . . 31

2. Southern Comfort Failed To Demonstrate A Distinct Period Of Suspended Operations . . . . . 33

D. The Air Force Is Not Responsible For Any Delay In Approving Submittals . . . . . 34

IV. Even If Southern Comfort Could Prove Entitlement To Delay Damages, The Government Would Be Responsible For 19 Days Of Delay, At Most . . . . . 37

CONCLUSION . . . . . 39

## TABLE OF AUTHORITIES

**CASE** **PAGE(S)**

Avedon Corp. v. United States,
15 Cl. Ct. 648 (1988) . . . . . 27, 28

Blinderman Construction Co. v. United States,
695 F.2d 552 (Fed. Cir. 1982) . . . . . 27

Chris Berg, Inc. v. United States,
197 Ct. C 455 F.2d 1037 (1972) . . . . . 23

Commercial Contractors, Inc. v. United States,
154 F.3d 1357 (Fed. Cir. 1998) . . . . . 20-22

Connecticut [sic] Builders v. Peters,
226 F.3d 1307 . . . . . 30

Edward R. Marden Corp. v. United States,
803 F.2d 701 (Fed. Cir. 1986) . . . . . 23

Essex Electro Eng'rs, Inc. v.Danzig,
224 F.3d 1283 (Fed. Cir. 2000) . . . . . 30

Fry Communications, Inc. v. United States,
22 Cl. Ct. 497 (1991) . . . . . 22

H.B. Zachry Co. v. United States,
28 Fed. Cl. 77 (1993), aff'd, 17 F.3d 1443 (Fed. Cir. 1994) . . . . . 22

Interstate General Government Contractors v. Stone,
980 F.2d 1433 (Fed. Cir. 1992) . . . . . 22

Interwest Construction Co. v. Brown,
29 F.3d 611 (Fed. Cir. 1994) . . . . . 22, 23

Johnson Controls, Inc. v. United States,
229 Ct. C 671 F.2d 1312 (1982) . . . . . 22

Kinetic Builder's Inc. v. Peters,
226 F.3d 1307 (Fed. Cir. 2000) . . . . . 28, 30

## TABLE OF AUTHORITIES (con't)


| CASE | PAGE(S) |
| --- | --- |
| Merritt-Chapman & Scott Corp. v. United States, 208 Ct. C 528 F.2d 1392 (1976) | 28 |
| P.J. Dick v. Secretary of Veterans Affairs, 324 F.3d 1364 (2003) | 29 |
| S.O.G. of Arkansas v. United States, 212 Ct. C 546 F.2d 367 (1976) | 23 |
| Tilley Constructors & Engineers, Inc. v. United States, 15 Cl. Ct. 559 (1988) | 24 |
| Servidone Construction Corp. v. United States, 931 F.2d 860 (1991) | 27 |
| Weaver-Bailey Contractors, Inc. v. United States, 19 Cl. Ct. 474, 476 (1990) | 28 |
| Wickham Contracting Co. v. United States, 212 Ct. C 546 F.2d 395 (1976) | 23 |
| William F. Klingensmith, Inc. v. United States, 731 F.2d 805 (Fed. Cir. 1984) | 27, 28 |
| Young- Montenay, Inc. v. United States, 15 F.3d 1040 (Fed. Cir. 1994) | 19 |

## STATUTES AND REGULATIONS

**PAGE(S)**

28 U.S.C. § 2514 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 19

31 U.S.C. § 3729(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

41 U.S.C. §604 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 18, 20, 21

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SOUTHERN COMFORT BUILDERS, INC. | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No. 00-755C |
| | ) | (Judge Allegra) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S POST-TRIAL BRIEF

Pursuant to the Court's April 20, 2004 order and Appendix A, ¶ 19 of the Rules of the Court of Federal Claims, defendant, the United States, respectfully submits its post-trial brief. This brief is intended to supplement defendant's May 22, 2003 pre-trial brief and should be considered in conjunction with that brief.

SUMMARY OF THE ARGUMENT

In order to establish fraud or a violation of the False Claims Act, the United States is required to prove that Southern Comfort Builders, Inc. ("Southern Comfort") knowingly or recklessly presented a false or fraudulent claim to the Government for approval. The evidence presented at trial clearly demonstrates that the Government met its burden. During trial, the Government established that the contract required Southern Comfort to provide variable frequency drives ("VFDs") to regulate the air handling units ("AHUs"). More important, the United States established that Southern Comfort's president knew for certain that the contract required VFDs. First, before ever presenting the VFD issue to the Government, Southern Comfort's president, Dale Ellis ("Mr. Ellis"), told his electrical subcontractor that it was required

to provide the VFDs. Second, Mr. Ellis' own neutral third party consultant told him that VFDs were required by the contract – and Mr. Ellis told the same consultant that Mr. Ellis understood that the VFDs were contractually required. Third, Southern Comfort's electrical subcontractor told Mr. Ellis that VFDs were required. Fourth, an attorney for Southern Comfort's electrical subcontractor told him that VFDs were required. And finally, Mr. Ellis acknowledged, in at least two separate meetings, that he knew VFDs were required. Accordingly, Southern Comfort committed fraud when it submitted a request for additional contract funds as part of its claim, knowing that the contract price already required it to provide VFDs. In doing so, it violated the False Claims Act, the antifraud provision of the Contract Disputes Act ("CDA"), 41 U.S.C. § 604, and committed fraud, pursuant to 28 U.S.C. § 2514. Among other consequences of its actions, Southern Comfort has forfeited any other claims arising pursuant to the contract.

Southern Comfort also seeks additional costs associated with the installation of electrical grounding. Again, just as in the case of the VFDs, the Government presented evidence that the grounding was clearly required by the terms of the contract. Southern Comfort's own electrical subcontractor testified that he understood the electrical grounding requirements and that, based upon the drawings, he had sufficient information to perform the electrical grounding installation.

Finally, the Air Force was responsible to provide an Uninterruptible Power Supply ("UPS") as government-furnished equipment for Southern Comfort to complete the required work. Admittedly, the Air Force was late in providing the UPS. However, the late delivery of the UPS was not the only cause of delay in completion of this contract. Southern Comfort concurrently delayed completion of the contact by failing to procure and install VFDs for the AHUs, as required by the contract. Furthermore, Southern Comfort delayed the completion of

the fire alarm system beyond the completion of the UPS. Therefore, while Southern Comfort is entitled to an extension of the time to complete the contract, it is not entitled to additional compensation.

## ARGUMENT

### I. Because The Contract Required Southern Comfort To Provide VFDs, And Because Southern Comfort Knew That VFDs Were Required, Southern Comfort Committed Fraud When It Submitted A Certified Claim Alleging That VFDs Were Not Required

#### A. The Contract Required Southern Comfort To Install VFDs

##### 1. Randy Thron Testified That "Absolutely [VFDs] Were Required By The Project. Absolutely."

In 1997, Mr. Ellis telephoned Randy Thron and asked him to review the drawings and specifications relating to VFDs on the XY project. Tr. 833:9-11. According to Mr. Ellis, Mr. Thron was a "neutral third party." DX 130-001. Mr. Thron, an architect and senior vice-president for BRPH Architects and Engineers, currently is in charge of all designs of BRPH in all of its offices. Tr. 829:4-5; 829:25-830:2. His job is to coordinate all disciplines for architectural designs, including mechanical and electrical disciplines. Mr. Thron testified that he reviewed the following contract documents at the request of Mr. Ellis: M13, M8, and specifications 15855, and 16481. Tr. 833:14-17 (citing DX 130-002).

> Q Upon reviewing those drawings and specifications did you make a determination as to whether variable frequency drives were required by the project?
>
> A Absolutely they were required by the project. Absolutely.
>
> Q Did you convey this information to Mr. Ellis?
>
> A Yes.

Tr. 833:18-24. (Emphasis added.) Mr. Thron reiterated that VFDs were clearly required by the contract, because they would be needed for a functioning system. Tr. 839:13-17. When the Court subsequently asked Mr. Thron whether Mr. Ellis knew that VFDs were required, Mr. Thron again explained that Mr. Ellis indicated that he knew that VFDs were contractually required. Tr. 840:14-23. When questioned about the specific provisions that supported Mr. Thron's opinion, he testified that drawing M 13 ("M 13") of the contract clearly required "variable frequency" for air handling units ("AHUs") 1, 3, 5 and 7. DX 28-023. Mr. Thron explained that M 13 requires VFDs "because in the schedule it indicates variable frequency type controllers." Tr. 834:22-25.

2. Herb Blauel, The Mechanical Engineer For Johnson Controls, Testified That The Contract Explicitly Required VFDs

Herb Blauel, the mechanical engineer for Johnson Controls who designed and created the mechanical drawings and specifications for the XY project, Tr. 669:8-10, further reinforced the testimony of Mr. Thron – that VFDs were unambiguously required. Mr. Blauel described in even greater detail why these requirements were unambiguous.

As part of Johnson Controls' launch-based support contract with the Air Force, Mr. Blauel designed the mechanical drawings and specifications, including M 13, and caused a draftsman to create the drawings. Tr. 682:2-5. Mr. Blauel testified that anyone knowledgeable in the industry would understand that there are only two options to control the airflow of AHUs – (1) by using inlet guide veins; or (2) by utilizing a VFD. Tr. 683:8-18. The M 13 requirement of a "variable frequency" control mandates that the contractor provide a device that changes the motor frequency from 20 to 60 hertz per second. Tr. 684:8-10. Mr. Blauel testified AHUs 1, 3, 5

and 7, required a variable air volume ("VAV") system – meaning that volume could be controlled with inlet guide veins or by a VFD. Tr. 689:1-14. Mr. Blauel testified that by designating the controls as "variable frequency", anyone knowledgeable in the industry would understand that a VFD, not inlet guide veins, was required. Tr. 683:8-21.

Mr. Blauel further testified that the mechanical specifications also require VFDs. Section 15855, ¶ 1.4(C.) sets forth guidelines for "Variable Air Volume Air Handling Units with Variable Frequency Drive – see specification section 16480". DX 105-076. Again, Mr. Blauel reiterated that this section, by specifically referencing VFDs, and by not referencing inlet guide veins, reinforces the VFD requirement. Tr. 691:23-692:2. Next, Mr. Blauel testified that Section 15855, ¶ 2.4(J.) also underscored the VFD requirement: "[For fan sections controlled by variable frequency drives, balance at all speeds between 25% and 100% of design RPM.]" Tr. 692:15-21; DX 105-081. This specification means that

> . . . when a fan is balanced, you know, there can be speeds at which it rides smoothly and those at which it would vibrate, just as a tire can be bad at 60 miles an hour, be okay at 40 or can be okay at 80. So this is saying that the fan has to be balanced for all of those speeds in between.

Tr. 692:23-693:3.

Mr. Blauel next acknowledged that, although section 15855 required VFDs, it cross-referenced an electrical specification that does not exist – section 16480. Tr. 693:12. However, Mr. Blauel stated that the next specification that would follow section 16480 – section 16481 – further evidenced the VFD requirement. Again, Mr. Blauel relied upon the precise wording of the specification. Specification 16481, ¶ 2.7 requires "Solid-State, Variable-Speed Motor Controllers." Tr. 694:12-18; DX 105-267 - 105-270. According to Mr. Blauel, this specification

provides for a "variable speed motor controller, so I mean that's – that would be a variable frequency drive . . "[a]nd down below there it says, 'By adjusting output voltage and frequency of controller,' I mean that's exactly what a variable frequency drive does." Tr. 694:12-18; 729:20-730:12. (Emphasis added.) According to Mr. Blauel, "I have no doubt in my mind [that the ¶ 1.5.A reference to 'solid state variable speed controllers' is] the same device because it describes a variable frequency drive." Tr. 732:23-734:4.

3. Richard Paullin, An Expert In Mechanical Engineering, Testified That The Contract Unambiguously Required VFDs

The Court admitted Richard Paullin as an expert in mechanical engineering. Tr. 1056:15-21. Mr. Paullin performed mechanical engineering work for a refinery in Ohio. Tr. 1054:14-25. As part of Mr. Paullin's work for the refinery, he worked with a variety of solid-state and magnetic motor controllers, including VFDs. Tr. 1055:11-1056:2. He also worked with the motor control centers and with heating ventilation and air conditioning ("HVAC") systems that were being installed in the motor control centers. Tr. 1056:8-14. Mr. Paullin explained that the main function of a VFD is to control the speed of the motor. Tr. 1059:10-16.

Mr. Paullin, having reviewed the contract documents, formed a professional opinion that the contract plans and specifications require the provision of VFDs. Tr. 1059:17-24. Mr. Paullin explained, in meticulous detail, how the contract documents and specifications demonstrate the VFD requirement.

First, Mr. Paullin reviewed drawing M 4 ("M 4"). DX 28-016. M 4 represents an overview of the new mechanical systems that are to be installed in the XY building. Tr. 1060:20-22. According to Mr. Paullin, the lower right hand corner of M 4 shows new AHUs that are to be

installed: "it says new AHU-5, see schedule sheet M13. So what this is showing is that a new air handling unit is to be installed right here and the characteristics of that air handler are shown on sheet M 13." Tr. 1061:1-12. Mr. Paullin testified in detail, how the drawings clearly specify a VAV system for the entire building and how the VFDs interplay with the VAV box:

> The interplay that the VFD causes with the VAV boxes can be simply stated in that when the VAV boxes sense that the room is getting too cold or that there is less cold air needed in the room, the VAV box essentially has dampers in it which close or louvers. So the VAV box will actually shut off the flow of air to the room.
>
> When that happens in a series of rooms, the duct static pressure increases, so in essence, the air handler or the fan is trying to push air through a series of ducts where the ends of each duct are closed. In essence, the air handler is trying to push air that can't go anywhere.
>
> What happens then is there's a sensor which senses the duct static pressure. Simply, what it does is it turns down the speed of the motor or the speed of the fan through the VFDs in order to decrease the air flow through the system. So the interplay is that when the VAV boxes close, the VFD turns down the speed of the motor.

Tr. 1062:21-1063:15.

Mr. Paullin reiterated Mr. Blauel's testimony that AHUs are available in only two different options to control the volume of airflow. Either the AHUs are equipped with inlet guide veins or with VFDs. Tr. 1063:19-1064:10. Accordingly, M 13 specified that the type of capacity control for "fan data" is required to have "variable frequency". According to Mr. Paullin, this "means that VFDs are required by this contract, as opposed to inlet guide veins." Tr. 1068:7-8. Mr. Paullin stated that M 13 "conclusively means that a variable frequency drive is required." Tr. 1070:19-21. In fact, Mr. Paullin testified that the three proposed manufacturers

listed in the specifications – Trane, York and Carrier – each manufactured AHUs with VFDs attached to the outside. Tr 1071:13-1072:14.

Mr. Paullin's opinion that VFDs were required by the contract was bolstered by the specification language. Section 15855, ¶ 1.4(C.) sets forth guidelines for "Variable Air Volume Air Handling Units with Variable Frequency Drive – see specification section 16480." DX 105-076. According to Mr. Paullin, this section refers to the VFDs and the requirements for balancing the fans. Tr. 1075:1-3.

> The last sentence of paragraph J on page 81 states, for fan sections controlled by variable frequency drive, balance at all speeds between 25 percent and 100 percent of design RPM. In this case, as we've shown on the other pages of this specification and the drawings, the fan section is being controlled by a variable frequency drive and this states the requirement for balancing the fan section.

Tr. 1074:21-1075:4.

With regard to the electrical specifications, Mr. Paullin testified that although specification 16480 does not exist, "the specification that you're faced with when looking for 16480 is Section 16481." According to Mr. Paullin, section 16481 – further evidences the VFD requirement. Tr. 1078:6-1082:12. In forming his opinion, Mr. Paullin relied upon numerous sub-paragraphs of section 16481. Id. The most blatant evidence that section 16481 requires VFDs is set for in ¶ 2.7, entitled "Solid-State, Variable-Speed Motor Controllers" DX 105-267 - 105-270. Mr. Paullin testified that paragraph 2.7 provides that

> . . . the variable speed motor controller is the type of motor controller that the VFD is on this contract and it says that, provide controllers listed and labeled as a complete unit and arranged to provide variable speed of a standard NEMA, Design B, three phase

> induction motor by adjusting the output voltage and frequency of controller.

Tr. 1081:1-7.

Therefore, based upon M4, M13, and all of the mechanical and electrical specifications cited above, Mr. Paullin formed the opinion that VFDs were required by the contract. Tr. 1082:13-17.

4. Independent Estimator Acknowledges VFD Requirement

Mr. Paullin consulted with Robert Edwards, an estimator and mechanical contractor for Duffy Mechanical Corporation. Tr. 1083:19-6. Mr. Edwards is a master mechanic in HVAC. Tr. 1084:2-12; DX 103-052-055. As an estimator, Mr. Edwards reviews plans, drawings, specifications and contracts – and estimates the mechanical contractor's portion of the work on the contract. Tr. 1084:20-1085:1. As an estimator, Mr. Edwards prepares bids by determining the quantity and pricing of material required by the drawings and specifications, and by estimating the labor necessary for the mechanical portions of the projects. Tr. 1085:4-10.

Mr. Paullin requested Mr. Edwards to submit a bid for the AHU work on the contract. Tr. 1085:14-19. "I told him that I couldn't tell him what the issues were, that I simply wanted him to provide me an estimate of the equipment that he would bid for an air handling unit on this contract." Tr. 1085:22-25. Mr. Paullin specifically refrained from explaining to Mr. Edwards any of the issues involved in this lawsuit. Tr. 1085:21-23. Mr. Paullin provided Mr. Edwards with a copy of the request for proposal ("RFP"), the amendments to the RFP, and a copy of the drawings and specifications. Tr. 1086:6-9.

Mr. Edwards complied with Mr. Paullin's request. Mr. Edward's included VFDs as part of the controls package he would need to purchase. Tr. 1087:2-7. Mr. Edwards subsequently met Mr. Paullin and explained that he had chosen AHUs manufactured by Trane based upon "a whole series of design choices that he made in bidding the project. One of the factors that he explained to me was the fact that VFDs were required." Tr. 1087:24-1088:1. Indeed, Mr. Edwards included VFDs in his bid. DX 103-051.

5. Independent General Contractor Acknowledges VFD Requirement

Mr. Paullin also consulted with Mr. Hartman, a general contractor, in the same manner that he consulted Mr. Edwards. Mr. Hartman is a general contractor for a large national general contracting firm. Tr. 1088:17-21. He is responsible for working with subcontractors in order to obtain estimates for various projects. Id. Mr. Paullin retained Mr. Hartman to obtain an independent opinion from a general contractor as to the general scope of work on the contract, with particular respect to the AHUs. Tr. 1089:13-16.

Specifically, Mr. Paullin asked Mr. Hartman to review the plans and specifications of the contract and to explain how he would bid the contract out to subcontractors. Tr. 1090:5-8. He was tasked to provide Mr. Paullin with the information he would provide to subcontractors and the specified equipment he would expect to receive from the subcontractors, in return. Tr. 1090:8-11. Mr. Paullin provided Mr. Hartman with no additional information. Tr. 1090:12-13.

Mr. Hartman responded to Mr. Paullin by providing him a summary of his opinion. Tr. 1090:24-1091:7; DX 103-057. Mr. Hartman provided Mr. Paullin with a scope sheet that identified what work was to be included in the project. Tr. 1091:9-14; DX 103-057. Mr. Hartman stated that VFDs were required by the contract. Tr. 1091:16-25; DX 103-057.

6. Issue Relating To <u>Which</u> Subcontractor Was Contractually Required To <u>Provide VFDs Is Irrelevant To Southern Comfort's Claim</u>

Southern Comfort's electrical subcontractor, Chrome Electric, and its mechanical subcontractor, One Contractor, based upon their respective <u>subcontracts</u> with Southern Comfort, both asserted that they were not contractually required to provide VFDs. However, because, the contract between the Air Force and Southern Comfort clearly required Southern Comfort to provide VFDs, the issue of <u>which</u> subcontractor was contractually required to provide VFDs, pursuant to the respective subcontracts, is immaterial to this lawsuit or our counterclaim.

Christina Powers, employed as an architect for Johnson Controls in the 1990s, coordinated the architectural work for the XY Project. Tr. 851:14-19. Ms. Powers testified that she was responsible for providing all of the coordination and input behind drawing A 1, DX 28-007, and that she directed the draftsmen to include all of the information and language set forth in that drawing. Tr. 854:3-18. General Note no. 4 provides as follows: "[a]ll new installations to be coordinated with electrical and mechanical requirements." DX 28-007; Tr. 855:14-16. Ms. Powers testified that the purpose of General Note no. 4 was to ensure that the architectural drawings were coordinated with electrical and mechanical drawings. Tr. 856:3-6. She also testified that the requirements of General Note no. 4 – and all of the requirements in A-1 through A-6 – applied to all of the mechanical and electrical drawings in the project. Tr. 856:17-24. General Note no. 4 confirms the self-evident – that the prime contractor is responsible for coordinating the mechanical and electrical requirements and ensuring that the contract drawings and specifications are followed. In this case, that means that Southern Comfort was required to coordinate which subcontractor was responsible for providing and installing the VFDs.

B. Mr. Ellis Knew That VFDs Were Required By The Contract

Mr. Ellis knew for certain that VFDs were required by the contract. Mr. Ellis' knowledge was manifested in numerous ways: (1) by affirming his understanding to Mr. Thron, his own neutral third-party, (2) by expressing his understanding to his own subcontractors, (3) by receiving correspondence from one of his subcontractor's lawyers, and (4) by acknowledging his understanding to others in at least two separate meetings.

1. Mr. Ellis' First Communication Regarding VFDs Was To Direct His Electrical Subcontractor To Supply The VFDs Pursuant To The Contract

Perhaps the most poignant manifestation of Mr. Ellis' knowledge that he was required to provide VFDs was his first communication involving the issue. On November 7, 1995, prior to any communication with the Government relating to the VFDs, Mr. Ellis received request for information ("RFI") no. 1 from Bill Butcher, the president Southern Comfort's electrical contractor on the project, Chrome Electric. DX 2-001. Mr. Butcher requested information as to who should supply the VFDs. Mr. Ellis responded to RFI no. 1 by writing "VFD's To Be Supplied By Electrical Contractor. D R Ellis", and sending his response back to Mr. Butcher. DX 2-001; Tr. 347:2-19. By informing his own electrical subcontractor to install the VFDs, Mr. Ellis unambiguously acknowledged that he understood, as of November 7, 1995, that VFDs were required by the contract.

Following Mr. Ellis' initial direction to Chrome Electric to provide VFDs, the issue did not go away. Accordingly, in a letter dated February 6, 1996, Mary Killgore, of Southern Comfort, informed Chrome Electric that Southern Comfort had ". . . not received a submittal for the motor controls. Please comply with your Contract and submit the required data ASAP." DX

128-001 (emphasis added). Southern Comfort was referring to Chrome Electric's requirement, pursuant to its own subcontract with Southern Comfort, to provide the VFDs. Tr. 84:16-22 (Ms. Killgore's testimony).

In a letter dated March 22, 1996, Chrome Electric's president, William Butcher, responded to Southern Comfort's demands by explaining to Mr. Ellis as follows:

> Section 15855, paragraph 1.4 covers quality assurance. Sub-paragraph C details "Variable Air Volume Air Handling Units with Variable Frequency Drive". This indicates that the <u>VFD's are an integral part of the Air Handling Units.</u>

Tr. 347:20-348:13 (Emphasis added); DX 126-016. Again, this communication is important because it demonstrates that Southern Comfort was informed that VFDs were contractually required – something that Mr. Ellis acknowledged on numerous occasions – both before and after this date.

2. <u>Nearly Two Years After Mr. Ellis' First Communication Directing Chrome Electric To Provide VFDs, Mr. Ellis Consulted With Randy Thron, A Neutral Third Party, Again Acknowledging That VFDs Were Contractually Required</u>

Following Mr. Ellis' communication with Mr. Butcher – directing Chrome Electric to supply the VFDs – Chrome Electric began to resist Mr. Ellis' directive. Nearly two years later, on September 10, 1997, Mr. Ellis consulted with Randy Thron as to <u>which</u> subcontractor was responsible for providing and installing the VFDs. Tr. 833:9-11 (Mr. Thron's testimony).

Mr. Thron testified that he reviewed the contract documents at the request of Mr. Ellis. Tr. 833:14-17 (citing DX 130-002).

> Q Upon reviewing those drawings and specifications did you make a determination as to whether variable frequency drives were required by the project?

A Absolutely they were required by the project. Absolutely.

Q Did you convey this information to Mr. Ellis?

A Yes.

Tr. 833:18-24. (Emphasis added.) When the Court subsequently asked Mr. Thron whether Mr. Ellis knew that VFDs were required, Mr. Thron again explained that Mr. Ellis knew that VFDs were contractually required. Tr. 840:14-23.

Mr. Thron's office drafted a summary of Mr. Thron's contractual understanding – ultimately concluding that the units should be provided by the electrical contractor. DX 130-003. As we will demonstrate in the next section, Mr. Ellis attached Mr. Thron's summary to a letter that Southern Comfort forwarded to Chrome Electric. In that letter, Mr. Ellis referred to Mr. Thron as a "neutral third party." DX 130-001.

3. Mr. Ellis, In Communications With Chrome Electric In 1997, Acknowledged That VFDs Were Required

Still hoping to convince Chrome Electric that VFDs were the responsibility of the electrical subcontractor, Mr. Ellis drafted a letter to Chrome Electric, dated September 29, 1997. DX 130-001; Tr. 349:11-350:24 (Mr. Butcher's testimony). In his letter, Mr. Ellis again unambiguously acknowledged that VFDs were required:

> [T]his letter shall be your written direction to install the Variable Frequency Drives as outlined on the blue prints and referenced in Division 1600 of the specifications.
>
> * * *
>
> Attached is a copy of a neutral third party, stating that the responsibility of furnishing the Variable Frequency Drives are the responsibility of Division 1600.

DX 130-001. This letter clearly manifests an understanding by Mr. Ellis that VFDs were part of the contract.

4. Chrome Electric's Attorney Informed Mr. Ellis That VFDs Were Unambiguously Required

After receiving Mr. Ellis' letter of September 29, 1997, demanding that Chrome Electric install VFDs, Mr. Butcher retained an attorney to represent him in connection with his dispute with Southern Comfort. Tr. 350:25-351:4. Acting upon behalf of his client, Chrome Electric, attorney Edward J. Kinberg informed Mr. Ellis that VFDs were contractually required. DX 16-001-003.

> In this case, drawing M 13 specifically states four AHU's must have a variable frequency drive as part of the mechanical package. This requirement placed you on notice that the AHU's require some sort of variable frequency control device as part of the package ordered from the supplier.
>
> * * *
>
> [T]he mechanical drawings clearly call for a variable frequency controller on AHU 1, 3, 5 & 7 and refer the reader to Section 16480, which does not exist. These facts clearly put you, and anyone bidding on the mechanical portion of the work on notice that the AHU's must have variable frequency drives. As this requirement is plainly shown on the face of the mechanical drawings, you had a duty to inquire as to the details needed to provide these units.[1]

DX 16-001-002 (emphasis added). This letter represents yet another communication that informed Mr. Ellis that VFDs were contractually required – a proposition with which Mr. Ellis already agreed, as demonstrated above.

[1] Mr. Butcher testified that he agrees with all of his attorney's assertions. Tr. 363:4-6.

5. Mr. Ellis Informed Mechanical Contractor And The Government That VFDs Were Required

Chrome Electric's president, Mr. Butcher, clearly articulated to Mr. Ellis that VFDs were contractually required. In addition, Mr. Butcher argued that the VFD requirement was covered by the mechanical engineer's subcontract, not Chrome Electric's subcontract. DX 16. By letter dated July 20, 1998, after Mr. Ellis apparently realized that he could not convince Chrome Electric to provide the VFDs, he informed Dofus Scott of One Contractor, his mechanical subcontractor, that VFDs were a contractual requirement. DX 19-001; Tr. 127:14128:3 (Mr. Scott's testimony). The subject of Mr. Ellis' letter is "FAILURE TO COMPLETE CONTRACT":

> Please be advised that your Company has failed to complete your Contract pertaining to the VFD's and Final Test and Balance at the XY Facility at Cape Canaveral Air Force Station.
>
> Southern Comfort Builders, Inc. is looking to One Contractor, Inc. to furnish and install the VFD's and Test and Balance as per Plans and Specifications.

DX 19-001. Tr. 128:9-130:6 (Mr. Scott's testimony).

By letter dated August 28, 1998, with a subject line titled "VFD'S", Mr. Ellis informed the Government that in July 1998, it requested One Contractor to "complete their contract . . . and [that Southern Comfort would] use legal avenue against One Contract Inc. to recuperate [Southern Comfort's] losses." DX 25-001. The subcontract to which Mr. Ellis referred was attached to his letter. DX 25-002. Pursuant to the subcontract, One Contractor was required to, among other things, "install complete HVAC systems including units, piping, controls, & Test and Balance." Id. (Emphasis added.) Mr. Ellis' letter to the Government was a clear

manifestation that Southern Comfort would use "legal avenue" against One Contractor for failing to provide VFDs in contravention of its subcontract requirements. Accordingly, these communications by Mr. Ellis to both Mr. Scott and to the Government further evidence Mr. Ellis' state of mind – that he knew VFDs were contractually required.

6. Mr. Ellis Acknowledged, In At Least Two Separate Meetings, That He Knew VFDs Were Contractually Required

a. Meeting Of May 8, 1996

Douglas Fowler, an employee of AJT Associates ("AJT"), worked as the Air Force inspector project manager on the XY Project. Tr. 602:14-20 (Mr. Fowler's testimony). As the inspector, he was responsible for maintaining all logs, reviewing requests for information, and communicating with the contractors on the project. Tr. 603:8-16. Mr. Fowler testified that he was present at a May 8, 1996 meeting between the Government and Southern Comfort. Tr. 606:4-24. Mr. Fowler testified that Mr. Ellis attended that meeting, in which "[t]here was some conversation around the requirements of having VFDs control the air handlers . . ." Tr. 606:26-607:14. More important, Mr. Fowler testified that Mr. Ellis acknowledged that VFDs were contractually required.

> Q Do you know whether or not [Mr. Ellis] acknowledged that the VFDs were a requirement of the contract?
>
> A He acknowledged that on the mechanical page of the schedule that they call for four VFDs for four air handlers.

Tr. 608:4-8 (emphasis added).

b. Meeting of July 3, 1996

Paul Antonevich was the contract administrator for the XY Project for a period of time in 1996. Tr. 820:12-821:2. As the contract administrator, Mr. Antonevich was responsible for resolving issues that arose between the civil engineering department of the Air Force and the contractor. Tr. 819:5-8. In his capacity as the contract administrator, Mr. Antonevich attended a meeting on July 3, 1996. Tr. 821:11-14. Following the meeting, Mr. Antonevich drafted a letter to Southern Comfort that included the following language: "[d]uring the meeting it was acknowledged that the contract does in fact, require the VFD's, and the actual problem you wished to have resolved was the question of which trade was required to provide them." DX 15-001; Tr. 821:19-822:8. Mr. Antonevich testified that Mr. Ellis acknowledged the VFD requirement: "[a]nd at the meeting, Mr. Ellis made it clear that he acknowledged that the VFD's were in the contract, but the real issue here was who was to do the installation." Tr. 823:12-14.

C. Because Mr. Ellis Knew That VFDs Were Required, And Nevertheless Filed A Certified Claim Stating That VFDs Were Not Required, Southern Comfort Violated Fraud Statutes

The Government filed counterclaims asserting fraud pursuant to three separate statutes: (1) the Forfeiture of Fraudulent Claims Act ("FFCA"), 28, U.S.C. § 2514; (2) the antifraud provision of the Contract Disputes Act ("CDA"), 41 U.S.C. § 604; and (3) the False Claims Act ("FCA"), 31 U.S.C. § 3729(a) (collectively referred to as the "fraud statutes"). In order to prevail pursuant to each statute, the Government need only demonstrate that Southern Comfort presented a claim to the Government for payment, knowing that it was not entitled to payment.[2]

[2] The antifraud provision of the CDA is triggered when a contractor is unable to meet his claim based upon a misrepresentation of fact or fraud on the part of the contractor. The FFCA requires forfeiture of any claim where the claimant knew a claim was false and intended to

This case involves whether Southern Comfort knowingly submitted a claim to the Government – alleging that it was not required to provide VFDs – when it knew VFDs were contractually required. The Court requested briefing upon whether the Government could invoke the fraud statutes in this context – where the underlying knowledge associated with the fraud relates to contract interpretation. The Government is unaware of any statutory provision or legal precedent that would exempt or nullify the fraud statutes in this type of situation. In fact, to allow plaintiff to escape the ramifications of its actions, based upon a contract interpretation defense to the fraud statutes, would undermine the obvious goal of the statutes – to discourage contractors from submitting claims to the Government for payment when they know that they are not entitled to compensation. Furthermore, as we set forth in the following section, the Federal Circuit has applied fraud statutes to the contract interpretation context.

By violating the FCA, the United States is entitled to $103,353, which comprises the entirety of the claim for VFDs – $34,451 – and accompanying treble damages, pursuant to the statute. The Government is also entitled to attorney fees and expert fees associated with the Government's response to the claim. In addition, pursuant to the CDA fraud claim, the Government is entitled to $34,451, in addition to the costs discussed above. The legislative history of the CDA makes clear that the Government's remedies pursuant to the FFCA, the FCA,

---

deceive the Government by submitting it. Young- Montenay, Inc. v. United States, 15 F.3d 1040, 1042 (Fed. Cir. 1994). The False Claims Act entitles the Government to relief whenever a contractor knowingly or recklessly makes a false record or statement to get a false or fraudulent claim paid. 31 U.S.C. § 3729 et seq., as amended by Debt Collection and Improvement Act of 1996, Pub. L. 104-134, Title 3, Ch. 10, Section 31001(s), April 26, 1996, 110 Stat. 1321-358, (effective September 29, 1999 for violations occurring after that date).

and the antifraud provision of the CDA are cumulative and not in the alternative. Specifically, the Senate report explaining the antifraud provision states:

> This provision is intended to be separate and distinct from the rights now possessed by the Government in legislation such as the False Claims Act . . . or the Forfeiture Statute . . . . That is, section 4(b) [the antifraud provision, codified at 41 U.S.C. § 604] is not intended in any way to diminish the rights now afforded to the Government under current legislation. . . . Section 4(b) will afford the Government a separate *and* additional remedy of recovering an amount equal to the fraudulent or misrepresented amount.

S. Rep. No. 95-1118, 95th Cong., 2d Sess. 20 (1978), reprinted in 1978 U.S.C.C.A.N. 5235 (emphasis added). Accordingly, the Government requests judgment in the amount of $137,804 plus costs.

D. Even If The Court Were To Find That Mr. Ellis Believed VFDs Were Not Contractually Required, The Government Still Prevails Upon The Fraud Statutes Because Southern Comfort's Belief Was Unreasonable

We have submitted extensive evidence demonstrating that Mr. Ellis knew that Southern Comfort was contractually required to provide VFDs. However, for purposes of argument, even if the Court were to conclude that Mr. Ellis did not believe that VFDs were contractually required, the Government still prevails upon the fraud statutes because Mr. Ellis' belief was unreasonable.

In Commercial Contractors, Inc. v. United States, 154 F.3d 1357 (Fed. Cir. 1998), an Army Corps of Engineers ("Corps") contract required Commercial Contractors, Inc. ("CCI") to excavate certain land in advance of building a flood control project. Id. at 1361. The contract drawings indicated the lines to which CCI was required to excavate. Id. CCI was compensated based upon the volume of earth excavated. Id. at 1362-1363. CCI excavated less than the

contract drawings required, but submitted cross-sections and quantity surveys indicating that it had excavated up to the contract lines. Id. at 1363. The Government filed fraud counterclaims. At trial, CCI argued that its excavation claims were not false because it interpreted the contract as providing for payment based upon the volume of earth computed from the contract drawings, regardless of whether CCI actually excavated up to the lines specified in those drawings. Id.

During performance of the contract, CCI's own subcontractor repeatedly warned CCI's president that he did not believe that the contract permitted CCI to excavate less than specified in the contract drawings. Id. The Court of Federal Claims found that CCI's contract interpretation was "untenable in light of the unambiguous provisions of the contract." Id. Although the Government presented no evidence that CCI's president knew that CCI could not excavate less than specified in the contract drawings, this Court found that CCI committed fraud – holding that CCI either "knew or acted in reckless disregard of whether its claims were false." Id. The Court entered judgment against CCI, pursuant to the FCA and the CDA, and it ordered CCI's affirmative claims to be forfeited pursuant to the FFCA. Id. at 1362.

The United States Court of Appeals for the Federal Circuit affirmed the Court's decision, with respect to the fraud statutes discussed above. Id. at 1374. The Federal Circuit held that, in order to prevail pursuant to the FFCA, the Government must establish that the contractor knew its submitted claims were false and that it intended to defraud the Government by submitting those claims. Id. at 1362. The Federal Circuit further held, based in large part upon CCI's own subcontractor informing CCI's president that he disagreed with the president's interpretation of the contract, that CCI's interpretation of the excavation contract was so unreasonable that it defeated CCI's actions pursuant to the FCA, CDA, and FFCA. Id. at 1364.

The factual composition of the Southern Comfort case is even more compelling from the Government's perspective. Unlike CCI, where there was no direct evidence to suggest that CCI's president knew that his contract interpretation was incorrect, here the Government presented extensive evidence that Mr. Ellis, over a span of years, knew that VFDs were a contractual requirement. Mr. Ellis acknowledged the VFD requirement in at least two meetings, in various correspondence to his subcontractors, and to his own "neutral third party." Additionally, just as in CCI, Mr. Ellis was told by both his electrical and mechanical subcontractors, as well as by the Government, that VFDs were a contractual requirement. Accordingly, even if this Court were to conclude that Mr. Ellis did not believe VFDs were contractually required, such a belief would be unreasonable, given the volume of evidence, mostly uncontradicted, to the contrary. Accordingly, the United States should prevail upon its claims pursuant to the FCA, CDA, and FFCA.

E. Even If The Court Were To Find That The VFD Requirement Was Ambiguous, The Ambiguity Was Patent And Southern Comfort Waived Its Right To Challenge The Alleged Ambiguities By Failing To Inquire Prior To Submitting Its Bid

It is well settled that "an ambiguity is patent whether there is 'an obvious error in drafting, a gross discrepancy, or an inadvertent but glaring gap.'" H.B. Zachry Co. v. United States, 28 Fed. Cl. 77, 81 (1993), aff'd 17 F.3d 1443 (Fed. Cir. 1994), citing Interstate General Government Contractors v. Stone, 980 F.2d 1433, 1435 (Fed. Cir. 1992), and quoting, among others, Fry Communications, Inc. v. United States, 22 Cl. Ct. 497, 504 (1991). Where a patent ambiguity exists in the contract, a contractor is under a duty to attempt to resolve the ambiguity prior to bidding if the contractor subsequently wishes to rely upon the provision. See Interwest Constr.

Co. v. Brown, 29 F.3d 611, 617 (Fed. Cir. 1994); Johnson Controls, Inc. v. United States, 229 Ct. Cl. 445, 671 F.2d 1312, 1319 (1982); Wickham Contracting Co. v. United States, 212 Ct. Cl. 318, 328, 546 F. 2d 395, 397-400 (1976); see also S.O.G. of Arkansas v. United States, 212 Ct. Cl. 125, 128, 546 F.2d 367, 369-71 (1976) (rule requiring contractor to attempt to resolve patent ambiguity was designed to prevent post-award disputes by encouraging contractor to seek clarification before anyone is legally bound); Chris Berg, Inc. v. United States, 197 Ct. Cl. 503, 515, 455 F.2d 1037, 1045 (1972) ("It is not the actual knowledge of the contractor, but the obviousness of the discrepancy which imposes the duty of inquiry."). Moreover, where a contractor has specifically verified its bid, despite a patent ambiguity, the contractor clearly has assumed the risk associated with the ambiguity. Wickham Contracting Co. v. United States, 212 Ct. Cl. at 328, 546 F.2d at 400. Further, the contractor must prove that he relied upon the error in submitting his bid. Edward R. Marden Corp. v. United States, 803 F.2d 701, 705 (Fed. Cir. 1986).

Here, even if an ambiguity exists, the ambiguity was clearly patent. The ambiguity, as now asserted by Southern Comfort, was whether VFDs were required by the contract. As set forth above, the uncontradicted testimony at trial revealed that only two types of methods for distributing air are compatible with VAV air systems: VFDs or inlet guide veins. Here, the contract makes numerous references to VFDs in both the drawings and specifications. No reference is made to inlet guide veins. Accordingly, given the frequent mention of VFDs in the contract, to the extent an ambiguity exists as to whether VFDs are required, such a glaring ambiguity is evident upon the face of the contract – thereby deeming the ambiguity patent.

It should be noted that mechanical section 15855, ¶ 1.4(C.) cross-references an electrical section that apparently does not exist: "Variable Air Volume Air Handling Units with Variable Frequency Drive – see specification section 16480." Nevertheless, the testimony unanimously revealed that if one looks for section 16480, one finds section 16481. As we have set forth in previous sections, section 16481 requires VFDs. As articulated above, the contractor bears the burden of coordinating the entire project and ensuring that the mechanical and electrical requirements are followed. The VFD cross-reference that is off by one number does not create a latent ambiguity because of the frequent contractual references to the VFD requirement throughout the drawings and specifications. As the general contractor, Southern Comfort was responsible for complying with all of the drawings and specifications.

Finally, the unrefuted evidence demonstrates that the Government requested and received bid verification from Southern Comfort prior to contract award. JX 1 ¶ 1. Therefore, by failing to seek clarification of this alleged ambiguity prior to submitting its bid, Southern Comfort is now precluded from recovering from work that it reasonably, but wrongly, believed was not required by the contract. Tilley Constructors & Engineers, Inc. v. United States, 15 Cl. Ct. 559 (1988).

II. The Contract Clearly Required Southern Comfort To Install Electrical Grounding

In its complaint and during trial, Southern Comfort argued that it was required to install grounding that was beyond the scope of the contract. The contract drawings speak for themselves. Drawing E-34 required Southern Comfort to "INSTALL 2-500 MCM THHN GROUND CONDUCTORS IN 3"EMT(TYP) BUSH CONDUIT ENDS AT EACH PLATE." DX 028-067 (emphasis in original).

Mr. Butcher, the owner and president of Chrome Electric, the electrical subcontractor on the project, described in detail the E-34 ground conductor requirements. According to Mr. Butcher, "2-500 MCM THHN" means that the contract requires a big, insulated cable. Tr. 390: 18-391:3. Mr. Butcher further explained the directives of E-34:

> And then the ground conductor is in a three inch conduit, three inch EMT. It's a round lightweight raceway, not like rigid or PVC, and push conduit ends at each plate. I'm assuming a connector and a bushing on the end of it.

Tr. 391:5-9. Mr. Butcher explained that the "(TYP)" refers to "typical three inch." Finally, he testified that the instructions "INSTALL", mean to place [the grounding conductors] in some place." Tr. 391:15-24.

Mr. Butcher further testified that the term "existing" is on the other side of the wall from the grounding conductor installation instructions and that the arrow leading from the term "existing" points to a dashed line and to the ground plate symbol. Tr. 373:2-15. Mr. Butcher testified that he recognized that the line just below the grounding installation language is a continuous line that appears to be hand-drawn. Tr. 366:9-368:9. Mr. Butcher explained that the continuous hand-drawn lines went through several rooms. Id. Mr. Butcher acknowledged that the general legend defines a solid, continuous line, as new construction. DX 28-002; Tr. 369:18-370:17. According to Mr. Butcher, the legend applies to all electrical and mechanical drawings. Tr. 370:17.

When the Court asked Mr. Butcher whether, assuming the solid line represents grounding, he possessed sufficient information in the specifications and drawings to "be able to

accomplish the task [of installing grounding conductors]", he responded as follows: "I could accomplish the task. Yes, sir." Tr. 398:7-16

Leonard Rice, the Johnson Controls lead electrical engineer on the XY Project, explained the grounding conductor installation directions. He testified that MCM stands for "thousand circular mills", a wire measurement using American wire gauge, and that THHN is an insulated conductor. Tr. 756:9-22. Mr. Rice testified that the grounding conductor is to be installed in "EMT", or electrical metallic tubing and the type of conduit is "(TYP)", meaning typical – "that we want it run throughout wherever it is shown to take that grounding." Tr. 757:14-18. Mr. Rice explained that the installation instructions pointed to a solid, hand-drawn line that "begins in Room 117, continues into Room 116, into Room 115, into Room 110G, into Room 110C, into Room 109, into Room 105, into Room 101A, into Room 110G, back into Room 101A, into Room 110GB, into Room 101C, and finally terminates in Room 110A." Tr. 758:11-759:13. Based upon the location map and general index, DX 28-002, Mr. Rice testified that the solid line symbolizes "new work" – meaning work to be installed pursuant to the contract. Tr. 759:18-760:2.

Mr. Doran, the Government's expert in scheduling analysis and construction management, who spent almost eight years reviewing specifications and drawings for Turner Construction Company, Tr. 928:2-931:16, confirmed Mr. Rice's testimony – that drawing E 34 unambiguously directed Southern Comfort to provide electrical grounding as described by the hand-drawn solid line. First, Mr. Doran underscored that the installation instructions required two 500,000 circular mills of conductors, surrounded by THHN, or plastic coating. Tr. 942:21-943:2. Mr. Doran also explained that the ground conductors would be encased in a three-inch EMT, or electrical

magnetic tubing. Tr. 943:3-9. Just like Mr. Rice, Mr. Doran testified that the solid-hand drawn line identified new construction, pursuant to symbology set forth in the general index. Tr. 943:10-946:25. Given this evidence, the requirement "INSTALL 2-500 MCM THHN GROUND CONDUCTORS IN 3"EMT(TYP) BUSH CONDUIT ENDS AT EACH PLATE" – and the associated arrow to a solid hand-drawn line – required Southern Comfort to provide ground conductors throughout the rooms specified on E 34.

## III. Because Southern Comfort's Delay In Providing The VFDs Was Concurrent With The Government's Delay In Providing The UPS, Southern Comfort Is Not Entitled to Any Compensation

In order to recover for an alleged compensable delay, a contractor must demonstrate: (1) the extent of the delay with a reasonable degree of accuracy; (2) that the delay proximately was caused solely by the Government's actions; and (3) that the delay caused specific, quantifiable injury to the contractor. See Servidone Constr. Corp. v. United States, 931 F.2d 860, 861 (1991); see also William F. Klingensmith, Inc. v. United States, 731 F.2d 805, 809 (Fed. Cir. 1984); Blinderman Constr. Co. v. United States, 695 F.2d 552, 559 (Fed. Cir. 1982). The burden of establishing these factors falls squarely upon the contractor. William F. Klingensmith, Inc. v. United States, 731 F.2d at 809; Avedon Corp. v. United States, 15 Cl. Ct. 648, 653 (1988).

The United States Court of Appeals for the Federal Circuit recently set forth specific factors that a trial court must address in weighing a contractors claim for Eichley damages:

> (1) was there a government-caused delay that was not concurrent with another delay caused by some other source; (2) did the contractor demonstrate that it incurred additional overhead (i.e., was the orginal time frame for completion extended or did the contractor satisfy the Interstate three-part test); (3) did the government CO issue a suspension or other order expressly putting the contractor on standby; (4) if not, can the contractor prove there

> was a delay of indefinite duration during which it could not bill substantial amounts of work on the contract and at the end of which it was required to be able to return to work on the contract at full speed and immediately; (5) can the government satisfy its burden of production showing that it was not impractical for the contractor to take on replacement work (i.e., a new contract) and thereby mitigate its damages; and (6) if the government meets it burden of production, can the contractor satisfy its burden of persuasion that it was impractical for it to obtain sufficient replacement work. Only where the above exacting requirements can be satisfied will a contractor be entitled to Eichleay damages.

P.J. Dick v. Secretary of Veterans Affairs, 324 F.3d 1364, 1373 (2003)

"In establishing the causal link, the contractor must show that the government's actions affected activities on the critical path of the contractor's performance of the contract." Kinetic Builder's Inc. v. Peters, 226 F.3d 1307, 1317 (Fed. Cir. 2000). Moreover, "only if the delay was caused solely by the government will the contractor be entitled to both an extension of time within which to perform, and recovery of excess costs associated with the delay." Weaver-Bailey Contractors, Inc. v. United States, 19 Cl. Ct. 474, 476 (1990) (citing William F. Klingensmith, Inc. v. United States, 731 F.2d at 809). The contractor must demonstrate that the Government was the "sole proximate cause" of the delay and that no concurrent cause would have equally delayed the contract, regardless of the Government's action or inaction. Merritt-Chapman & Scott Corp. v. United States, 208 Ct. Cl. 639, 650, 528 F.2d 1392, 1397-98 (1976); Avedon Corp. v. United States, 15 Cl. Ct. at 653, 659 (recovery denied "because concurrent delays rendered the [Government-caused] delay . . . irrelevant").

A. Although The UPS And The VFDs Both Became Critical Path Items On May 9, 1996, The UPS Issue Was Resolved On October 23, 1998 And The VFDs Remained On The Critical Path Until February 12, 1999

The Government acknowledges that it was late in furnishing the UPS, which was required to be in place at the start of the project. Nevertheless, the lack of the UPS did not become a delay on the critical path until May 9, 1996, when continuous work stopped on the project. Tr. 986:18-24 (Mr. Doran's testimony); DX 103-020. Project records demonstrate that the UPS was provided to the contractor on July 1, 1998, when the contracting officer, Linda Brantley informed Southern Comfort that the UPS was installed.[3] Although Southern Comfort completed the power transfer work on November 25, 1998, Tr. 1147:14-16, the UPS had ceased being a critical path item as of October 23, 1998. "So, standing on October 23, 1998, I know that there is more work remaining on the VFD than there is on the UPS. Therefore, from an as-built critical path standpoint, in the final completion period the VFDs were critical simply because they had more work remaining." Tr. 1174:18-24. (Mr. Paullin's testimony). This fixes the UPS as being on the critical path from May 9, 1996 to October 23, 1998.

On May 9, 1996, both the UPS and the VFDs became critical path items. Because one delay was caused by the Government (UPS) and one delay was caused by the contractor (VFDs), Southern Comfort's failure to procure and install VFDs became a concurrent critical path delay. Tr. 986:18-24 (testimony of Mr. Doran); Tr. 1094:18-1095:2 (Mr. Paullin's testimony). As stated above, on October 23, 1998, the UPS issue was resolved and was no longer on the critical path. Mr. Paullin testified that Southern Comfort did not complete the work dependent upon the VFDs

[3] Linda Brantley's letter of July 7, 1998, confirmed a conversation in which she informed Mr. Allison of Southern Comfort on July 1, 1998, that the UPS was installed and available for final power hookup. Tr. 974: 20-948:12; DX 27-001.

until February 12, 1999, over three months later, when testing and balancing of the air conditioning system was complete. Tr. 1096:23-25. The delay caused by the failure of Southern Comfort to furnish and install the VFDs exceeds the delay caused by the failure of the Air Force to install the UPS. Accordingly, given the definition of concurrent delay as set forth above, Southern Comfort's delay was fully concurrent with the Air Force's delay and is therefore is not entitled to any compensation.

B. Southern Comfort, By Failing To Perform A Critical Path Method Analysis, Is Unable To Prove Its Damages Case

Here, the delays of the UPS and the VFDs were both concurrent. DX 103:012-013; Tr. 1108:4-9. However, for purposes of argument, even if the delays were not concurrent, Southern Comfort still has failed to prove its case because it failed to conduct a critical path analysis. It is well-established that a contractor seeking to prove the Government's liability for delay possesses the burden of proving, among other things, the causal link between the Government's wrongful acts and the delay in the contractor's performance. Essex Electro Eng'rs, Inc. v.Danzig, 224 F.3d 1283, 1295 (Fed. Cir. 2000). The Federal Circuit now requires the contractor to perform a critical path analysis in order to prove the causal link:

> In establishing the causal link, the contractor must show that the government's actions affected activities on the critical path of the contractor's performance of the contract.

Kinetic Builder's Inc. v. Peters, 226 F.3d 1307, 1317 (Fed. Cir. 2000). Mr. Midgette acknowledged that he never performed the requisite critical path analysis:". . . I never did a critical path method analysis." Tr. 406:15-16.

> Q Mr. Midgette, are you aware of the Connecticut [sic] Builders v. Peters case, which is 226 F.3d 1307?

> A No.
>
> Q Okay. If I were to tell you that that case provides, and I'll quote here from headnote 15, "In establishing a causal link between wrongful acts of government and delay in government contractor's performance, as required to prove government's liability for delay, the contractor must show that the government's actions affected activities on a critical path of the contractor's performance of the contract." You didn't do that, did you?
>
> A No, sir.

Tr. 407:22-408:10. Accordingly, by failing to conduct a critical path analysis, Southern Comfort has failed to prove delay damages.

C. Even If Southern Comfort Were Permitted To Neglect Conducting A Critical Path Analysis, It Still Failed To Demonstrate Entitlement To Damages Based Upon Delay

1. VFD Installation Was Not Dependent Upon UPS

Mr Midgette committed other errors which seriously undermined his credibility and the strength of his opinions. Mr. Midgette is not an electrical engineer and has no experience as an electrical engineer. Tr. 441:12-14. In his expert report, Mr. Midgette stated that the Government's late provision of the UPS prevented Southern Comfort from energizing the new lighting, given that 480/277 volt power was required. DX 32-020. However, the daily inspection reports demonstrate that 277 volt power was available before the UPS was installed. For example, on March 1, 1996, the"electricians work[ed] on an alternate supply to get 277v power lights working." DX 110-014. The logs also record that on March 11, 1996, the "electricians remov[ed] old lighting circuits and put[] in new lighting circuits in Room 110C." DX 110-026. On the following day, "[e]lectricians [ran] lighting circuits in Room 110." DX 110-029. On

March 13, 1996, additional 277 volt work was performed: "[t]he electricians were still wiring lighting and running circuits to the final panels." DX 110-030. Thus, the inspection logs flatly contradict Mr. Midgette's assertion that the new 277 volt lights could not be powered prior to the installation of the UPS.

Mr. Midgette also asserted that 480 volt power was not available to power the AHUs and that they were running on 277 volt power prior to the installation of the UPS. Tr. 1160:13-25. Again, the evidence contradicts Mr. Midgette's opinion. Nevertheless, Mr. Midgette acknowledged that 480 volt power was existing in the facility to run the AHUs. Tr. 1168:16-1169:13; DX 28-034. Furthermore, Mr. Scott of One Contractor, Inc., Southern Comfort's mechanical subcontractor, testified that the AHUs were installed and in running order prior to the Government's provision of the UPS on July 1, 1998. Tr. 106:5-14. Because the UPS and the VFDs run on the same power, the VFDs could also have been installed and operating without the installation of the UPS. Tr. 988:9-16 (testimony of Mr. Doran). The VFDs used two power sources to operate: they regulated the frequency of the 480 volt power to drive the fan motors and they used 110 volt power to operate. Tr. 1141:12-16 (testimony of Mr. Paullin). Both 480 volt and 110 volt power were available in the building prior to the UPS installation. The testing and balancing of the air conditioning system could have been completed prior to the UPS installation. Tr. 1009:25- 1010:3 (testimony of Mr. Doran). Accordingly, the lack of a UPS could not be a cause of delay in completion of any part of the AHU system or any aspects of the project other than the final power transfer.

2. Southern Comfort Failed To Demonstrate A Distinct Period Of Suspended Operations

Mr. Midgette acknowledged that pursuant to the Eichleay formula, a contractor must establish two elements: (1) distinct period of suspended operations or pure delay caused by the owner, and (2) actual economic impact on the absorption of contractor's home office overhead. DX 101-024; Tr. 455:24-456:6. In fact, Mr. Midgette testified that he "wholeheartedly" agreed with those requirements. Tr. 456:8. Nevertheless, Mr. Midgette conceded that there was not a distinct period of suspended operations. Accordingly, Southern Comfort has failed to demonstrate entitlement to delay damages.

In his expert report, Mr. Midgette asserted 913 days of suspended operations from April 1996 to July 7, 1998. Tr. 456:9-23; DX 101-020. Nevertheless, when Mr. Midgette was directed to the Government's expert report, he admitted that he had no reason to dispute the Government's expert analysis indicating that 127 days of actual work occurred during the period that Mr. Midgette referred to as "suspended operations". Tr. 457:22-458:9. In fact, Mr. Midgette testified that he had no reason to dispute that Southern Comfort worked at a continuous pace between March 31, 1996, and May 9, 1996 – also during the period of alleged "suspended operations". Tr. 459:3-7. Accordingly, because Southern Comfort failed to prove a distinct period of suspended operations – indeed the Government affirmatively established that 127 days of actual work occurred during the period of alleged suspended operations – it has not met its burden, as set forth in Eichleay, and has failed to prove entitlement to delay damages.

D. The Air Force Is Not Responsible For Any Delay In Approving Submittals

Southern Comfort alleges that the Government's delay in approving submittal 19A should factor into a delay analysis. We will demonstrate that the Air Force did not delay in approving submittals.

According to Southern Comfort's schedule, submittals should have been presented to the Government for approval prior to the end of April 1995. DX 45-001. As we set forth in the first section, Southern Comfort repeatedly instructed its subcontractor, Chrome Electric, to install the VFDs. In his first correspondence relating to VFDs, Mr. Ellis directed Chrome Electric as follows:: "VFDs to be supplied by the Electrical Contractor." This direction directly responded to RFI no. 1, submitted on November 7, 1995. DX 2-001. In February 1996, Southern Comfort again reminded Chrome Electric to provide VFDs: "[t]o date we have not received a submittal for the motor controls. Please comply with your Contract and submit the required data ASAP." DX 128-001. In September 1997, Southern Comfort yet again directed Chrome Electric to provide VFDs: "[a]s per our many conversations and on our telephone conversation on September 18, 1997 and September 29, 1997, this letter shall be your written direction to install the Variable Frequency Drives as outlined on the blue prints and referenced in Division 16 of the specifications." DX 130-001.

Despite a manifested understanding that VFDs were required, Southern Comfort failed to present the first submittal for the VFDs (Submittal 19) until October 27, 1997, two-and-one-half years late. DX 70-001; Tr. 875:6-18. In Submittal 19, Southern Comfort included a proposed General Electric manufactured VFD with the following disclaimer language: "CHROME ELECTRIC WILL NOT BE RESPONSIBLE FOR EXCHANGING AND/OR PROVIDING

ADDITIONAL EQUIPMENT TO CORRECT ANY PROBLEMS THAT MAY ARISE DUE TO EQUIPMENT INCOMPATIBILITY." DX 70-005 (emphasis in original). By including this phrase, Southern Comfort asserted that it would not take any responsibility for compatibility issues. Tr. 877:3-6 (Ms. Brantley's testimony). Ms. Brantley, the contracting administrator on the XY Project, was very concerned by Southern Comfort's disclaimer because it was contractually required to provide a workable system in which the AHU was compatible with the VFD. Tr. 878:4-7. Accordingly, the Air Force approved Submittal 19 on November 19, 1997, with the exception that "[t]he variable frequency drive and the motor shall be 100 percent compatible." Tr. 879:4-8. DX 70-002; DX 59-002. In a November 1997 letter written by Ms. Brantley and signed by the contracting officer, John Stringer, the Government reiterated that the AHUs and the VFDs must be 100 percent compatible:

> [N]ormally . . . if a submittal is approved, you can just check it off, send it back to [the contractor] without a cover. But in this case, we felt we needed to involve our contracting officer to let him know what was going on as well and just to make sure it was compatible. That we were not going to make a determination of compatibility.

DX 059-002; Tr. 879:14-880:11.

Notwithstanding the clarity of the Government's directive – that Southern Comfort was contractually required to ensure compatibility, Southern Comfort resubmitted the same submittal – this time numbered 19A – on January 22, 1998. Tr. 881:11- 882:20; DX 71:001-024. Submittal 19A contained the same general information as Submittal 19. DX 71; Tr. 5-8 (Ms. Brantley's testimony). Because Submittal 19 had already been approved, Submittal 19A caused some confusion on the part of the Government. Tr. 884:5-13. After receiving Submittal 19A,

Ms. Brantley requested the Air Force technical personnel to determine compatibility, even though it is not customary practice, because she wanted Southern Comfort to complete the project. Tr. 885:12-886:2. The Air Force civil engineering representative to the project, Jack Olski, identified a compatible VFD and sent a memo to Ms. Brantley identifying the equipment. Tr. 886:17-887:9; DX 8-003. Because Mr. Olski determined that the General Electric VFD that was proposed in Submittals 19 and 19A was not compatible with the AHUs, Submittal 19A was disapproved on July 2, 1998. Tr. 887:50-22.

Mr. Doran testified that 30 calendar days would be the standard time for the Government to respond to submittals. Tr. 1014:3-5. However, Submittal 19A was not a standard submittal. In responding to Submittal 19A, the Air Force not only conducted a review of the equipment proposed by the contractor for compatibility, but performed work that was contractually required of the contractor – to determine which VFDs were compatible with the existing AHUs, and provided that information to Southern Comfort as part of the Air Force's response to Submittal 19A. Tr. 885:12-886:7; 887:23-888:12; 889:8-12; DX 8-003. Ms. Brantley testified that in conducting this work that was the responsibility of the contractor, the Government had to perform a "lot of research" and hold numerous meetings." Tr. 888:18-25. In addition, during the process to review Submittal 19A, the Air Force was corresponding and communicating with Southern Comfort in order to clarify the nature of Submittal 19A. DX 23-001; DX 24-001. Given these circumstances, it would not be reasonable to allow the Air Force more than 30 days to respond to Submittal 19A.

Even, for purposes of argument, if some period of the time it took the Air Force to respond to Submittal 19A is deemed to be unreasonable, the delay may not have had any effect

on the critical path of this project as built. The Air Force responded to Submittal 19A on July 2, 1998. DX 8-001-023. However, correspondence from Southern Comfort indicates that even after this date, it still did not have a subcontractor ready to perform the VFD work. On July 3, 1998 and again on July 20, 1998, Southern Comfort wrote to Mr. Scott, its mechanical subcontractor, in an effort to obtain the VFDs. DX 18-001; DX 19-001. This evidence demonstrates that during the time Submittal 19A was pending before the Air Force, Southern Comfort still did not have a subcontractor ready to perform the work and therefore, even if a response to Submittal 19A had been provided earlier, Southern Comfort would have been unable to proceed any faster in the installation of the VFDs. Eventually, according to Russ Allison, Southern Comfort hired another electrical contractor to perform the VFD installation, after Submittal 19A had been returned disapproved. Tr. 171:19-24. There exists no evidence to suggest that the VFDs would have been installed earlier, if Submittal 19A was responded to sooner.

## IV. Even If Southern Comfort Could Prove Entitlement To Delay Damages, The Government Would Be Responsible For 19 Days Of Delay, At Most

As we have demonstrated, Southern Comfort failed to prove entitlement to delay for several reasons. First, the entirety of the delay was concurrent. Second, Southern Comfort never conducted a critical path analysis – a necessary predicate for obtaining delay damages. Third, Southern Comfort failed to demonstrate a distinct period of suspended operations – another requirement for delay damages. Nevertheless, for purposes of argument, this section assumes that Southern Comfort has proven entitlement to delay damages, based upon the Government's response time to Submittal 19A. As we will demonstrate, even in that circumstance, Southern Comfort would be entitled to, at most, 19 days of delay.

The evidence established that 112 days elapsed between October 23, 1998, the date that the UPS dropped off the critical path, and February 12, 1999, the date that the VFDs were completed. If, for purposes of argument, the Government's delay in responding to Submittal 19A was charged against the Government and in favor of the plaintiff, Southern Comfort could still only establish, at most, 19 days of delay, as explained by the following calculation. Between January 22, 1998, when submittal 19A was provided to the Air Force, and July 2, 1998, when the Air Force responded, 161 days elapsed. Assuming that only 30 days is deemed acceptable to respond to 19A, that leaves a delay of 131 days in responding to Submittal 19A. As set forth above, there are 112 days between the date that the UPS dropped off the critical path and the date that the VFDs were completed. Accordingly, subtracting 112 from 131 yields 19 days of delay that could be attributed to the Air Force. In other words, at most, there could have been 19 days in which the UPS was the sole cause for the delay, when only the UPS was on the critical path. Accordingly, even if the Court were to reject all of the Government's arguments demonstrating that Southern Comfort has failed to prove delay damages, the most Southern Comfort could recover would be 19 days of delay.

Given the complexities associated with Submittal 19A and the effort that the Government undertook to guarantee compatibility for the contractor – a highly unorthodox effort by the Government to conduct a study that is the responsibility of the contractor – at least 60 days would be a reasonable period in which to respond to Submittal 19A. If the Court were to determine that, given the efforts conducted by the Government to guarantee compatibility, 49 or more days was an appropriate time frame for responding to Submittal 19A, then Southern Comfort would be entitled to no delay damages.

CONCLUSION

For all of these reasons, defendant respectfully requests that the Court find in favor of the Government pursuant to the fraud statutes and that the Court deny Southern Comfort's requested relief.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ James M. Kinsella
JAMES M. KINSELLA
Deputy Director

s/ David R. Feniger
DAVID R. FENIGER
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.
Washington, D.C. 20005
Tel. (202) 307-3390
Fax (202) 305-2118
Attorneys for Defendant

OF COUNSEL:

JOHN LAURO
Trial Attorney
Contract Litigation Division
Air Force Legal Services Agency

June 4, 2004