**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SOUTHERN COMFORT BUILDERS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 00-755C** |
| **V.** | ) | **(Judge Allegra)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFF'S REPLY BRIEF**

COMES NOW the Plaintiff in the above cited action and files this Brief in Reply to Defendant's Post Trial Brief, and states:

**I. The Defendant has failed to prove that Dale Ellis ever acknowledged that the VFDs were required by the contract.**

**A. While Mr. Ellis acceded to the direction of the Defendant to install VFDs on the Air Handling Units (AHUs) he never acknowledged that they were required by the contract.**

The Defendant attempts to establish by innuendo and suppositions that Mr. Ellis acknowledged that the contract required the furnishing of VFDs and merely sought to avoid installing them. The Defendant contends that this knowledge is shown by: conversations with Mr. Thron; acknowledgments to the Plaintiff's subcontractors; receiving correspondence from Chrome Electric's attorney; and, by acknowledging this fact in two meetings with government personnel.

**1. Acknowledgment to Government Personnel in meetings:**

**a. <u>Mr. Fowler:</u>**

The Defendant first contends that Mr. Ellis acknowledged the requirement for the VFDs in a meeting with Mr. Fowler, a government inspector. As pointed out in Plaintiff's Post Trial Brief, Mr. Fowler's testimony was: "The only--I don't recall the exact words for Mr. Ellis. I just recall that when the meeting was finished that Mr. Ellis had agreed to go off and get VFDs installed in the XY, and the air handling units." (Fowler, Tr. 607-608) In fact, the minutes of the meeting state that Mr. Ellis was "directed" to provide the VFDs, not that Mr. Ellis had agreed that they were required by the contract. (PPFF No. 122;

DX 125-001) This equivocal testimony certainly does not establish that Mr. Ellis acknowledged anything.

**b. Mr. Antonevich:**

The second acknowledgment allegedly occurred at a meeting attended by Mr. Antonevich. Like Mr. Fowler, Mr. Antonevich did not remember Mr. Ellis' exact words and could not specifically testify that Mr. Ellis acknowledged that the contract required the VFDs rather than acknowledging that this was the Defendant's interpretation and that he would do as directed and provide the VFDs. There were apparently no minutes taken of this meeting, however, all of the ancillary documentation refers to the Plaintiff being "directed" to install the VFDs.

**2. <u>Statement to Mr. Thorn:</u>**

Here, again, the Defendant attempts to prove a fact by mischaracterizing equivocal testimony. Even Mr. Thorn's written reply to Mr. Ellis (DX 130-003) stated that there was enough evidence to "infer" that the VFDs should be provided. This certainly indicates that even in Mr. Thorn's opinion the plans and specifications did not clearly direct the bidders to install VFDs.

In response to a question by the Court as to his conversation with Mr. Ellis concerning the furnishing of VFDs, Mr. Thron stated that: "He (Mr. Ellis) indicated that--I believe he indicated that they were required." (Thorn, Tr., p. 840, LL 14-23) However, in response to cross examination as to whether he recalled Mr. Ellis' exact direction, the following conversation took place:

> "Q In answer to the Judge's question concerning your directions from Mr. Ellis, you said you believe. Do you recall his exact direction to you?
>
> A You know that was '97. He gave me a call. He said, could you do me a favor and look at some documents with respect to VFD's and --
>
> Q He didn't tell you whether the government had directed him to do it or whether --
>
> A No.
>
> Q -- he said it's in the contract and I've got to do it or he just

Said he wanted you to do that?

A He just wanted me to review it. I hadn't -- you know I didn't even know anything about the project before that call."

(Thorn, Tr, p. 842-843)

It should also be noted that, in spite of Mr. Thorn's unsure and qualified memo to Mr. Ellis, he also had conferred with a mechanical engineer to review the plans and specifications before he issued the memo, and he did not even directly draft the memo. (Thorn, Tr., p.832-833) He also thoroughly reviewed both the mechanical and electrical specifications before formulating his opinion. (Thorn, Tr., p. 836; LL 2-18)

There is nothing in either Mr. Thorn's memorandum or testimony that indicates that Mr. Ellis actually was of the opinion that the plans and specifications required the VFDs as opposed to having been directed by the government to provide them and was struggling as to which of his subcontractor's were supposed to provide them.

**3. Mr. Ellis did not acknowledge to Subcontractors that he was aware that the plans and specifications required the furnishing of VFDs:**

The Defendant contends that the "most poignant" manifestation of Mr. Ellis' knowledge of the requirement to furnish the VFDs was a hand written note on a Request For Information/Clarification (RFI) forwarded by Mr. Butcher, Plaintiff's electrical subcontractor. (DX 2-001) While the RFI is dated 7 November, 1995, there is no date on the handwritten note and Mr. Butcher's testimony sheds no light on when the RFI was returned with the note. This was an RFI from a subcontractor to the Plaintiff. On 4 December, 1995, the Plaintiff forwarded RFI #27 to the Defendant questioning the providing of the VFDs, which apparently also forwarded the RFI #1 from Crome Electric (DX3- 002 & 003; PX47-001) This was answered by the Defendant on 15 December, 1995, wherein the Defendant first directs that VFDs are to be included in the contract. (DX2- 001) RFI #40 was forwarded from the Plaintiff to the Defendant on 12 February, 1996, with a letter from Crome Electric disputing the determination of the Defendant as contained in its 15 December, 1995, letter. (PX43-001-003) The Defendant then forwarded a response drafted by Mr. Blauel on 21 February, 1996 (DX5-002), which was responded to by the Plaintiff, over the

signature of Mr. Ellis, on 4 April, 1996, with letters from both the electrical and the mechanical subcontractors. (PX6-001-007

It is obvious that during this time period there was no agreement between the Plaintiff and the Defendant that the VFDs were required, nor was there any "poignant" accession by Mr. Ellis that the contract did require the VFDs. In fact, it is apparent that Mr. Ellis is supporting his subcontractor's positions that the VFDs were not clearly required in either the mechanical or the electrical specifications. Only two years later when he was directed to supply the VFDs and threatened with a charge of abandonment of his contract did Mr. Ellis finally direct that the VFDs be provided.

In its Brief at page 14 the Defendant asserts that Mr. Ellis acknowledged that VFDs were required in a letter to Crome Electric in 1997. This is another in the Defendant's efforts to blatantly mischaracterize Mr. Ellis's letters. This letter was no more than an acceptance of the government's direction that the VFDs be provided and an attempt to have one of the subcontractors provide them before he was assessed with liquidated damages. He even states in his letter that he will support any claim for extra costs for the furnishing of the VFDs, which clearly indicates his position that the VFDs are not required by the contract.

The Defendant attempts to characterize Mr. Ellis's arguments with his subcontractors as an acknowledgment on his part that the contract called for the furnishing of VFDs. In reality, Mr. Ellis never changed his position that the VFDs were not clearly called for in the contract and that the contract was ambiguous as to the VFDs. He did realize, however, that the Defendant was going to insist that the VFDs be provided and that they would punish him by the assessment of liquidated damages if he did not comply with the Defendant's directions. He then complied with the direction of the contracting officer and insisted that one or the other of his subcontractors provide them.

**4. The letter from Crome Electric's attorney was neither credible nor was it admissible to establish any probative facts:**

In an attempt to avoid providing the VFDs, Crome Electric retained an attorney who wrote a letter to Mr. Ellis alleging that the VFDs should be provided by the mechanical contractor and not the electrical contractor. The Court, in a long discussion of the hearsay rule, excluded the attorney's letter for any purpose other than to establish that someone wrote a letter to Mr. Ellis expressing the opinion that the

VFDs were required by the contract. As the Court excluded the letter for any other purpose, there is no probative value to this letter to establish Mr. Ellis' opinion at the time. Nor is there any evidence to establish that the opinion of the attorney was based on anything other than his support of his client.

**5. Summary:**

The Defendant has not provided any facts that would establish that Mr. Ellis at any time acceded to the Defendant's position that the VFDs were required by the contract. All of the evidence establishes that Dale Ellis was always of the opinion that neither the mechanical or electrical sections of the plans and specifications clearly placed prospective bidders on notice that they were to provide and install the VFDs. At all times he supported the positions of his subcontractors that they were not required to furnish the VFDs and assured them that he would sponsor any claim they had for costs incurred in being required to install the VFDs. He did, however, finally realize that it would be futile to continue to try to convince the Defendant of his position and then set about directing one or the other of his subcontractors to furnish the VFDs so that the Defendant would accept the project.

**B. The case cited by the Defendant did not comply with the Court's request and there is no evidence that the Plaintiff violated the False Claims Act:**

The Court requested Defendant's counsel to prove it with any cases where the fraud standard had been applied in this set of facts. This is whether or not any cases had found fraud present when the factual situation indicated merely a difference in interpretation of the plans and specifications. While the Plaintiff provided the Court with cases that specifically eliminated the situation of differences in contractual interpretation from the False Claims Act application, the Defendant could only supply one case, and it was not on point.

In *Commercial Contractors, Inc. V. United States*, 154 F.3d 1357 (Fed. Cir., 1998) an excavation contractor filed a claim for excess excavation quantities, among other claims. The contract drawings contained clear and specific lines to which the contractor was to excavate and provided that any excavation past those lines would be at the sole expense of the contractor. The contract also required the contractor to retain a licensed surveyor to ensure the quantities were accurate. During the performance of the contract, the contractor was continually warned by his subcontractor that he was excavating beyond

the lines provided in the contract and that the quantities exceeded that provided in the contract. The contractor ignored his subcontractor's warnings and even prohibited the subcontractor from meeting with the government to discuss the excavation.

The lower court noted that the contractor was an engineering graduate of the Naval Academy and that he should have been able to read the drawings and realize that the lines limited his excavation. The lower court found that the contractor had excavated less than required by the contract but submitted false data indicating that he had excavated up to the contract lines. This finding was not disputed by the contractor. The court stated that the interpretation forwarded by the contract was in direct conflict with the plain meaning of the contract. The court also found that the contractor knowingly billed for backfill quantities not placed and that he backfilled with prohibited material. The court also found that the contractor improperly heated concrete test cylinders so that it would appear that the concrete met the required strength earlier that it actually did to allow the contractor to move his concrete forms quicker.

Based on all of the active and knowing fraud perpetrated by the contractor, the Federal Circuit upheld that Court of Federal Claims' determination that the contractor had violated the False Claims Act. The case at bar does not come close to the knowing and active fraud in the case cited by the Defendant. The Defendant's brief argues that the Plaintiff's subcontractors informed the Plaintiff that the plans and specifications called for VFDs when the evidence and their testimony establishes that both the mechanical and electrical subcontractors argued that the requirement for the furnishing of the VFDs was not in their portions of the contract, so it must be the other subcontractors responsibility. At no time did the subcontractors take the position that the requirement for the VFDs was clearly a part of the contract. In fact, his position was based in part on letters and memorandum from both of the subcontractors contending that the VFDs were not required by the contract.

This is clearly a case of a difference in interpretation of the provisions of the contract. Mr. Ellis took the position at the start of the performance of the contract that the plans and specifications did not clearly call for the furnishing of the VFDs, and he maintained that position through the entire contract until specifically directed to install them and threatened with termination if he refused.

As pointed out in the cases provided by the Plaintiff, an improper interpretation of the contract by

a plaintiff does not constitute a false claim. *United States v. Basin Electric Power Coop., 248 F.3d 781 (2001, CA8 ND); United States ex rel. Butler v. Hughes Helicopters, Inc., McDonnell Douglas Helicopter Company, 71 F.3d 321 (1995, CA9, CA)*. In addition, the government was always kept aware of the Plaintiff's position in the matter and all correspondence from the subcontractors to the Plaintiff concerning the dispute was forwarded to the government. Both parties were always aware of the other's positions in the matter and that there was a difference of opinion. The fact that the government was always aware of the Plaintiff's position is viewed by some courts as indicating that the contractor did not knowingly submit a false claim. *United States ex rel. Kreindler & Kreindler v. United Technologies Corp., 985 F.2d 1148 (1992, CA2 NY); United States ex rel. Stone v. Rockwell Int'l Corp., 282 F.3d 787 (2002, CA10 CO)*

Plaintiff therefore argues that it did not violate the False Claims Act by the submission of its claim concerning the furnishing of the VFDs and requests this Court to dismiss the Defendant's counterclaim.

**II. The specification and plans were defective in that they did not clearly require Variable Frequency Devices and were ambiguous:**

**A. The Defendant's "expert" testimony lacked credibility:**

**1. Richard Paullin:**

The Defendant presented Mr. Richard Paullin to the Court as its expert in schedule analysis and mechanical engineering. The Plaintiff did not object so he was so admitted. It appeared that , after some questioning as to his background on cross examination that the Plaintiff may have been hasty is allowing his admission as an expert in mechanical engineering as it appeared that he had no experience in mechanical engineering since he left college. He also testified that he had never even submitted a bid on a mechanical project. He also testified that he had never inspected or analyzed the existing system and was not aware that one of the old Air Handling Units had been left on the roof of the building and had been operating without the benefit of a VFD. (Paullin, Tr., pp 1128-1131) Therefore, while Mr. Paullin may have been admitted as an expert, the Plaintiff would assert that his lack of experience in mechanical engineering and his complete lack of experience in HVAC equipment should go to the weight of his testimony.

During cross examination Mr. Paullin admitted that the VFDs were not shown on Drawing M14 and that the only indication of a VFD is a line with nothing on the end of it and nothing to indicate it is attached to a VFD. He also admitted that there was no indication or symbol showing VFDs on any of the electrical drawings.

It is the contention of the Plaintiff that the testimony of Mr. Paullin as to mechanical engineering items should be disregarded based on his lack of experience in the field.

**2. Mr. Hartman and Mr. Edwards:**

Both of these individuals were requested by Mr. Paullin to prepare bids on the air handling units. Mr. Paullin testified that he requested the additional information to "independently provide a double check on my analysis in order to confirm my conclusions". He requested that Mr. Edwards prepare a bid on the just the air handling units without the BAVs or the terminal boxes. Mr. Paullin told Mr. Edwards that he was involved in a claim on a contract and may have told Mr. Edwards that he was retained by the government. (Paullin, Tr., p. 1136) Mr. Paullin testified that he gave Mr. Edwards all the time that he needed to prepare his bid. He also testified that he was not aware of how long it takes mechanical contractors to prepare bids in the real world. (Paullin, Tr., p. 1137)

Mr. Paullin also told Mr. Hartman that his estimate was needed because Mr. Paullin was involved in a matter in litigation and that he was retained by the government. He also gave Mr. Hartman all the time he needed to prepare his estimate and then assisted Mr. Hartman in preparing Mr. Hartman's professional opinion on the matter. (Paullin, Tr., pp. 1137-1138)

It would appear that neither of the opinions of Mr. Edwards or Mr. Hartman were independent or realistic. In the "real world" any mechanical contractor who is bidding on a government project usually has no more than fifteen (15) days to prepare a bid. As was testified to by Mr. Scott and Mr. Butcher, they usually do not do an extensive review of any portions of the plans and specifications that does not directly affect their portion of the work. Both Mr. Edwards and Mr. Hartman had the benefit of being able to take their time to prepare their estimates and to leisurely review all of the portions of the plans and specifications before coming to a conclusion as to the AHUs. In addition, their duties were restricted by

Mr. Paullin's instructions to merely the AHUs and not the entire mechanical section of the plans and specifications.

It should also be noted that both Mr. Edwards and Mr. Hartman were alerted by Mr. Paullin as to who Mr. Paullin represented so they were aware of the conclusion he was trying to reach. This prior information tainted their conclusions to the point that they are not credible. The Plaintiff contends that this was not an "apple to apple" comparison and that the conclusions reached by Mr. Edwards and Mr. Hartman are useless for this analysis.

**3. Mr. Blauel:**

Mr. Blauel testified that he was the author of the mechanical section of the plans and specifications but that he considered the variable frequency devices as electronic devices and therefore the requirements would be in the electrical portion of the specifications. (PPFFs No. 123 & 125) He also testified that he considered "motor controllers" and variable frequency devices" as two different types of equipment. (PPFF No. 127) Mr. Blauel testified that while Paragraph 2.7 of Section 16841 of the specification describes a VFD, he did not place anything in the mechanical section of the specifications that would refer any mechanical contractor bidding on the project to Paragraph 2.7. (PPFF No. 128) He also testified that he did not identify VFDs on sheet M13 of the drawings because it would make the chart to "crowded" (PPFF No. 123)

**4. Mr. Rice:**

Mr. Rice was responsible for drafting the electrical portion of the plans and specifications and testified that he was not very knowledgeable of VFDs at the time they drafted the specifications as VFDs were on the "cutting edge" of technology and the Air Force had not made the switch from pneumatic to electronic controls. (PPFFs No. 131 & 133) After reviewing the electrical drawings Mr. Rice testified that there was nothing on the drawings that referred to either VFDs or any electrical connections for VFDs. (PPFF No. 132)

**B. Plaintiff's witnesses established that the plans and specifications were ambiguous and defective:**

While this was covered extensively in Plaintiff's initial brief, a review of Plaintiff's position would

be in order. It is the argument of the Plaintiff that the mechanical and electrical sections of the plans and specifications standing alone would not alert a reasonable mechanical or electrical contractor that the VFDs were required by the contract.

To the mechanical contractor a VFD is an electronic device which should be provided for in the electrical section of the plans and specifications. (PPFFs No. 84, 85, 90) The only reference in the plans was on Sheet M13 in a chart where the description was shortened because the author did not want to crowd the page. The reference on Sheet M14 was obscure and did not indicate a VFD. While it may have been the intention of the drafter to indicate a VFD, it fell far short of its mark. The mechanical specification had only one reference to VFDs and then referred to the electrical specifications. At this point the mechanical contractor would cease any further research as it would be in the realm of the electrical contractor.

As to the view of the electrical contractor, there was ample evidence from witnesses for both sides that the electrical plans did not indicate the installation of VFDs (PPFFs 27, 28, 29, 102, 103, 111, 132) even though Paragraph 3.2.D. of specification section 16481 stated that controllers would be located "as indicated". The specifications provided alternate fan motors but did not identify which ones were to be provided. There was no reference in the plans or the specifications directing the bidder to Paragraph 2.7 of Section 16481 of the specifications which defines a VFD.

The Defendant attempts to make much of a contract requirement that the general contractor is required to coordinate the trades and subcontractors on the project. However, this provision has nothing to do with the bidding phase of the project. It obviously cannot become a contractual requirement until the contract is signed. It is also impossible for a general contractor to go behind every bid he receives from a subcontractor prior to bidding on a project. There is not enough time and it generally does not have the expertise, which is exactly why they subcontract to specialty subcontractors.

When the contract is looked at as a whole, it is obvious that the drafters of the mechanical and electrical parts of the plans and specifications did not coordinate with each other which resulted in the requirement for the VFDs falling through the cracks. Mr. Blauel left it up to Mr. Rice and Mr. Rice did not indicate a requirement for the VFDs in the plans. It is not up to the bidders to discern what is in the minds

of the drafters of the plans and specifications. It is up to the drafters of the plans and specifications to draft them clearly enough so that a reasonable contractor can identify what is to be provided. In this, the Defendant failed.

**III. The Plaintiff has established the basis for its delay costs claim:**

**A. There was no need for a CPM analysis:**

The Defendant argues that the Plaintiff has failed to prove its delay damages claim because it did not prepare a CPM schedule and because there were concurrent delays for which the Plaintiff is responsible. There is no question or dispute that the Defendant failed to install the Uninterruptible Power Supply until approximately two (2) years after they were originally scheduled to be installed. There is also no question or dispute that the Plaintiff could not complete the contract until the UPS was installed. The Defendant's Brief acknowledges that continuous work on the project stopped on 9 May, 1996, and the UPS was not installed and turned over to the Plaintiff until 1 July, 1998, a delay of approximately 781 days. Because of delays incurred in power outages and launch scheduling, the contract was not completed until February, 1999, a delay of another six (6) months. Therefore, it is obvious without the furnishing of a CPM schedule that the Plaintiff was delayed in the completion of its contract by the failure of the Defendant to furnish the UPS.

Mr. Doug Fowler testified that there was a great deal of work to be performed even after the UPS was installed as old circuits had to be deactivated and removed before the new circuits could be installed. (PPFF No. 116) This had to be done circuit by circuit and involved coordinating power outages with the users. (PPFF No. 116) While there was temporary power provided, it was only 277 volts while the new equipment, including the VFDs, needed 480 volts to be operational and tested. (PPFF No. 119)

The Defendant argues that the fact that the Plaintiff did not install the VFDs until after the UPS was installed created a concurrent delay. However, the evidence indicates that the lack of the VFDs did not delay any of the effort and merely constituted additional effort to be performed when the UPS was installed and the circuits were changed. The VFDs could not be tested and balanced until the new circuits were installed and the AHUs operated without the VFDs during the delay period, therefore there was no effective delay to the contract by waiting until the UPS was installed to install the VFDs.

The Court engaged in a long discourse with the Defendant's "expert", Mr. Paullin, concerning the installation of the VFDs and the UPS and their effect on the delay of the project. (Tr., pp 1144-1158) Mr. Paullin testified that the mechanical contractor installed the VFDs on October 23, 1998, but the electrical work on them was not performed until December, 1998. (Paullin, Tr., p. 1157, LL 9-13) This makes it obvious that no matter when the VFDs were delivered and mounted on the walls, they could not have been made operational until the new electrical circuits had been installed so the VFDs could be tested and balanced. It is therefore clear that, in reality, there was not a concurrent delay as the lack of the VFDs was not delaying the project and the lack of the UPS was.

There was also a discussion as to the choice of when to perform certain work. It is obvious that the Plaintiff made the decision not to install the VFDs until the UPS was installed as it would have resulted in two remobilizations instead of one. It would also have been useless to merely have the mechanical contractor install the VFDs when they could not have been tested and balanced until the UPS and the new circuits were installed. Mr. Paullin even admitted that had the VFDs been installed prior to the furnishing of the UPS, there would have been no concurrent delay even though the AHUs ran without the VFDs and there was no appreciable delay to the project because of the lack of the VFDs. (Paullin, Tr., p. 1151)

The Defendant also seems to make much of the fact that there was a lot of sporadic work on the project during the delay time. The Court opined that this may have been caused by a subcontractor doing non critical work on the project when it also had other work on site. Mr. Paullin testified that this may be the case, however, he had not done enough research to verify it. (Paullin, Tr., pp. 1153, 1157) The Defendant seems to take the position that to recover for a delay, there must be a long period of time without any work at all to constitute a recoverable delay. This does not reflect real world activity, especially in this case.

It is obvious that the completion of the project was delayed for more than two (2) years due to the failure of the Defendant to provide the UPS. While there was some work done at various times during the delay period, this had no effect on the overall delay of the project. In fact, had the Plaintiff done the analysis necessary, it could probably have established that the multiple demobilizations and

remobilizations that occurred during the delay period increased its delay costs.

**B. The Defendant misquotes the cited cases on Critical Path Analysis:**

The Defendant has greatly mischaracterized the cases it cites concerning the Critical Path Method of CPM. In its brief and in its cross examination of Mr. Midgette, Defendant's counsel takes the position that *Essex Electro Engr's, Inc. V. Danzig, 224 F.3d 1283, 1295 (Fed.Cir. 200)* and *Kinetic Builder's, Inc. V. Peters, 226 F.3d 1307, 1317 (Fed.Cir. 2000)* require that the Plaintiff perform a formal CPM analysis to prove that any government delays affected the critical path. Neither of these cases, nor any other case law, requires a formal CPM analysis before a claimant can recover delay costs.

*Essex* does state that the contractor must prove the extent of the delay, the contractor's harm from the delay, and the causal link between the government's wrongful acts and the delay. (*Essex, id. at 1231)* The Court goes on the say: "In recent cases, that principle has been characterized as requiring the government's acts to 'have affected activities on the critical path'". (*Essex, id at 1232)* It did not, however, state that the contractor has to perform a critical path analysis. *Kinetic* cites *Essex* but also does not state that a formal CPM analysis is required.

The Plaintiff contends that in a case such as the instant one, it is obvious that the government's delay was on the critical path. All parties have stipulated that the UPS was not furnished when the contract stated it would be, and everyone agrees that the contract could not be competed until the UPS was furnished. A CPM analysis in this instance would have been superfluous.

It should also be noted that *Essex* reiterates the Courts rulings that "all delays due to defective or erroneous Government specifications are per se unreasonable and hence compensable" (*Essex, id at 1289)* and that delays can be apportioned if there is clear evidence to determine the apportionment. (*Essex, id at 1292)*

**IV. SUMMARY**

It is the Plaintiff's contention that it has established that the plans and specifications produced by the Defendant were defective in that they were ambiguous as to the furnishing of Variable Frequency Devices (VFDs) for the Air Handling Units (AHUs). When reviewed by a reasonable contractor in the time constraints of the competitive bidding process, there were no indications that would point the bidder to the

realization that the VFDs were required. It is contended that the Plaintiff's interpretation is reasonable and therefore prevails under the rule of *contra proferentum.*

The Defendant has failed to establish that Mr. Dale Ellis was aware of the absolute contract requirement for the furnishing of VFDs (as there was none) and filed a false claim with that knowledge. All of the proof indicates that Mr. Ellis supported both the mechanical and electrical subcontractors, who both asserted that the plans and specification did not require the VFDs, and furnished the VFDs under protest with an intent to file a claim for the costs.

The proof establishes that the Plaintiff was delayed over two years in completion of the contract by the failure of the Defendant to provide the UPS and this clearly affected the critical path. The delay in installing the VFDs did not affect the critical path as they could not be installed, tested and balanced until the UPS and the new circuits were installed.

Therefore, the Plaintiff requests a ruling by this Court awarding it all the damages requested.

Submitted, this the 8th day of July, 2004

Respectfully Submitted
MCMANUS & GRAHAM

_/s/____________________
John C. McManus
Georgia Bar. No. 49775

_/s/____________________
J. Hatcher Graham
Georgia Bar No. 304577

P.O. Box 95269
Atlanta, Georgia, 30347
(404) 929-9122

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SOUTHERN COMFORT BUILDERS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 00-755C** |
| **V.** | ) | **(Judge Allegra)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served opposing counsel with a copy of the foregoing pleading via U.S. First Class Mail, properly addressed with sufficient postage affixed thereto as follows:

David R. Finiger, Esq.
United States Department of Justice
1100 L Street, NW
Room 11008
Washington, DC 20005

This the __ day of July, 2004

Respectfully Submitted
MCMANUS & GRAHAM

_/s/____________________
John C. McManus
Georgia Bar. No. 49775

_/s/____________________
J. Hatcher Graham
Georgia Bar No. 304577

P.O. Box 95269
Atlanta, Georgia, 30347
(404) 929-9122