**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| **SOUTHERN COMFORT BUILDERS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 00-755C** |
| **V.** | ) | **(Judge Allegra)** |
| | ) | |
| **THE UNITED STATES,** | ) | |
| | ) | |
| **Defendant.** | ) | |

# PLAINTIFF'S POST TRIAL BRIEF

**MCMANUS & GRAHAM**
J. Hatcher Graham
Georgia Bar No. 304577
John C. McManus
Georgia Bar No. 497775

P.O. Box 7626
Warner Robins
Georgia 31095
(478) 953-5606

## TABLE OF CONTENTS


| TITLE | | | PAGE |
|---|---|---|---|
| I. | PLAINTIFF'S PROPOSED FINDINGS OF FACT | | 1 |
| | A. | Specifications | 1 |
| | B. | Drawings | 3 |
| | C. | Correspondence | 5 |
| | D. | Testimony | 17 |
| II. | THE LAW | | 26 |
| | A. | The False Claims Act | 26 |
| | B. | Defective Specitications | 29 |
| | C. | Concurrent Delays | 32 |
| | D. | Duty To Cooperate | 32 |
| III. | DISCUSSION | | 34 |
| | A. | False Claims Act | 34 |
| | B. | Variable Frequency Devices | 35 |
| | C. | Grounding | 39 |
| | D. | UPS | 40 |


## TABLE OF AUTHORITIES


| TITLE | PAGE |
|---|---|
| **II. CASES** | |
| **E. UNITED STATES SUPREME COURT** | |
| *Rainwater v. United States, 356 US 590 (1958)* | 27 |
| *United States v. Spearin*, 248 U.S. at 136-137 | 29 |

**F. UNITED STATES COURTS OF APPEALS**


| | |
|---|---|
| *Aleman Food Servs., Inc. v. United States, 994 F.2d 819, 822 (Fed. Cir. 1993)* | *31* |
| *Blake Constr. Co. v. United States,* 987 F.2d 743 (Fed. Cir., 1993) | 30 |
| *Blinderman Constr. Co. V. United States, 695 F.2d 552, 559 (Fed.Cir. 1982)* | *32* |
| *Community Heating & Plumbing Co., Inc. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993)* | *31* |
| *Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991)* | *31* |
| *Hagood v. Sonoma County Water Agency, 81 F3d 1465 (1996, CA9 Cal)* | *27* |
| *Harrison v. Westinghouse Savannah River Co., 176 F3d 776 (1999, CA4 SC)* | *28* |
| *Hindo v. University of Health Sciences, 65 F3d 608 (1995, CA7 Ill* | *27* |
| *Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988)* | *33* |
| *Muniz v. United States, 972 F.2d 1304, 1309 (Fed. Cir. 1992)* | *31* |
| *Northrop Grumman Corp. v. Goldin, 136 F.3d 1479, 1483 (Fed. Cir. 1998*) | *31* |
| *P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 916-17 (Fed. Cir. 1984)* | *32* |
| *San Carlos Irrig. and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed.Cir. 1989) | 29 |
| *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir 1987) | 30 |
| *Triax Pacific, Inc. v. West, 130 F.3d 1469, 1473 (Fed. Cir. 1997)* | *31* |
| *United States ex.rel. Aflatooni v. Kitsap Physicians Servs., 158 F3d 439 (1998, CA9 Wash);* | *27* |
| *United States v. Basin Elec. Power Coop., 248 F3d 781 (2001, CA8 ND)* | *28* |
| *United States ex.rel. Berge v. Board of Trustees of Univ.* | *28* |

*of Al., 104 F3d 1453 (1997, CA4 Md)*

*United States es rel. Butler v. Hughes Helicopters, Inc, McDonnell Douglas Helicopter Company, 71 F3d 321 (1995, CA9 CA)* *28*

*United States ex rel. Durcholz v. FKW Inc., 189 F3d 542 (1999, CA7 Ind)* *28*

*United States es rel. Kreindler & Kreindler v. United Technologies Corp., 985 F2d 1148 (1993, CA2 NY)* *29*

*United States ex.rel. Oliver v. Parsons Co., 195 F3d 457 (1999, CA9 Cal)* *28*

*United States ex rel. Quirk v. Madonna Towers, Inc., 278 F3d 765 (2002, CA8 MN)* *28*

*United States ex.rel. Schwedt v. Planning Research Corp., 313 US App. SC 200, 59 F3d 196 (1995)* *27*

*United States ex rel. Stone v. Rockwell Int'l Corp, 282 F3d 787 (2002, CA10 Colo)* *29*

*Veit & Company, Inc. V. The United States*, 56 Fed.Cl. 30 (2003) 32

**C. UNITED STATES COURT OF FEDERAL CLAIMS**

*Amertex Enterprises. LTD v. United States*, 1995 U.S. Claims LEXIS 259 (1995) 30

*CHEMS, Inc. v. United States*, 59 Fed.Cl. 168, 214 (2003) 29

*Cray Research, Inc. V. The United States*, 41 Fed.Cl. 427 (1998) 30

*First Interstate Bank, N.A. v. United States, 27 Fed Cl 348 (1992)* *28*

*Firestone Tire & Rubber Co. v.United States, 195 Ct. Cl. 21, 444 F.2d 547, 551 (Ct. Cl. 1971)* *31*

*Fru-Con Construction Corporation v. United States*, 42 Fed.Cl. 94, 96 (1998) 30

*Goodley v. United States, 26 Cl Ct 1075 (1992)* 28

*Gulf Western Precision Engineering Co. v. United States*, 211 Ct.Cl. 207, 218, 543 F.2d 125, 130-131 (1976) 30

*H.L.C. & Assoc. v. United States, 176 Ct. Cl. 285, 307, 367 F.2d 586, 599 (1966)* *33*

*Hol-Gar Mfg. Corp. v. United* [*435] *States,* *169 Ct. Cl. 384, 351 F.2d 972, 975 (Ct. Cl. 1965)* — *31*

*Hol-Gar Mfg. Corp. v. United State*, 175 Ct.Cl. 518, 360 F.2d 634, 638 (1966) — 30

*Information Sys. & Networks Corp., 34 Fed. Cl. 457, 460* — 33

*International Electronics Corporation v. United States*, 1980 U.S. Ct.Cl. LEXIS 1072 (1980) — 33

*ITT Arctic Servs., Inc. v.United States, 207 Ct. Cl. 743, 524 F.2d 680, 692 (Ct. Cl. 1975)* — *32*

*John C. Grimberg Co., Inc. v. United States, 7 Cl. Ct. 452, 456 (1985),* aff'd without opinion, *785 F.2d 325 (Fed. Cir. 1985)* — *31*

*Kehm Corp. v. United States, 93 F. Supp. 620, 623, 119 Ct. Cl. 454, 469 (1950)* — *33*

*Lathan Co., Inc.,v. United States, 20 Cl. Ct. 122, 129 (1990)* — *33*

*Lewisburg v. United States*, 1982 U.S. Ct. Cl. LEXIS 2379 (1982) . — 33

*Lewis-Nicholson, Inc. v. United States, 213 Ct. Cl. 192, 550 F.2d 26, 32 (1977)* — *32, 33*

*M.A. Mortenson Company v. United States*, 40 Fed.Cl. 389, 1998 — 29

*Roberts v. United States, 174 Ct. Cl. 940, 357 F.2d 938 (1966)* — *33*

*Singer-General Precision, Inc. v. United States, 192 Ct. Cl. 435, 427 F.2d 1187, 1193 (Ct. Cl. 1970).* — *31*

*S.O.G. of Arkansas v. United States, 212 Ct. Cl. 125, 546 F.2d 367, 369 (Ct. Cl. 1976)* — *32*

*Sterling Millwrights,Inc. v. United States, 26 Cl. Ct. 49, 67 (1992)* — *32*

*Thanet Corp. v. United States, 219 Ct. Cl. 75, 591 F.2d 629, 633 (Ct. Cl. 1979).* — *31*

*Turner Construction Co. v. United States*, 54 Fed.Cl. 388, 398 (2002) — 30

*Tyger Construction Company, Inc. v. The United States*, 31 Fed.Cl. 177 (1994) — 32

*United Technologies Corp., Sikorsky Aircraft Div. v. United States, 27 Fed. Cl. 393, 397 (1992)* — *33*

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**SOUTHERN COMFORT BUILDERS, INC.,** )
)
**Plaintiff,** )
)
**V.** ) **No. 00-755C (Judge Allegra)**
)
**THE UNITED STATES,** )
)
**Defendant.** )

## III. PLAINTIFF'S PROPOSED FINDINGS OF FACT:

COMES NOW the Plaintiff in the above cited action and offers Plaintiff's Proposed Findings Of Fact (PPFF) in this litigation:

PPFF No. 1: Contract F08650-95-0011 was awarded on 20 October 1994 for the Phase 2 of a project to make certain alterations and renovations to the XY Building at Cape Canaveral Air Station, FL. (DX 100-001)

PPFF No. 2: The contract was for the amount of $1,089,000.00. Notice to Proceed was to be issued within 60 days of contract award and the performance time was 425 calendar days after Notice To Proceed. (DX 100-002)

### G. Specifications:

PPFF No. 3: According to the Table of Contents of the Technical Specifications to Repair/Upgrade XY Building, Phase II, Division 15 was the Mechanical Section and Division 16 was the Electrical Section. (DX 100-022)

PPFF No. 4: Division 15855 is entitled "Air Handling Units With Coils" (DX 105-075)

PPFF No. 5: Paragraph 1.4 of Division 15855 is entitled "Quality Assurance" and defines "Air Handling Units", "Constant Volume Air Handling Units", "Variable Air Volume Air Handling Units With Variable Frequency Drive", and "Air Coils". (DX 105-076)

PPFF No. 6: Paragraph 1.4.C. of Division 15855 states:

"Variable Air Volume Air Handling Units with Variable Frequency Drive-see specification section 16480." (DX 105-076)

PPFF No. 7: A review of the Tables of Contents reveals that the Specifications do not contain a Section 16480 but does contain a section 16481. (DX 100-022)

PPFF No. 8: Paragraph 2.4 of Section 15855 contains at the end of subparagraph "J." a statement in brackets that provides: "[For fan sections controlled by variable frequency drives, balance at speeds between 25% and 100% 0f design RPM.]" (DX 105-081)

PPFF No. 9: Specification Division 16481 is entitled "Motor Controllers" (DX 105-262)

PPFF No. 10: Paragraph 1.2 entitled "Summary" of Section 16841 states:

> "A. This Section includes a.c. motor control devices rated 600 V and below that are not supplied as an integral part of motor/controller packages." (DX 105-262)

PPFF No. 11: Paragraph 1.3 of Division 16481 defines a motor controller as: "A device that controls, protects, and energizes an electric motor, and where required, controls its speed or the torque or power delivered to it." (DX 105-262)

PPFF No. 12: Paragraph 1.5 of Division 16481 entitled "Quality Assurance" provides:

> "A. Manufacturers Qualifications: Provide solid-state, reduced-voltage and solid-state, variable-speed controllers from manufacturers regularly engaged in the manufacture of equipment of the types and capacities indicated, with such products in satisfactory use in similar service for not less than 5 years." (DX 105-263)

PPFF No. 13: Paragraph 2.0 entitled "PRODUCTS" lists various types of motor controllers. These include "Motor Controllers, General" (paragraph 2.2), "Manual Motor Controllers" (paragraph 2.3), "Magnetic Motor Controllers" (paragraph 2.4), "Multispeed Motor Controllers" (paragraph 2.5), "Reduced-Voltage Motor Controllers" (paragraph 2.6), "Solid-State, Variable-Speed Motor Controllers" (paragraph 2.7) and "Auxiliary Control Devices" (paragraph 2.8). (DX 105-264-270)

PPFF No. 14: Paragraph 3.2.C. of Section 16481 states: "Location: Locate controllers as indicated and within sight of motors controlled." (DX 105-272)

**H. Drawings:**

PPFF No. 15: The first sheet of the Drawings (Sheet 1 of 66) contained at the bottom left portion a "General Legend". This Legend identified lines on the drawing as indicating whether the work was "new", "existing to be removed", "new hidden" or "existing hidden" depending on whether the lines were whole or dashed and the size of the dashes. (Drawing Sheet 1 of 66)

PPFF No. 16: Drawing M4 (Sheet 15 of 66) showed the "New Mechanical Plan-NW". This Drawing indicated that there was to be new air handling units at AHU1 and AHU3, however, AHU4 was to remain.

PPFF No. 17: For both of the AHUs to be removed the Drawing stated: “SEE SCHED. SHT. M13".

PPFF No. 18: Drawing M4 (Sheet 15 of 66) also contained the following legends:

“12. PROVIDE CONTROLS AS SHOWN ON SHT M14 FOR EACH NEW AHU AND VAV BOX.
13. CONTRACTOR TO MODIFY DUCTWORK AS REQUIRED. EXCEPT FOR AHU7, SCHEDULED AIR HANDLERS SAME MAKE AND MODEL AS THOSE REMOVED.”

PPFF No. 19: Drawing M5 (Sheet 16 of 66) showed the “NEW MECHANICAL PLAN-SE”. This drawing indicated that AHU’s 5 and 7 were to be replaced. For AHU7 the Drawings stated: “SEE DETAIL 6, SHT M10"

PPFF No. 20: Drawing M5 contained the following Legends:

“1. PROVIDE CONTROLS AS SHOWN ON SHT. M14.
2. CONTRACTOR TO MODIFY DUCTS AS REQUIRED. EXCEPT FOR AHU7, SCHEDULED AIR HANDLERS ARE SAME MAKE AND MODEL AS THOSE REMOVED.”

PPFF No. 21: Drawing M10 (Sheet 21 of 66) is entitled “MECHANICAL ELEVATIONS” and does not contain any details as to controls for the AHUs.

PPFF No. 22: Drawing M13 (Sheet 24 of 66) is entitled “MECHANICAL SCHEDULES”. This Drawing contains several charts containing various data for the mechanical systems.

PPFF No. 23: Drawing M13 contains a Chart entitled “CHILLED WATER AIR HANDLING UNIT SCHEDULE”. This Chart contains data pertaining to AHUs 1, 3, 5 and 7. Within this chart is a group of columns entitled “FAN DATA”. Under this heading is also a column entitled “CAPACITY CONTROL” that is divided into two columns entitled “RANGE” and “TYPE”. The “RANGE” column is blank and under “TYPE” for all three of the AHUs listed is the phrase “VARIABLE FREQUENCY”.

PPFF No. 24: There is no information listed on Drawing M13 for AHU4.

PPFF No. 25: The design engineer testified that he did not place the phrase “VARIABLE FREQUENCY DEVICE” in the “TYPE” column to save space.

PPFF No. 26: Drawing M14 (Sheet 25 of 66) is entitled “MECHANICAL CONTROLS”. In the lower left portion of the Drawing is a Legend that states “AHU MOTOR SPEED”.

PPFF No. 27: Drawing E1 (Sheet 32 of 66) is entitled “ELECTRICAL LEGEND”. This Drawing contains three (3) columns of Legends and abbreviations pertaining to the electrical drawings. In the third column from the left side of the Drawing is a symbol for “MOTOR CONTROLLER”.

PPFF No. 28: The electrical drawings cover 35 separate drawings (Sheets 32 through 66 of 66).

There is no reference in any of the electrical drawings to the installation of a "motor controller" nor does the symbol for a "motor controller" appear on any of the electrical drawings.

PPFF No. 29: None of the electrical drawings contain any reference to the installation of or the wiring for a "motor controller" or a variable frequency device.

PPFF No. 30: None of the mechanical drawings show the installation of either a "motor controller" or a "variable frequency device".

**I. Correspondence:**

PPFF No. 31: On 18 April, 1995, the Plaintiff forwarded a letter to the Defendant informing the Defendant of delays in progress encountered because of failure to complete lead abatement and the Defendant's delaying the digging and the jack and bore of the roadway. (DX 34-001)

PPFF No. 32: A meeting was held on 24 April, 1995, where the Plaintiff was given permission to jack and bore the roadway. (DX 35-001-003)

PPFF No. 33: On 7 November, 1995, Bill Butcher of Chrome Electric, Inc. forwarded a "Contractor Request For Information/Clarification" (RFI) (RFI No 1) to the Plaintiff which stated: "CONCERNING FIELD COMMENTS: IF THE AIR HANDLING UNITS REQUIRE VFD'S THE MECHANICAL CONTRACTOR WOULD PROVIDE THEM. DRAWING ONLY SHOWS AHU'S BEING REPLACED. THERE ARE NO NOTES INDICATING VFD'S OR NEW ELECTRICAL EQUIPMENT FOR AHU'S." (DX 2-001)

PPFF No. 34: There is a handwritten reply to RFI No. 1 which states: "VFD's to be supplied by Electrical Contractor." This was signed by D.R. Ellis. (DX 2-001)

PPFF No. 35: On 16 November, 1995, the Plaintiff placed the Defendant on notice that:" The absence of the UPS on the North side of the facility is now causing delays for not only our electrical contractor, Chrome Electric; but also delays for other trades such as painting since access to the entire walls are hampered by electrical equipment that cannot be removed until the UPS is installed." (PX 10-001)

PPFF No. 36: On December 4, 1995, Mary Kilgore, project manager for the Plaintiff, forwarded RFI No.27 to the Defendant. The RFI stated: "Sect. 15855 pg2 1.4.C refers to variable air volume Air Handling Units w/Variable Frequency Drive-see specification section 16480. There is no section 16480.

Please advise ASAP if variable Frequency Drives are required and provide us with the spec. Section 16480 so we can submit costs for these electrical controllers. Times is of the essence." (DX 3-002)

PPFF No. 37: On 5 December, 1995, Chrome Electric, Inc. Informed the Plaintiff that Chrome was being impacted in its work by the failure on the installation of the UPS. (PX 226-001)

PPFF No. 38: On 12 December, 1995, Mr. Rice of Johnson Controls, who represented the Defendant, responded is to a 16 November, 1995, letter that they were aware that the absence of the UPS was creating problems. (DX 48-001)

PPFF No. 39: On 14 December the Plaintiff informed the Defendant that: "The electrical portion of the project will be finished as fast as it can be because there is no UPS to provide the new power for the building." (PX 11-001)

PPFF No. 40: Mary Kilgore testified that all of the new power in the building was going to go through the new UPS which was being fed by a new substation and neither was there. There was no way to repower the building the way the drawings provided. (Kilgore, TR. p. 61)

PPFF No. 41: Kilgore testified that Chrome Electric got to a point where they ran out of work because the UPS was not there. They would have to leave the job site and then return when there was work. (Kilgore, TR, p. 63)

PPFF No. 42: On 15 December, 1995, the Defendant forwarded a letter to the Plaintiff, a portion of which reads as follows:

> "2. The following is provided in reply to your RFI #27:
> a. M13 AHU schedule specifies variable frequency drive.
> b. M14 controls diagram refers to AHU motor speed control.
> c. Specification section 15855, Page 2, para 1.4.C refers to variable frequency drive in section 16480 this should read 16481.
> d. Specification section 16481, Page 6, para 2.7 specifies solid state variable speed motor controllers (the section title is "Motor Controllers").
> e. A no cost submittal is required, as all components are specified."
>
> (DX 3-001; PX 20-001)

PPFF No. 43: In a meeting held on 19 December, 1995, the Plaintiff informed the Defendant that the failure to provide the UPS was a major issue. (DX 39-002)

PPFF No. 44: In a quote to Chrome Electric dated 14 February, 1996, for the VFD's, Consolidated Electric Supply was of the opinion that the specification for the equipment was from an old specification for

direct current drives as they were rarely used on alternating current drives. (PX 4-002)

PPFF No. 45: On 21 February, 1996, the Defendant forwarded to the Plaintiff a Memorandum from Johnson Controls dated 20 February, 1996 and authored by Herb Blauel which stated:

> "There is no ambiguity concerning the variable frequency drives (also know as variable speed drives). The air handler schedule (sheet M13) specifies "VARIABLE FREQUENCY" under "CAPACITY CONTROL" (copy attached). Sheet M14 references "AHU MOTOR SPEED" in the control diagram (copy attached). The specification (section 15855, 1.4.C, copy attached) is for "Variable Air Volume Air Handling Units with Variable Frequency Drive" and references section 16480 for details (note that the correct section number is 16841, but anyone looking for 16840 would come face-to-face with 16481). The drawings clearly show on every sheet that the new air handlers are connected to duct systems with either new or existing VAV (variable air volume) boxes.
> The letter from Chrome Electric acknowledges that the drives are required, but argues that the mechanical contractor is responsible."
>
> (DX 5-002)

PPFF No. 46: On 22 March, 1996, Plaintiff's electrical subcontractor forwarded a letter to Plaintiff concerning the VFDs. The letter stated, in part:

> "Having reviewed the plans and specifications in detail, we have discovered the following. Nowhere in the entire section on electrical drawings are the VFD's indicated. To be more specific in this regard we offer the following: Drawing E-1 contains the electrical legend. This legend includes disconnects, combination starters, panelboards, and motor controllers, as well as many other symbols for various electrical items, and goes into fine detail indicating whether panelboards are surface or flush mounted, etc...., but make no mention of VFD's and no symbol to represent them. There is also a list of abbreviations on this same page and VFD's are not listed.
>
> Electrical drawings E-3 thru E-9 show existing power and details. Nowhere in these drawings are any VFD's shown.
>
> Drawing E-12 is the power installation one line drawing, E-13 is the power installation drawing, and E-14 is the roof power installation drawing. None of these drawings indicate any VFD's.
>
> These drawings would indicate the location of any VFD's if the electrical contractor was expected to wire them. They would also indicate the amperage and voltage needed to power them, as well as the size of conduit and wire required. Panel and circuit number would also have been shown to indicate where the VFD's were being fed from.
>
> To follow this up further, we checked drawings E-20 thru E-26 showing the existing panel schedules, and drawings E-28 thru E-32A which show the power panel schedules. In review of every panel schedule, on every drawing indicated, we were unable to locate any circuits that were designated for VFD's. This indicates to us that there are no VFD's on the job, as there is no circuity indicated anywhere on the entire set of electrical drawings to power them." (PX 6-003-005; PX 33-003-005)

PPFF No. 47: On 25 March, 1996, One Contractor, Inc., Plaintiff's mechanical contractor, forwarded a letter to the Plaintiff wherein he contended that the VFDs were electrical/electronic appurtenances to the equipment and would have not been included in the mechanical section.(PX 6-006-

007; PX 33-006-0007)

PPFF No. 48: On 27 March, 1996, the Defendant's representative was contacted by Computer Sciences Raytheon as to why the XY Building was missing ground plates and cable. He called the Plaintiff's representative, Mary Killgore and Robert of Chrome Electric and was informed that as the requirements were shown on the Fire Alarm Drawings and not on the electrical drawings, they were not included in the bid. (DX 42-001)

PPFF No. 49: On 2 April, 1996, the Plaintiff forwarded to the Defendant a letter from Chrome Electric, the Plaintiff's electrical subcontractor, dated 2 April, 1996, concerning the grounding controversy that stated, in part:

> "...Having studied the drawings throughly, we have determined the only place these conductors are indicated is on drawing E-34 titled, "Fire Alarm Installation". Although these grounding conductors are indicated on the drawing, they are accompanied by a note saying "existing".
>
> Taking into account that this system is on the Fire Alarm Installation drawings and the note adjacent to the system says "existing, along with the fact that at no point on this drawing is there any indication that the 2-500 MCM conductors shown are tied to either a ground rod, ground grid or building steel, we were under the impression that this system was already complete." (PX 9-002)

PPFF No. 50: On 4 April, 1996, the Plaintiff forwarded letters from Chrome Electric and One Contractor, Inc., to the contracting officer. Plaintiff contended that the drawings were incomplete and that the VFDs were not a part of the contract. (PX 6-001; PX 33-001)

PPFF No. 51: On 9 April, 1996, the Defendant's contracting officer, John W. Stringer, wrote to the Plaintiff and stated that the Defendant had decided after reviewing the contract that it was the Plaintiff's responsibility to supply and install the VFDs. (DX 44-001-002)

PPFF No. 52: On 9 April, 1996, the Defendant's contracting forwarded to the Defendant a memorandum from Johnson Controls, prepared by Mr. Rice, dated 4 April, 1996, reflecting the Defendant's interpretation of the grounding plate issue. The memorandum stated:

> "A thorough review of the referenced drawing has been made with the following result:
>
> 1. The word 'existing' clearly goes to a ground plate and conductor as shown by the arrows. The fact these items are existing is also indicated by the line style indicated on the cover sheet for the drawing package.
>
> 2. The note indicating the required installation is attached by an arrow to the required installation. The installation requirement is also shown by the line style as indicated on the cover sheet for the drawing package.

3. This grounding is for the communications equipment contained in the XY building and is more appropriately shown on the fire alarm drawing since it is a separate system from the power system.

4. Specification section 16452 paragraph 3.1D requires the installation of a minimum #4 AWG insulated grounding conductor, in raceway to each terminal cabinet or central equipment location. The drawing indicates the extent of the required installation and sizes the conductor over the minimum as is required by the number of equipment locations. The Phase 1 portion of the rehabilitation extended the same size grounding from the grounding electrode to the location indicated on the drawings." (DX 52-002)

<u>PPFF No. 53</u>: On 17 April, 1996, Chrome Electric, Inc. Forwarded a letter to the Plaintiff which was forwarded to the Defendant on 25 April, 1996. The letter was in reply to Johnson Control's memorandum of 4 April (DX 52-002) and stated, in part:

"...The reply to item #1 and #2 is the line style that is shown on the fire Alarm drawing E34 as indicated on the cover sheet. The closest symbol shown on the cover sheet is the one stating existing work to be removed or relocated. There were no existing grounding plates installed at these locations when the project started.

The third comment states that this grounding system is for the communications equipment and is more appropriately shown on the fire alarm drawing than on a power drawing since it is a separate system from the power system.
This statement is confusing to me. How would a contractor know that this system would be for grounding, communications or power system by showing it on a fire alarm drawing.

All drawings are to stand on their own to represent what is to be required. In no way would a contractor know that the grounding shown on the fore alarm drawing would be for the communication system.

Comment four states that a #4 AWG insulated grounding conductor is required in a raceway to each terminal cabinet. I cannot locate any terminal cabinet on drawing E34 that would support this statement. I do not know what Phase 1 is or how it relates to this project. The existing note is not connected to the grounding that is shown to be installed on drawing E34." (PX 51-002-003)

<u>PPFF No. </u>54: On 24 April, 1995, Mary Kilgore attended her first meeting with the Defendant. The subject of the meeting was scheduling. Ms. Kilgore was of the opinion that the Defendant was not prepared to begin the contract because the UPS was not there and everything was tied to it. (Kilgore, Tr. pp. 55-56)

<u>PPFF No. 55</u>: Meetings were held only when the Plaintiff had a problem and needed to discuss it with the Defendant. (Kilgore, TR p. 58)

<u>PPFF No. 56</u>: On 9 May, 1996, the contracting officer directed the Plaintiff to install the grounding system. (PX 213-001)

<u>PPFF No. 57</u>: On 13 May, 1996, Chrome Electric, Inc., acknowledged the direction to install the

grounding system and stated that they would be filing a Request For Equitable Adjustment. (PX 215-001)

PPFF No. 58: On 16 May, 1996, the Plaintiff forwarded to the Defendant RFI #35, which was RFI #5 from Chrome Electric, Inc. The RFI, dated 15 May, 1996, stated:

> "Section 16452, 1.2 Summary B 1&2, does not cover technical grounding as stated on Johnson Control's letter dated, 4-4-96. Chrome Electric has been directed to proceed with the grounding shown on E34. Before work can be started, please clarify the following so appropriate costs can be submitted.
>
> 1. Drawings do not indicate the type of material the ground plates are made of. Note states to drill 1" on center each way but does not state the size of the holes to be drilled. There is no mounting detail on how to install the plate to the wall or what type of material is to be used.
>
> 2. This system is not connected to any existing grounding system. Please clarify.
>
> 3. What is the maximum distance which the conduit can be away from the ground plate?
>
> 4. Johnson Control's letter dated, 4-4-96, Note #3, states that this system is for the communications equipment contained in the XY Building. Please provide further information as to where this is referenced and can be found in the specifications.
>
> 5. Note #4: I do not understand what this equipment has to do with the grounding shown on E34. Where does it state or show that this grounding is for signal and communications? There are no terminal cabinets or central equipment shown on E34 or a manner in which to connect.
>
> 6. Room 110C shows a ground plate symbol but does not show how it is to be connected." (DX 53-001-002)

PPFF No.59: On 4 June, 1996, the Defendant replied to Plaintiff's RFI #35 with a response from Johnson Controls that stated:

> "1. In order to provide a compatible system the plates should be copper of the size indicate on sheet E-4. Hole size should allow for attachment of the 500 MCM conductors specified. No detail was shown since prior to bid no specific ground plate was considered. As with all electrical equipment mounted on walls there should be an insulating medium between the possible live parts and the wall. Various mounting schemes are possible. A plate similar to Erico B54X series may be utilized.
>
> 2. Per the contract inspector the grounding system required in Phase 1 has been installed at the location shown on the drawings. The system to be installed by this contractor is a continuation of that system.
>
> 3. Conduit should allow for the bending radius of the 500 MCM conductors.
>
> 4. Specification section 16452 paragraph 3.1 D requires the installation of a minimum #4 AWG insulated ground conductor, in raceway to each terminal cabinet or central equipment location. The drawing indicates the extent of the required installation and sizes the conductor over the #4 minimum as is required by the number of equipment locations. The Phase 1 portion of the rehabilitation extended the same size grounding system from the grounding electrode to the location indicated on the drawings.
>
> 5. Choice of connecting method was left to the contractor, however, since the smoke from

exothermic welds may cause problems with the buildings occupants, a hydraulic connection of a compression lug and a bolted connection to the plate would seem to be the most logical method. Terminal cabinets and conductors to those cabinets or other equipment will be installed by others.

6. Utilize the same method as at other points." (DX 54-001-002)

PPFF No. 60: On June 12, 1996, D.R. Ellis, President of the Plaintiff, wrote to One Contractor, Inc., the Plaintiff's mechanical contractor, concerning a meeting with Sally Bergman and John Shields of the Defendant. He stated: "I was told that their position had not changed on the VFD issue; as stated in their letter dated April 9, 1996 it is the responsibility of the mechanical Contractor to provide the required VFD and if they felt that there were any ambiguities in the Specifications or on the Blueprints you would need to file an Equitable Adjustment Claim. It was clearly stated that these items would be installed to complete this Contract or they would exercise the Liquidated Damages Clause..." (DX 57-001)

PPFF No. 61: On 8 August, 1996, Chrome Electric, Inc. informed the Plaintiff that the scale on the Fire Alarm Installation Drawing (E34) was incorrect and that there would be additional expense incurred for extra conduit, wire and labor. (PX 221-001)

PPFF No. 62: On 21 November, 1996, the Defendant forwarded to the Plaintiff a letter over the signature of Kenneth W. Settles, directing the Plaintiff to install the VFDs. (DX 15-001)

PPFF No. 63: In a Memo For Record dated 19 June, 1997, the Defendant's employee, Linda Brantley, informed the Plaintiff that the Defendant had not taken beneficial occupancy of the air handling units because the VFDs had not ben installed. (DX 41-001)

PPFF No. 64: On 16 September, 1997, the Defendant, over the signature of John W. Stringer, corresponded with the Plaintiff, which correspondence stated, in part: "1. Reference our letters dated 12 Dec 95, and 21 Nov 96 and meetings of 8 May 96, 6 Jul 96 and 25 Feb 97 wherein you were directed to provide Variable Frequency Drives pursuant to the subject contract." (DX 7-001)

PPFF No. 65: On 27 October, 1997, the Plaintiff submitted a Material Approval Submittal No. 19 for the Motor Controllers. The submittal was signed as approved by the contracting officer on 19 November, 1997, with a comment that the VFDs must be 100% compatible with the motors. (DX 70-001-018)

PPFF No. 66: On 26 January, 1998, the contracting office for the Defendant, John W. Stringer, drafted a MEMO FOR RECORD which stated, in part: "...Russ continues to want to discuss whether or not

he should even be providing the VFDs. Told him that at this point that is no longer an issue. We have directed him to provide them since it is our position that the drawings clearly require them as part of the job...." (DX 22-001)

PPFF No. 67: On 17 March, 1998, the Plaintiff corresponded with the Defendant requesting the status of its Submittal 19A. (PX 72-001)

PPFF No. 68: On 24 March, 1998, the Defendant corresponded with the Plaintiff questioning whether or not there was a difference between Submittal 19A and the product submitted under Submittal 19. The Defendant stated that it was still reviewing the submittal. (DX 23-001)

PPFF No. 69: On 31 March, 1998, the Plaintiff responded to the Defendant's 24 March, 1998, letter stating:

> "Reference your letter dated 24 March 1998. The information as to the difference between submittal No. 19 & submittal No. 19a is the same make and model VFD except the comments on submittal No. 19 indicate that it appears to be suitable.
> Submittal No. 19a has more data & options so that your design engineer can approve or disapprove the VFD's without notations. It is not the responsibility of the contractor to design these systems." (DX 24-001)

PPFF No. 70: On 16 June, 1998, the Plaintiff corresponded with the Defendant requesting the status of Submittal 19A (PX 73-001)

PPFF No. 71: On 2 July, 1998, the Defendant forwarded to the Plaintiff a disapproved Submittal No. 19A concerning Motor Controllers and included information on a Trane Co. variable frequency device which the Defendant considered compatible with the AHU's installed by the Plaintiff. The Submittal form had been forwarded to the Defendant on 22 January, 1998. (DX 8-001-023)

PPFF No. 72: On 3 July, 1998, the Plaintiff forwarded a letter to its mechanical subcontractor attaching the Defendant's 2 July, 1998, letter and directing the mechanical subcontractor to install the VFDs. (DX 18-001)

PPFF No. 73: On 7 July, 1998, the Defendant forwarded a letter to the Plaintiff over the signature of Linda L. Brantley, informing the Plaintiff that the UPS power for the XY facility had been completed under a separate contract and that the site was available for electrical work by the Plaintiff. The letter also stated that the Defendant was of the opinion that only 37 days of electrical work remained on the contract. (DX 13-001)

PPFF No. 74: On 17 July, 1998, the Plaintiff's mechanical subcontractor, One Contractor, Inc., provided the Plaintiff with a detailed explanation of why the VFDs would not be and were not included in the mechanical division of the specifications and drawings. He had reviewed both the mechanical and electrical (16481) sections of the specifications and had talked with representatives of the Trane Co. And the result was that he had not bid the VFDs because they are electric/electronic devices and would not be furnished under the mechanical portion of the contract.

PPFF No. 75: On 20 July, 1998, the Plaintiff forwarded a letter to One Contractor, Inc., it's mechanical subcontractor stating that if One Contractor did not furnish and install the VFDs, the Plaintiff would employ another subcontractor to perform the effort and deduct the amount from One Contractor's subcontractor. (DX 19-001)

PPFF No. 76: On 12 August 1998, the Defendant forwarded a Memorandum to the Plaintiff which stated in part: "a. The government made a determination the VFD's were a part of the contract and would be provided." (DX 58-001)

PPFF No. 77: On 26 August, 1998, the Defendant forwarded to the Plaintiff an approved Submittal No. 19B for the Motor Controllers. (DX 30-001)

PPFF No. 78: On 28 January, 1999, the Defendant forwarded to the Plaintiff an approved Submittal No. 30 for the Test and Balance Procedure for the Air Handling Units. (DX 31-001)

PPFF No. 79: According to Doug Fowler's log, there was still nine (9) months of work to be accomplished after the UPS was installed. (DX 136-001-002)

**J. Testimony:**

PPFF No. 80: Mary Kilgore testified that she would have to defer any opinion as to whether Drawing sheet M13 called out for variable frequency drives to the electrical and mechanical subcontractors as she was neither an electrical nor a mechanical engineer. (Kilgore, TR, p. 82)

PPFF No. 81: Dofus Scott of One Contractor, Inc. testified that prior to submitting a bid to the Plaintiff, he reviewed the plans and the specifications. He then got a price on the air conditioning equipment, priced out the duct work and added in the labor. (Scott, TR. P. 103)

PPFF No. 82: Mr. Scott testified that he had been an air conditioning contractor for 20 years and had been doing work on government contracts since 1962. (Scott, TR, p. 102)

PPFF No. 83: Mr. Scott testified that he only reviewed the "M" or mechanical drawings to prepare his bid. (Scott, TR, p. 104)

PPFF No. 84: Mr Scott identified Defendant's Exhibit 105 as the mechanical specifications for the subject contract and testified that there was no reason in preparing the mechanical bid to review other then the mechanical drawings and specifications. (Scott, TR, pp. 104-105)

PPFF No. 85: On direct questioning, Mr. Scott described a variable frequency drive as a motor that controls the air handler in case part of the variable volume boxes are closed and that its purpose was to maintain a certain pressure on the duct line. He stated that he had installed VFDs prior to this contract but that usually they were part of the electrical specification because they are high voltage. (Scott, TR, pp. 105-106)

PPFF No. 86: Mr. Scott described the drawings and specifications as lousy and stated that there were a lot of things that did not work according to the drawings and specifications, like the VFDs. He also stated: "It only mentioned on my drawing variable frequency, which indicates that I should buy a motor and the units that would work with variable frequency, which I did. (Emphasis added) (Scott, TR, p. 108)

PPFF No. 87: Mr. Scott testified that the motors have to be specially made to operate with the VFDs so that it could operate at different speeds without burning up. (Scott, TR, p. 108)

PPFF No. 88: Mr. Scott testified several times that there is nowhere in the mechanical drawings or specifications where it shows or requires the furnishing of a variable frequency drive. (Scott, TR, pp. 110, 133, 134-135, 138, 141, 143, 146, 148)

PPFF No. 89: Mr. Scott testified that in reviewing the drawings a contractor would not know where to place a VFD or how to wire it. (Scott, TR, pp. 110-111)

PPFF No. 90: In response to a question from the Court as to whether he ever saw any references to variable frequency drives in the electrical specifications, Mr. Scott states: "I probably did. I don't remember, but I probably saw that. But then, since this was over, since it refers you to the electrical spec, when you put one of these jobs together, you have to put it together in a hurry and you don't have time to go over everybody's specifications. So when it referred me to the electrical spec, then I dropped it there." (Scott, TR, p. 147)

PPFF No. 91: Russ Allison had worked with Del Ellis since 1983. He started as an estimator and

progressed to a project manager. (Allison, TR, p.150)

PPFF No. 92: Mr. Allison took over the subject project when Mr. Ellis had a heart attack in August of 1996. (Allison, TR, p. 154)

PPFF No. 93: Mr. Allison testified that "Typically, you would find VFDs on the mechanical sheet. Usually associated with that, you would find a corresponding sheet, electrically, showing a disconnect for that VFD or a circuit breaker in one of your breaker boxes with a circuit number saying that this is how you're going to power that piece of equipment." He testified that none of that information was present in the plans or specifications for this project. (Allison, TR, p. 172)

PPFF No. 94: As to Mr. Ellis's position on the VFDs, Mr. Allison testified: "Mr. Ellis' position on it was that the VFDs were not shown in the drawings nor were they shown on specification..." He also testified that Mr. Ellis' position never changed. (Allison, TR, p. 188)

PPFF No. 95: When asked about Mr. Thron's memorandum (DX 130-003) which stated that there was enough evidence to infer (emphasis added) that the electrical contractor should install the VFDs, Mr. Allison stated: "I couldn't infer that, nor could I infer that Southern Comfort had to install them, because they're not shown on the electrical drawing nor are they shown on the mechanical drawing where they're to be located. How could you ask an electrician to install something without showing conduit and wire and a breaker to operate that piece of equipment?" (Allison, TR, pp. 190-191)

PPFF No. 96: Mr. William Butcher testified that he had been with Chrome Electric, Inc. for 19 years and that the company did industrial electrical contracting. At the time of his testimony the company was performing approximately eighty percent (80%) government and twenty percent (20%) non government. (Butcher, TR, pp. 321-322)

PPFF No. 97: Mr. Butcher testified that when his company bids on a project they dwell on the electrical plans and specifications and skim through everything else. (Butcher, TR, p. 323)

PPFF No. 98: Mr. Butcher testified that if there were requirements elsewhere in the plans and specifications other than in the electrical sections, the electrical contractor would not be aware of them. He also testified that the VFDs required high voltage connections and that there was nothing in the electrical drawings that indicated any connection for the VFDs. (Butcher, TR, p. 345)

PPFF No. 99: Mr. Butcher testified that it was the position of Mr. Ellis that the requirement to

install the VFDs was not in the contract and that Mr. Ellis' position did not change to the end of the contract. (Butcher, TR, p. 389)

PPFF No. 100: Mr. Butcher testified that Drawing E34 (DX 28-067) did not indicate that grounding was a part of his contract. (Butcher, TR, p. 329)

PPFF No. 101: Mr. Butcher testified that Drawing E34 (DX 28-067) even had an incorrect scale which caused hm to have to expend extra costs in conduit, wire and labor. (Butcher, TR, pp. 334-335)

PPFF No. 102: Mr. Butcher testified that VFDs were not shown on the electrical drawings, therefore, a contractor reviewing the plans would not know to install them. If the VFDs were shown in other parts of the drawing package, the electrical contractor would not be altered to this and would not know f he was to install them. (Butcher, TR, pp. 344-345, 386-387)

PPFF No. 103: Mr. Butcher testified that the VFDs required high voltage power and this should have been shown on the drawings. There were no high voltage connections shown on the drawings and no connections shown for VFDs. (Butcher, TR, p. 345)

PPFF No. 104: Mr. Butcher testified that nothing on Drawing E34 (DX 28-067) indicated that grounding plates or wiring was to be installed. He stated that there is nothing indicated where the grounding is connected or a path from the ground to a specific point. He testified that you have to have a connection for the grounding wire or it does not act as a ground. (Butcher, TR, pp. 381-382)

PPFF No. 105: In response to questions from the Court, Mr. Butcher testified that the drawing E34 was missing the typical symbols for indicating grounding and that it was not drawn in the way a typical grounding system would be drawing on an electrical drawing. (Butcher, TR, pp. 396-397)

PPFF No. 106: Mr. Stringer testified that all of his opinions concerning the inclusion of the variable frequency devices in the contract was arrived at from conversations with personnel at civil engineering. (Stringer, TR, pp. 502, 503, 504, 506, 507, 510) Mr. Stringer had no background in engineering. (Stringer, TR, p. 539)

PPFF No. 107: On cross examination Mr. Stringer admitted that his response to Plaintiff's initial RFI concerning the VFDs was to merely forward the civil engineering position and that he basically attached a cover letter and sent it. (Stringer, TR, pp. 541, 555)

PPFF No. 108: Mr. Stringer testified when asked concerning Drawing M14, what about the phrase

“motor speed” in the drawing referred to VFDs: “The way it was explained to me by the technical people that this all taken together, this page M13, page M-14, and the other referenced specification information would lead the contractor to assume that the VFDs were in fact required. I can’t say how-- not being a technical person, not being an engineer.” (Stringer, TR, p. 546)

PPFF No. 109: Mr. Stringer stated that his opinions were based on conversations with technical personnel and if they were incorrect, his conclusions and opinions would also be incorrect. (Stringer, TR, pp. 546-547)

PPFF No. 110: In cross examination concerning the specification Section 15855, paragraph 1.4.C. (DX 105-076) Mr. Stringer admitted that there was nothing in the contract or drawings that would refer a contractor to paragraph 1.4.C. of Section 15855 (Stringer, TR, pp. 547-548)

PPFF No. 111: Mr. Stringer also admitted that there was nothing is the contract specifications or drawings that referred the contractor to specification section 16841, paragraph 2.7 entitled “Solid-State, Variable-Speed Motor Controllers” (DX 105-267). (Stringer, TR, p. 551)

PPFF No. 112: Mr. Stringer did not do any research as to who drafted the specifications, whether the specifications were “boiler-plate”, or whether or not certain sections of the specifications did or did not apply to this contract. (Stringer, TR, p. 554)

PPFF No. 113: Mr. Stringer testified that when he received Submittal 19 concerning the Motor Controllers he though that Mr. Ellis had finally accepted the fact that he has to install the VFDs. (Stringer, TR, p. 560)

PPFF No. 114: Mr. Stringer testified that under Phase III of the project, in response to a pre-bid questions from a prospective offeror, the government advised that the VFDs should be installed by the electrical subcontractor. (Stringer, TR, p. 571)

PPFF No. 115: In response to a question from the Court in reference to paragraph 3.2.C of specification section 16481 (DX 105-272), Mr. Stringer stated that he assumed that when a specification states “as indicated” he assumes that there would be something “either verbally or in the drawings” to indicate where the item would be installed. (Stringer, TR, p. 587)

PPFF No. 116: Mr. Doug Fowler, inspector for the Defendant, testified on Direct and Cross as to the large amount of work still to be performed by the Plaintiff after the installation of the UPS. Prior to even

installing new equipment the Plaintiff had to deactivate all of the old circuits and tie them into the new UPS. This had to be done circuit by circuit and coordinate power outages with the users. (Fowler, TR, pp. 616-620, 646-648)

PPFF No. 117: Mr. Fowler testified that the change order issued to get temporary power to the building because of the failure to install the UPS was for lighting only. (Fowler, TR, pp. 623-624)

PPFF No. 118: On Cross examination Mr. Fowler reviewed the photographs at PX-232. He identified pictures of the VFDs as PX-232-011, 012 and 014. (Fowler, TR, pp. 651-653)

PPFF No. 119: The temporary power was only 277 volts and it was necessary to achieve 480 volts to test the new equipment. (Fowler, TR, p. 657)

PPFF No. 120: Mr. Fowler testified on direct examination that he had attended a meeting on May of 1996, (DX 124-001) that he did not recall the exact words of Mr. Ellis but that at the end of the meeting Mr. Ellis agreed to "go of and get VFDs installed". (Fowler, TR, p. 608)

PPFF No. 121: The minutes of the meeting on 8 May 1996, attended by Mr. Fowler, state that Plaintiff was "directed" to do the grounding issue and the VFDs. (DX 124-002)

PPFF No. 122: A VFD issue summary prepared by Linda Brantley states that the Plaintiff was "directed" to install the VFDs at an 8 May 1996 meeting. (DX 125-001)

PPFF No. 123: Mr. Blauel testified that he was the creator of the mechanical drawings. He also testified that the only reason he did not utilize the phrase "Variable Frequency Drives" rather than just "Variable Frequency" on Drawing M13 (DX 28-023) was that it might crowd other places on the drawing. (Blauel, TR, p. 684, 713)

PPFF No. 124: Mr. Blauel testified that he did not include in the mechanical drawings any locations for the VFDs because he did not want to micro-manage the contractor. (Blauel, TR, pp. 701-702) He did not think it was necessary to include any depiction of the VFDs in the mechanical drawings. (Blauel, TR, p. 711)

PPFF No. 125: Mr. Blauel considered the VFDs as electronic devices and therefore their requirements would be in the electrical part of the specifications and drawings. (Blauel, TR, p. 708)

PPFF No. 126: Mr. Blauel identified the VFDs in PX 232-011 as being approximately four (4) feet long. (Blauel, TR, pp. 712-713)

PPFF No. 127: Mr. Blauel testified that he interprets the term "motor controller" as a starter "or maybe some fuses kinds of things and so forth". He testified that in his familiarity, a motor controller and a VFD are two different types of equipment. (Blauel, TR, pp. 721-722, 725)

PPFF No. 128: Mr. Blauel testified that nothing in the mechanical section of the specification or drawings referred to paragraph 2.7 of Specification Section 16841(DX 105-267) (Blauel, TR, p. 722)

PPFF No. 129: Mr. Blauel testified that he did not coordinate his drawings and specification section with the electrical engineer who designed the electrical drawings and specifications. (Blauel, TR, pp. 739, 740)

PPFF No. 130: Mr. Rice testified that he was not aware of whether he utilized a master specification or took the electrical division of the specification from another project. (Rice, TR, p. 789)

PPFF No. 131: Mr. Rice testified that he was not as knowledgeable about the VFDs at the time of the drafting of the specifications as he was when he testified. (Rice, TR, p. 792)

PPFF No. 132: The following question and answer transpired during the testimony of Mr. Rice after he was given an opportunity to review the electrical portion of the drawings, Drawing E1-E34:

> "Q See if we can find something that refers to either the placement of VFD's or an electrical connection the indicates variable frequency drive or variable speed motor controllers, as defined in your electrical specifications.
>
> ***
>
> THE WITNESS: Thank you. No, sir. I see nothing that would tell them put a variable frequency drive on these drawings.
> Q No little block that says VFD or any electrical connection that goes in it?
> A. None that I can see, sir."
> (Rice, TR, p. 797)

PPFF No. 133: Mr. Rice testified that at the time of the drafting of the specifications for the subject contract, the industry was on the "cutting edge" of converting from pneumatic controls to direct digital controls and that the Ar Force had not made the switch. (Rice, TR, pp.816-817)

PPFF No. 134: On direct examination, Mr. Antonevich testified that Mr. Ellis had stated at a meeting held on 26 June, 1996, (DX 56) that he (Mr. Ellis) acknowledged that the VFDs were in the contract. On cross examination Mr. Antonevich stated that he could not remember the exact words spoken by Mr. Ellis. (Antonevich, TR, p. 823)

PPFF No. 135: Mr. Paulsin testified in response to a question from the Court that the reference to pneumatic controller in the "Remarks" column on Drawing M13 (DX 28-023) meant that the system could

be controlled pneumatically as well as electronically. (Paulsin, TR, p. 1068)

## II. THE LAW:

### A. THE FALSE CLAIMS ACT:

The False Claims Act provides for liability for any person who: "knowingly presents, or causes to be presented, to an officer or employee of the United States Government a false or fraudulent claim for payment or approval". (31 U.S.C. P3729(a)(1)) The terms "knowing" and "knowingly" mean that respect to information a person: (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or, (3) acts in reckless disregard of the truth or falsity of the information." (31 U.S.C. P3729(b))

The objective of Congress in enacting the False Claims Act was broadly to protect funds and property of the government from fraudulent claims, regardless of particular form or function of government instrumentality upon which such claims were made. (*Rainwater v. United States, 356 US 590 (1958))* The False Claims Act imposes two sorts of liability; first, submitter of false claim or statement is liable for civil penalty, regardless or whether submission of claim actually causes government any damages and even if claim is rejected, and second, submitter of claim is liable for damages that government sustains because of submission of false claim. *United States ex.rel. Schwedt v. Planning Research Corp., 313 US App. SC 200, 59 F3d 196 (1995)*

What constitutes the offense is not intent to deceive, but knowing presentation of claim that is either fraudulent or simply false; requisite intent is knowing presentation of what is known to be false. *Hindo v. University of Health Sciences, 65 F3d 608 (1995, CA7 Ill)* Under scienter requirement of False Claims Act, plaintiff must establish the defendant had actual knowledge that he was submitting false or fraudulent claim, or that defendant acted with deliberate indifference as to truth or falsity of claim. *United States ex.rel. Aflatooni v. Kitsap Physicians Servs., 158 F3d 439 (1998, CA9 Wash); Hagood v. Sonoma County Water Agency, 81 F3d 1465 (1996, CA9 Cal)* Contractor relying on good faith interpretation of regulation is not subject to liability under False Claims Act, not because his interpretation was correct or reasonable, but because good faith nature of his action forecloses possibility that Act's scienter requirement is met. *United States ex.rel. Oliver v. Parsons Co., 195 F3d 457 (1999, CA9 Cal)*

Liability under False Claims Act is subject to judicially-imposed requirement that false statement or

claim be material; materiality depends on whether false statement has natural tangendency to influence agency action or is capable of influencing agency action. *Harrison v. Westinghouse Savannah River Co.*, *176 F3d 776 (1999, CA4 SC); United States ex.rel. Berge v. Board of Trustees of Univ. of Al., 104 F3d 1453 (1997, CA4 Md)*

Innocent mistakes or negligence are not actionable under the False Claims Act. *Hindo, supra.; Aflatooni, supra.; Goodley v. United States, 26 Cl Ct 1075 (1992); United States ex rel. Durcholz v. FKW Inc., 189 F3d 542 (1999, CA7 Ind); First Interstate Bank, N.A. v. United States, 27 Fed Cl 348 (1992); United States ex rel. Quirk v. Madonna Towers, Inc., 278 F3d 765 (2002, CA8 MN)* Improper interpretation of contract by government contractor does not constitute false claim for payment. *United States v. Basin Elec. Power Coop., 248 F3d 781 (2001, CA8 ND)*; *United States es rel. Butler v. Hughes Helicopters, Inc, McDonnell Douglas Helicopter Company, 71 F3d 321 (1995, CA9 CA).*

Government knowledge of falsity of claim does not automatically bar False Claim Act action; however, fact that the contractor has fully disclosed all information to government may show that contractor has not knowingly submitted false claim. *United States es rel. Kreindler & Kreindler v. United Technologies Corp., 985 F2d 1148 (1993, CA2 NY)* Defendant in action brought under False Claims Act may be able to cast doubt on whether he knowingly submitted false claim by showing that government itself was already aware of facts underlying FCA claim when allegedly fraudulent claim was submitted. *United States ex rel. Stone v. Rockwell Int'l Corp, 282 F3d 787 (2002, CA10 Colo)*

**B. DEFECTIVE SPECIFICATIONS:**

Any discussion of delays and extra costs caused by defective specifications necessarily begins with *United States v. Spearin*, 248 U.S. at 136-137 where the Court stated that "if the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." The Court of Appeals for the Federal Circuit has refined this concept as follows:

> "Spearin stands for the proposition that when the government includes detailed specifications in a contract, it impliedly warrants that (i) if the contractor follows those specifications, the resultant product will not be defective or unsafe, and (ii) if the resultant product proves defective or unsafe, The contractor will not be liable for the consequences. *Spearin,* 248 U.S. at 136-137, 39 S.Ct. at 61. As with any

> contract-based claim, however, a plaintiff must allege and prove (1) that a valid warranty existed, (2) the warranty was breached, and (3) plaintiff's damages were caused By the breach. *San Carlos Irrig. and Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed.Cir. 1989);"

*M.A. Mortenson Company v. United States*, 40 Fed.Cl. 389, 1998; See Also *CHEMS, Inc. v. United States*, 59 Fed.Cl. 168, 214 (2003).

Design specifications implicitly warrant that if followed an acceptable result will be produced. *Stuyvesant Dredging Co. v. United States,* 834 F.2d 1576, 1582 (Fed.Cir 1987); *Hol-Gar Mfg. Corp. v. United State*, 175 Ct.Cl. 518, 360 F.2d 634, 638 (1966) To determine whether the specifications are performance or design the court considers both the specifications as a whole and the way in which they were enforced. *Blake Constr. Co. v. United States,* 987 F.2d 743 (Fed. Cir., 1993) See also *Amertex Enterprises. LTD v. United States*, 1995 U.S. Claims LEXIS 259 (1995) The key inquiry is the extent of the discretion afforded the contractor. *Turner Construction Co. v. United States*, 54 Fed.Cl. 388, 398 (2002) However, analysis of a defective specification claim is not limited to assessment of the element of discretion. A contractor, in addition to demonstrating that the subject specifications do not permit meaningful discretion, must also show that the defective specifications are the cause of the injury. *Gulf Western Precision Engineering Co. v. United States*, 211 Ct.Cl. 207, 218, 543 F.2d 125, 130-131 (1976); *Fru-Con Construction Corporation v. United States*, 42 Fed.Cl. 94, 96 (1998).

The Plaintiff has alleged that the specifications and drawings were defective in that they did not accurately call for the installation of variable frequency devices and the Defendant disagrees alleging that the specifications and drawings clearly call for the . VFDs. The question has become whether or not the specifications and drawings are ambiguous or misleading and what was the responsibility of the Plaintiff in preparing its bid. This involves a matter of contract construction.

A clear explanation of contract interpretation is found in *Cray Research, Inc. V. The United States*, 41 Fed.Cl. 427 (1998) at pp. 434-435 where this Court stated:

> "Contract interpretation is a question of [**21] law to be decided by the court, and is amenable to summary judgment. See *Muniz v. United States, 972 F.2d 1304, 1309 (Fed. Cir. 1992); P.J. Maffei Bldg. Wrecking Corp. v. United States, 732 F.2d 913, 916-17 (Fed. Cir. 1984).* When interpreting a contract, the court looks first to the plain meaning of the contract. See *Aleman Food Servs., Inc.*

*v. United States, 994 F.2d 819, 822 (Fed. Cir. 1993); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).* The court construes the meaning of particular terms, not according to the actual intentions of the parties at the time but, rather, objectively, as would a "reasonably intelligent person acquainted with the contemporaneous circumstances." *Hol-Gar Mfg. Corp. v. United* [*435] *States, 169 Ct. Cl. 384, 351 F.2d 972, 975 (Ct. Cl. 1965).* The court must give reasonable meaning to all parts of the contract, and not render any portion meaningless. *Fortec, 760 F.2d at 1292; Thanet Corp. v. United States, 219 Ct. Cl. 75, 591 F.2d 629, 633 (Ct. Cl. 1979).*

If parties to a contract dispute the meaning of words in the contract, the court employs the following analysis. First, [**22] the court considers the plain language of the contract. *Northrop Grumman Corp. v. Goldin, 136 F.3d 1479, 1483 (Fed. Cir. 1998); Gould, 935 F.2d at 1274.* Next, the court determines whether the words, given their ordinary meaning, create an ambiguity. See *John C. Grimberg Co., Inc. v. United States, 7 Cl. Ct. 452, 456 (1985),* aff'd without opinion, *785 F.2d 325 (Fed. Cir. 1985).* "A contract is ambiguous if it is susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Community Heating & Plumbing Co., Inc. v. Kelso, 987 F.2d 1575, 1579 (Fed. Cir. 1993)* (citations omitted). If a contract term is unambiguous, the court cannot assign it another meaning, no matter how reasonable it may appear. *Triax Pacific, Inc. v. West, 130 F.3d 1469, 1473 (Fed. Cir. 1997)* (citing *R.B. Wright Constr. Co. v. United States, 919 F.2d 1569, 1572-73 (Fed. Cir. 1990)).*

A contract will be interpreted to fulfill the principal objective purposes of the parties, since one party's subjective, unwritten intent cannot bind the other party. See *Firestone Tire & Rubber Co. v.* [**23] *United States, 195 Ct. Cl. 21, 444 F.2d 547, 551 (Ct. Cl. 1971); Singer-General Precision, Inc. v. United States, 192 Ct. Cl. 435, 427 F.2d 1187, 1193 (Ct. Cl. 1970).*

***

An ambiguity may be patent or latent. See *Newsom, 676 F.2d at 650.* A patent ambiguity is one that is apparent from the face of the contract; a latent ambiguity becomes evident when, considered in light of the objective circumstances, two conflicting interpretations appear reasonable. *ITT Arctic Servs., Inc. v. United States, 207 Ct. Cl. 743, 524 F.2d 680, 692* [**24] *(Ct. Cl. 1975).* If the ambiguity is patent, the plaintiff has the duty to seek its clarification. *Newsom, 676 F.2d at 650; S.O.G. of Arkansas v. United States, 212 Ct. Cl. 125, 546 F.2d 367, 369 (Ct. Cl. 1976).* If the plaintiff has not done so, the court will construe the ambiguity against the plaintiff. *Id. 546 F.2d at 371.*

See also *Veit & Company, Inc. V. The United States*, 56 Fed.Cl. 30

**<u>C. CONCURRENT DELAYS:</u>**

An issue arose as to whether or not there were concurrent delays on the part of the Plaintiff and the Defendant and, if so, how they were to be treated. This Court has approved the apportionment of fault in concurrent delays between the parties. In *Tyger Construction Company, Inc. v. The United States*, 31 Fed.Cl. 177 (1994) this Court determined that the Plaintiff could receive damages for delay even though there were concurrent delays if it could be clearly established that the delays of the government were found to be separate and independent causes of delay. *Tyger,* at 275. See also *Sipco Services & Marine, Inc. V. United States*, 41 Fed. Cl. 196, 225; *Blinderman Constr. Co. V. United States, 695 F.2d 552, 559 (Fed.Cir. 1982).*

**D. DUTY TO COOPERATE:**

As this Court have said many times:

> "It is black letter law that every contract with the government contains an implied obligation that neither party will do anything to prevent, hinder, or delay performance." *Sterling Millwrights, Inc. v. United States* [**58] *, 26 Cl. Ct. 49, 67 (1992)* (citing *Lewis-Nicholson, Inc. v. United States, 213 Ct. Cl. 192, 550 F.2d 26, 32 (1977)).* It is within this context that the court considers the allegation that NASA hindered and delayed SIPCO's performance through the imposition of standards not contemplated by the contract documents.
> The duty of cooperation between parties to a contract is undisputed. Specifically directed to NASA, "the government has an implied duty to cooperate with its contractors." *Information Sys. & Networks Corp., 34 Fed. Cl. 457, 460* (citing *Malone v. United States, 849 F.2d 1441, 1445 (Fed. Cir. 1988)).* The government's duty of cooperation inheres in the idea that it not hinder contractor performance, but the government "must do whatever is necessary to enable the contractor to perform." *Lewis-Nicholson, Inc. v. United States, 213 Ct. Cl. 192, 204, 550 F.2d 26, 32 (1977)* (citing *Kehm Corp. v. United States, 93 F. Supp. 620, 623, 119 Ct. Cl. 454, 469 (1950)).* Thus, the government's obligation has both positive and negative aspects.
> This implied obligation is breached "when delay occurs because of excessive supervision or control over the contractor." *Lathan Co., Inc.,* [**59] *v. United States, 20 Cl. Ct. 122, 129 (1990)* (citing *Roberts v. United States, 174 Ct. Cl. 940, 357 F.2d 938 (1966)).* It is true, however, that its obligation not to hinder performance does not foreclose all government action with regard to the contractor's performance of the contract. As a matter of fact, "the Government may, without liability, merely direct the contractor to perform in accordance with the terms of the contract." n16 *20 Cl. Ct. at 128* (citing *H.L.C. & Assoc. v. United States, 176 Ct. Cl. 285, 307, 367 F.2d 586, 599 (1966)).* Nevertheless, although the government may insist upon contractor compliance with the terms of the contract, "the government cannot impose a more stringent testing procedure or standard

for demonstrating compliance than is set forth in the contract."
*United Technologies Corp., Sikorsky Aircraft Div. v. United States, 27 Fed. Cl. 393, 397 (1992)* (citations omitted). Where government actions delay contractor performance and increase costs, "the contractor has a claim for damages." *Lathan, 20 Cl. Ct. at 129* (citing *Lewis-Nicholson, 550 F.2d at 26).”*

It has also been established that the failure to furnish government furnished equipment is a failure to cooperate and a breach of the government's duties ans well as a breach of the contract. *International Electronics Corporation v. United States*, 1980 U.S. Ct.Cl. LEXIS 1072 (1980); *Lewisburg v. United States*, 1982 U.S. Ct. Cl. LEXIS 2379 (1982) .

**III. DISCUSSION:**

**A. FALSE CLAIMS ACT:**

The Court specifically requested the Defense to brief the Court as to whether there were any cases that had held a contractor liable under the False Claims Act for a difference in interpretation of a contract provision. The overwhelming answer **is: NO!** In fact, there are several cases stating exactly the opposite: that a contractor cannot be held liable under the False Claims Act merely for a difference in interpretation of a contract provision. See *United States v. Basin Elec. Power Coop*., and; *United States ex rel. Butler v. Hughes Helicopters, Inc, McDonnell Douglas Helicopter Company, supra.*

The cases uniformly state that there must either being a conscious, knowing falsehood or a reclous disregard for the truth. The facts in this case do not come close. The only shred of evidence that the Defense has put forth upon which to base its allegation is the thery that during some meeting with government officials, Mr. Ellis admitted that the contract did, in fact, call for the installaton of variable frequency devices and then, in disregard of this affermation, he submitted a claim for the cost of their purchase and installation. It is the opinion of the Plaintiff that this theory does not even pass the “smell” test, let alone carry a preponderence of the evidence.

Both Mr. Antonevich and Mr. Fowler testified that that attended meetings with Mr. Ellis, however, neither could remember Mr. Ellis' exact words. (PPFF Nos. 120 & 134) Neither of the meeting minutes reflects that Mr. Ellis stated that he agreed with the Defendant's position that the VFDs were included. In fact, the minutes of the meeting attended by Mr. Fowler (DX-124-002) specifically state that the Plaintiff was directed to install the VFDs. (PPFF No. 122)

All of the actions of Mr. Ellis reflect his position that he did not agree that the VFDs were included in the contract. Only when he was directed to install them did he go to his electrical and mechanical subcontractors to attempt to determine whose responsibility is was to purchase and install the VFDs. Mr. Ellis' affidavit (PX 230) states categorically that he agreed with both of the subcontractors that the VFDs were not included in either of their requirements and did not change his opinion even when he was directed to install them. As the documents relate, Mr. Ellis resisted installing the VFDs for almost two (2) years before he relented and directed his electrical subcontractor to install them. (PPFF Nos. 42, 44, 45, 46, 47, 50, 51, 60, 62, 64, 65 and 66)

The testimony of both Russ Allison (PPFF No. 94) and William Butcher (PPFF No. 99) was that Mr. Ellis' position from the start of the contract was that the VFDs were not included in the contract and that his position never changed.

It is the position of the Plaintiff that the Defendant's imposition of a False Claims Act allegation is merely a feeble attempt to cloud the issues in this case and only results in defaming a man who can no longer defend himself. Plaintiff requests that this allegation be dismissed

**B. VARIABLE FREQUENCY DEVICES:**

Initially, we should clear up one aspect of this part of the litigation. The absence of Specification Section 16480 is a patent ambiguity. This is of the type that it is so clear that it is obvious that something is incorrect or missing in the contract. However, this admission does not end the controversy nor does it, in the opinion of the Plaintiff, bear any fruit for the Defendant's arguments. This is because that, even admitting that Section 16840 was obviously missing, this does not clear up the remainder of the problems with the specification and drawings.

The only reference to Section 16840 is found at Section 15855, paragraph 1.4.C. which covers the Quality Assurance for Variable Air Volume Air Handling Units with Variable Frequency Drive. (DX 105-076) This is in the mechanical section of the specifications and would normally be reviewed prior to bid only by the mechanical contractor. (PPFF No. 97) Mr. Scott testified that he did look at the electrical specifications (Section 16481) and may have seen references to VFDs in the electrical portion of the specifications, however, as he was only responsible for the mechanical sections, he did not review them in detail. He testified that when you bid a job such as this, you are in a hurry because of the short response

time and you do not have time to go over everybody's specifications. (PPFF No. 90) Therefore, as Mr. Scott, the only subcontractor who was responsible for reviewing the mechanical specifications in detail, saw the reference to Section 16840 and ignored it and referred to Section 16481, the fact that his may be a patent ambiguity is inconsequential in light of the other problems with the specification and drawings.

It would appear that it is the consensus of the witnesses that the VFDs are electronic equipment and should be listed under the electrical portion of the specifications and drawings. Mr. Scott (PPFF No. 90) and Mr. Butcher (PPFF Nos 98,103) that the VFDs are high voltage equipment and belong in the electrical section. Mr. Blauel, the drafter of the mechanical section of the specifications considered the VFDs electronic devices which belonged in the electrical sections. (PPFF No. 122)

It appeared to be the testimony of all parties that the only alleged reference to variable frequency devices in the mechanical drawings was the term "Variable Frequency" in one of the blocks in one of the charts on Drawing M13. (PPFF No. 23) While Drawing M14 has a legend that states "AHU MOTOR SPEED" there is no reference to a VFD and no depiction of a connection to one. There is nothing in the mechanical drawings that show a contractor where to place a VFD or how to wire it. (PPFF No. 89)

The one reference to VFDs in the mechanical specifications is at Paragraph 1.4.C. of section 15855 where it refers to Variable Ar Volume Air Handing Units w/Variable Frequency Drives. It then refers the reader to "Specification Section 16480" (16481) which is in the electrical section. Mr. Scott testified that when he saw a reference to the electrical specifications he stopped there because you do not have time to go over everyone's specification sections. (PPFF No. 90)There is therefore no specific reference in either the mechanical drawings or the mechanical specifications that would alert a mechanical contractor who is attempting to prepare a bid that it is required to provide VFDs for the project.

Mr. Scott testified that he reviewed the mechanical drawings at M13 and interpreted the reference to "Variable Frequency" for him to provide a motor and the units that would work with variable frequency, which he did. (PPFF No. 86)

According to Mr. Butcher, when his company bids on projects, they dwell on the electrical plans and specifications and skim through everything else. (PPFF No. 97) If there were requirements in other parts of the specifications and drawings that placed responsibilities on the electrical contractor, the contractor would not be aware of them in reviewing the material. (PPFF No. 98) Mr. Butcher testified that

the VFDs were not shown on the electrical drawings nor was there any indication of any connection for the VFDs even though they required high voltage connections. (PPFF Nos. 98, 102, 103)

Mr Rice, the Defendant's electrical engineer and the author of the electrical drawings and specifications, testified that at the time of this project, VFDs were on the "cutting edge" of technology or converting from pneumatic controls to direct digital controls and the Air Force had not yet made the switch.. (PPFF No. 130) In response to a question on cross examination, Mr. Rice stated that there was nothing n the electrical drawings that would tell a contractor to install a variable frequency drive. (PPFF No. 129)

It is the position of the Plaintiff that the Defendant issued an erroneous and ambiguous set of plans and specifications that misled the Plaintiff and its subcontractors. While the government's witnesses testified that if you cross referenced both the mechanical and the electrical sections of both the plans and specifications you would find indications that the VFDs were required, this does not comport to "real world" experiences. When a general contractor is biding a job such as this, it does not have time to go behind the bds from the various subcontractors. Each of the subcontractors do not have time, and are not expected to, to research each others responsibilities. It is the general contractor's responsibility to coordinate the work of its subcontractors after the project has begun, however, it has neither the responsibility or the time prior to bid to ensure that the subcontractors have fully explored every possibility in their bid.

Knowing this, it is incumbent on the Defendant to issue a set of plans and specifications that is clear and unambiguous as to the responsibilities of each trade. They cannot include oblique references to "Variably Frequency", without more explanation, in the mechanical sections and then place all of the descriptive portions defining a VFD in the electrical sections and expect a mechanical contractor to realize that it is supposed to provide the devices.

In the same vein, the Defendant cannot put the description of a VFD in the specifications along with the description of several other devices and then not include any reference to VFDs in the electrical drawings and expect an electrical contractor to read the minds of the Defendant's engineers that the Defendant requires the installation of a VFD. This takes it out of the realm of ambiguous and squarely into defective.

It is the contention of the Plaintiff that the Defendant issued incomplete and defective

specifications that misled the Plaintiff's subcontractors. The requirement to furnish the VFDs was ambiguous, at best, and the Plaintiff should be reimbursed for the cost of purchasing and install the VFDs along with any resulting impact costs.

**C. Grounding**:

Both Mr. Butcher and Mr. Rice testified extensively concerning the requirement for grounding in Drawing E34 of the electrical drawings. Mr. Butcher testified that the drawings depicting the alleged grounding requirement was not done in the way a typical grounding system would be draw and was missing the typical symbols for indicating grounding. (PPFF No. 105) There was no indication of a connection to a ground or to a specific point which is required for a viable grounding system. (PPFF No. 104) Mr. Rice's response was that it was to connect to an "existing" system, therefore there was no need to have a specific ground point.

The difficulty with the testimony of Mr. Rice is that there is no indication on Drawing E34 that the alleged new system is connected to the old system. There is an indication of an existing system on the other side of the wall, however, there is no line or other device indicating a connection between the two. Therefore there is nothing to alert a bidder that the "system" he is to install is not a "stand alone" system that would not require a grounding point. It is therefore also ambiguous as to whether there is any work to be done on the grounding system, especially since it is to be installed for the communications system and the alleged requirement is place on the fire alarm drawing.

**D. UPS:**

There is no question that the UPS was required to be furnished by the Defendant so that the Plaintiff could complete its work. All of the new electrical work had to be tied into and tested with the new UPS. As early November, 1995 the Plaintiff was notifying the Defendant that the lack of the UPS was impacting its work. (PPFF Nos. 35, 38, 39) In fact, there has been no dispute by the Defendant that the UPS was supposed to be furnished at the beginning of the Plaintiff's contract and was not on line until 30 July, 1998, (DX 136-001) three and one half years after the contract was awarded and two and one half years after the first notification of the impact of the absence of the UPS.

The Defendant now seeks to absolve itself of the impact of its failure to provide the UPS in a timely manner by arguing either that there was not much work left to accomplish after it was placed on-

line, or argue that there was a concurrent delay with the Plaintiff's failure to furnsh the VFDs.

As to the first argument, the Defendant's witness, Doug Fowler, testified convincingly as to the amount of work remaining after the UPS was installed. (PPFF No. 116) He also provided a memorandum that had been gleaned from daily reports and chronicled work that extended into February of 1999 before the contract was complete.(PPFF No, 79) This work included the disconnecting of the old electrical boxes and wiring and reconnection to the new UPS. This required at least two major power outages so that work could be accomplished. The work was further delayed by a launch that required suspension of work. The contract was finalized by testing and balancing the VFDs and completion of the final punch lists in February of 1999.

The Defendant then argues that because the Plaintiff was late in providing the VFDs, there was a concurrent delay and the Plaintiff is then prohibited from receiving remuneration because of the Defendant's delays. Of course, if this Court finds that the specifications are ambiguous concerning the VFDs and the Plaintiff was not responsible for furnishing them, the Defendant is then liable for both of the delays.

Even if the Plaintiff is held liable for furnishing the VFDs, this does not end the matter. The Defendant is obviously operating under the theory that a concurrent delay wipes out all responsibility for delay damages on either side. As the above cited cases establish, this is not necessarily the result. There is precedent to the effect that if the government's cause for delay is separate and distinct from that of the contractor, the delays, and their costs, can be apportioned. This is expressly the case in this litigation. The VFDs and the UPS are clearly separate and distinct causes for delay. The days and the costs can be identified and isolated, therefore apportioned.

There is also the matter of the impact of each delay cause. The Court questioned the Defendant's expert concerning the impact and scheduling of each of the delays. In the case of the VFDs, the air handling units continued to operate without the VFDs (in fact, AHU No. 4 was never replaced therefore it is assumed that it is still operating without a VFD) until the time the VFDs were installed. It is also a fact that during one of the launches the VFDs were disconnected and the AHUs still operated. The operation of the building was never delayed or compromised by the lack of the VFDs and their installation, when provided, went quickly. There is also the matter that as the VFDs operated on 480 volts and the temporary power

was only 277 volts, they could not be installed until the UPS was furnished, therefore, scheduling their installation and testing and balancing prior to the installation of the new UPS would have been a waste of time as the testing and balancing would have to have been accomplished under the new wiring

It is therefor the contention of the Plaintiff that the Defendant should bear the entire cost of the delays occasioned by the failure to furnish the UPS.

Submitted, this the 10th day of June, 2004.

Respectfully Submitted;
MCMANUS & GRAHAM

S/ J. Hatcher Graham
Georgia Bar No. 304577

S/ John C. McManus
Georgia Bar No. 497775

P.O. Box 7626
Warner Robins
Georgia31095
(478) 953-5606