# In The United States Court of Federal Claims

No. 00-755C

(Filed: March 14, 2005)

This Opinion Will Not Be Published in the U.S. Court of Federal Claims Reporter Because It Does Not Add Significantly to the Board of Law.

_________

SOUTHERN COMFORT BUILDERS, INC., *
Plaintiff, *
*
v. *
*
THE UNITED STATES, *
*
Defendant. *
*

_________

**OPINION**

_________

**ALLEGRA, Judge:**

This case is before the court following trial at Patrick Air Force Base in Coco Beach, Florida. Plaintiff, Southern Comfort Builders, Inc. ("Southern Comfort"), brought this action under the Contract Disputes Act against the United States, acting through the Department of the Air Force ("Air Force"), seeking $260,731.00 in damages, plus interest. For the reasons that follow, the court finds that plaintiff is not entitled to the damages it seeks. The court also concludes that defendant has not borne its burden of proof on several fraud-based counterclaims it filed in this action.

## I. FACT FINDINGS

On August 24, 1994, the Air Force issued solicitation no. FO8650-94-B-0032 for Phase 2 of the repair of the XY Building at Kennedy Space Center in Florida, covering various services including replacement of the heating and air conditioning units. Bidders were instructed to provide sealed bids no later than September 23, 1994. Southern Comfort, a Florida corporation, entered a timely bid of $1,089,000. On September 28, 1994, the project's contracting officer notified Southern Comfort that it had submitted "the apparent low responsive bid," but noted that

its proposal was $737,000 below the government's estimated project cost and requested that Southern Comfort verify its bid. In this notice, plaintiff was advised that –

> If you intend to verify your bid, your reply should state that you have thoroughly reviewed all bidding documents, specifications, and drawings . . . . You should indicate that you have reviewed your original work sheets and bid papers. Lastly, you should state that you understand all work to be performed and would like a contract in the amount of your original bid.

In a letter dated the following day, Southern Comfort stated that it had "reviewed and re-examined" the plans, specifications, and drawings relating to the contract and indicated that it understood "all the work that is to be performed," under the contract. It thereby verified its contract price of $1,089,000.

On October 20, 1994, the Air Force awarded contract no. FO8650-95-C-0011 ("the contract") to Southern Comfort. The Air Force issued a formal Notice to Proceed on January 18, 1995, and indicated that completion of the work was required within 425 calendar days after receipt of the notice, thereby establishing a completion date of March 18, 1996. Various amendments and extensions were provided during the course of performance, establishing a final expected completion date of September 19, 1997. However, the contract was not ultimately completed until March 18, 1999.

The contract called for Southern Comfort, as contractor, to "furnish all plant, materials, labor, equipment and perform all work required to repair, upgrade and complete extensive rehabilitation of mechanical, electrical, and architectural finishes" at the XY Building. The technical specifications and drawings for the project, which were developed for the Air Force by Johnson Controls, exceeded 500 pages and were divided into 15 substantive divisions. Pertinent to this action are divisions 15 and 16, dealing with, respectively, the mechanical and electrical specifications for the project. Southern Comfort contracted out the work for both the mechanical and the electrical portions of the work, respectively, to One Contractor, Inc. ("One Contractor") and Chrome Electric, Inc. ("Chrome").[1]

The project ran into difficulties from the start. On April 18, 1995 – three months after issuance of the notice to proceed – Southern Comfort notified the Air Force that although "it was our intention to begin work on this project on 01/19/95," work had not yet commenced because of, *inter alia*, government delays in performing required lead-abatement work. Once work on the project began, other difficulties began to manifest themselves, including three disputes that are the central focus of this litigation, involving whether: (i) the contract required Southern Comfort

---

[1] The subcontract with One Contractor appears to have been executed on December 22, 1994. It provides, in relevant part, that One Contractor was to "furnish all materials, labor, taxes, and Insurances . . . to install complete HVAC system including units, piping, controls, and Test & Balance."

to install "Variable Frequency Drives" ("VFDs"); (ii) the contract required Southern Comfort to install a ground for a communications system; and (iii) the Air Force's failure timely to provide an uninterruptible power supply ("UPS") for the project caused compensable delay. The court will enumerate its findings relating to each of these disputes, *seriatim*.

**A. Variable Frequency Drives**

The contract required Southern Comfort to replace the heating, ventilation and air conditioning ("HVAC") system in the XY Building. Part of that project involved the replacement of the system's air handling units ("AHUs"), which are the devices that propel air through the HVAC system. It is uncontested that an HVAC air-handling system can be either constant or variable volume. The contract's specifications clearly called for a variable volume air handling system, which involves two primary operations: controlling air flow out of the system using louvers and ducts, and controlling air flow within the system using a fan. As to the latter operation, in a variable volume system, there are two possible mechanisms for controlling air flow within the system. The simpler of the two is a device known as "inlet guide veins," which are a series of louvers inside the air handling unit itself which simply shuts off the flow of air coming into the unit, while the fan continues to run. The other mechanism is a variable frequency drive (VFD), which modulates the speed of the fan to accommodate the system's needs.

The contract refers expressly to VFDs in two places in the mechanical division. Section 15855, titled "Air Handling Units with Coils," contains paragraph 1.4C, "Quality Assurance," which describes certain quality control requirements. The section refers to four pieces of equipment, one of which is "Variable Air Volume Air Handling Units with Variable Frequency Drive – see specification section 16480." Since the contract does not contain a section 16480, the correct reference appears to be to section 16481, "Motor Controllers." Later in section 15855, paragraph 2.5, "Fans," includes the following language in brackets: "For fan sections controlled by variable frequency drives, balance at all speeds between 25% and 100% of design RPM." Less explicit references to VFDs may be found in other parts of the specifications. For example, section 16481 contains paragraph 1.5, "Quality Assurance," which states that the contractor must "[p]rovide solid-state, reduced-voltage and solid state, variable speed controllers" and paragraph 2.7 of this section, entitled "Solid-State, Variable-Speed Motor Controllers," which directs the contractor to "provide controllers listed and labeled as a complete unit and arranged to provide variable speed . . . ."

The schematic drawings for the project do not include the term "variable frequency drive" at any point. However, drawing M13, in the mechanical section, includes the words "variable frequency" in a schedule describing capacity control for the HVAC system's chilled water handling unit. No drawings indicated the placement of VFDs or the electrical connections that would be required to connect them.

On November 7, 1995, Chrome Electric, the electrical subcontractor, sent Southern Comfort the first of many requests for information ("RFIs"). In this request, Chrome questioned whether the technical specifications required it to provide VFDs in the air-handling units. A handwritten note on the RFI, signed at some later point by Southern Comfort's principal, Mr. Ellis, states that "VFD's [sic] to be provided by electrical contractor." It appears that Mr. Ellis faxed the handwritten reply back to Chrome sometime after November 7 – the record does not indicate when. Less than one month later, on December 4, 1995, Southern Comfort submitted RFI No. 27, stating:

> Sect. 15855 pg. 2 1.4.C refers to Variable Air Volume Air Handling Units w/ <u>Variable Frequency Drive– see specification section 16840. There is no section 16840</u>. Please advise ASAP if Variable Frequency Drives are required and provide us with the spec section 16480 so we can submit costs for these electrical controllers. Time is of the essence.

(Emphasis in original). On December 15, 1995, the contracting officer delivered to Southern Comfort its response to RFI No. 27, identifying two diagrams – M13 and M14– and two contract provisions that, in his view, established the requirement for VFDs. The contracting officer concluded that no additional costs would be payable for the addition of VFDs because "all components are specified" in the contract.

Notwithstanding these communications, the controversy over the VFDs continued, with both subcontractors insisting that the other was required to provide the devices. On February 12, 1996,[2] Southern Comfort submitted another RFI (No. 40) to the contracting officer, in which it stated:

> Please be advised that because of the ambiguity in the specifications and drawings, neither the Mechanical or [sic] Electrical contractors included VFDs in their proposals. The attached letter from Chrome Electric Inc. sums up the research into this matter showing how the ambiguity occurs. As before, if VFDs are required, we will submit costs.

On March 22, 1996, Chrome provided Southern Comfort with a detailed explanation of its position on this issue, stating, in relevant part, that "nowhere in the entire section of electrical drawings are the VFDs indicated."[3] Chrome also reviewed the mechanical section and concluded

---

[2] The RFI is dated February 12, 1996, but attaches a memorandum from Chrome dated March 22, 1996. The Air Force response, however, is dated February 20, 1996, and refers explicitly to the attached Chrome memorandum. It appears from subsequent correspondence that the correct date of the Chrome memorandum was February 8, 1996.

[3] More than two years later, the mechanical subcontractor provided a similar analysis to Southern Comfort, pointing out that although section 15855 referred explicitly to VFDs, it did

that under paragraph 1.4C of section 15855 – entitled "Variable Air Volume Air Handling Units with Variable Frequency Drive" – VFDs were "an integral part of the Air Handling Units" to be provided by the mechanical subcontractor. On April 9, 1996, the Air Force rejected Southern Comfort's position with respect to VFDs, stating that "when read as a whole the contract required you to furnish variable frequency drives." The parties held a meeting on July 3, 1996, at which, according to the contracting officer's notes of that meeting, "it was acknowledged that the contract does, in fact, require the VFD's [sic]." On November 21, 1996, the Air Force issued another letter ordering Southern Comfort to install the VFDs.[4]

Almost a year later, the VFDs still had not been installed, and on September 16, 1997, the Air Force again ordered Southern Comfort "to provide Variable Frequency Drives pursuant to [the] contract," and referred to five previous occasions on which it had directed the installation of VFDs orally or in writing. On September 29, 1997, Mr. Ellis of Southern Comfort provided Chrome with "written direction to install the Variable Frequency Drives as outlined on the blue prints and referenced in Division 1600 of the specifications." Mr. Ellis further stated that he understood Chrome's position that "the prints and specifications are vague and have ambiguities" and that he would "support any efforts" Chrome might make to receive an equitable adjustment. Mr. Ellis, however, also attached a report prepared by a "neutral third party, stating that the responsibility for furnishing" the VFDs belonged to the electrical subcontractor. That document, prepared at Mr. Ellis's request by Randy Thron, stated that "although clear direction is not indicated on who should supply the VFDs, enough reference is provided to infer that material is to be coordinated and installed by the electrical contractor."

On the same day that Mr. Ellis directed Chrome to provide the VFDs, he also provided the Air Force with a handwritten note indicating that the VFDs were "on order."[5] Despite this representation, installation of the VFDs was not completed until late December of 1998, and was not approved by the Air Force until January 28, 1999. On July 30, 1999, Southern Comfort submitted a request for equitable adjustment with respect to the VFD installation costs. The Air Force denied that request on March 27, 2000.

---

not provide full technical specifications for their installation and cross-referred to the electrical division (*e.g.*, section 16480) for those specifications.

[4] This letter stated that –

> The government is not involved in the management of a prime contractor's business and does not decide which of the prime's subcontractors are responsible for specific tasks. Therefore, as prime contractor, you are directed to provide VFD's [sic] as required by the contract specifications.

[5] In addition, handwritten minutes of a meeting held on June 11, 1996 and attended by Mr. Ellis also indicate that the VFDs had "been ordered – long lead [time]."

**B. Electrical Grounding**

Electrical drawing E34 of the contract presents a schematic for a fire-alarm system. The drawing includes the following direction: "INSTALL 2-500 MCM THHN GROUND CONDUCTORS IN 3" EMT(TYP) BUSH CONDUIT ENDS AT EACH PLATE." The specified ground, although included on the fire-alarm schematic, was not part of the fire-alarm system, but was intended instead for the communications system.

On March 25, 1996, the Air Force became aware that there were grounding plates and wire missing from the XY Building. Upon inquiry, the Air Force learned that Chrome Electric had not installed the grounding system, having not understood it to be within its scope of work. On April 2, 1996, Chrome Electric delivered a letter to Southern Comfort in which it raised the grounding issue for the first time, stating:

> Please be advised that we have been informed that Chrome Electric is expected to install 2-500 MCM grounding conductors . . . . Having studied the drawings thoroughly, we have determined the only place these conductors are indicated is on drawing E-34 titled, "Fire Alarm Installation." Although these grounding conductors are indicated on this drawing, they are accompanied by a note saying, "existing."
>
> Taking into account that this system is on the Fire Alarm Installation drawings and the note adjacent to the system says "existing", along with the fact that at no point on this drawing is there any indication that the 2-500 MCM conductors shown are tied to either a ground rod, ground grid or building steel, we were under the impression that this system was already complete.
>
> Therefore, Chrome Electric did not include this system in our package at bid time . . . . If you wish to add this system to our current work, Chrome Electric would be happy to provide you with a cost estimate.

The Air Force rejected Chrome Electric's interpretation of the contract in a letter dated April 9, 1996, to which it attached a memorandum drafted by Johnson Controls that provided a point-by-point refutation of Chrome's position.[6] On May 13, 1996, Chrome indicated that it would

---

[6] In critical part, this memorandum from Johnson Controls stated:

> A thorough review of the referenced drawing has been made with the following result:
>
> 1. The word 'existing' clearly goes to a ground plate and conductor as shown by the arrows. The fact these items are existing is also indicated by the line style as

proceed with the grounding installation, but considered it "a change to the contract." On May 15, 1996, Chrome submitted RFI No. 5, contesting the Air Force's arguments and asking the Air Force to provide answers to six questions about the grounding system "so appropriate costs can be submitted." The Air Force provided those answers on May 30, 1996. The parties discussed the grounding issue at a meeting held on June 11, 1996, and it appears that Chrome (using a subcontractor) installed the grounding system in September and October of 1996. On October 14, 1996, Chrome Electric submitted a request for equitable adjustment in the amount of $25,265. It is unclear whether this request was ever formally acted upon.

### C. Uninterruptible Power Supply

Electrical drawing E13 of the contract, entitled "Power Installation," instructs the contractor to, *inter alia*, "run power from each section of UPS . . . to the corresponding section of each motor control center" and "extend conduit underground from UPS to Rm. 120." Drawing E13 incorrectly shows this UPS as "existing," as there was no UPS on the site. On November 16, 1995, Southern Comfort notified the Air Force that "the absence of the UPS . . . is now causing delays" both for the electrical contractor and others, because access to the worksite was "hampered by electrical equipment that cannot be removed until the UPS is installed." On December 5, 1995, Chrome Electric notified Southern Comfort of various tasks that could not be completed because the UPS was not installed. On December 15, 1995, Southern Comfort advised the Air Force that it would cease working on the project as of December 22, 1995, due to delays, stating that "the electrical portion of the project will be finished as far as it can be because there is no UPS to provide the new power for the building."

---

indicated on the cover sheet for the drawing package.

2. The note indicating the required installation is attached by an arrow to the required installation. The installation requirement is also shown by the line style as indicated on the cover sheet for the drawing package.

3. This grounding system is for the communications equipment contained in the XY building and is more appropriately shown on the fire alarm drawing than on a power drawing since it is a separate system from the power system.

4. Specification section 16452 paragraph 3.1D requires the installation of a minimum #4 AWG insulated grounding conductor, in raceway to each terminal cabinet or central equipment location. The drawing indicates the extent of the required installation and sizes the conductor over the minimum as is required by the number of equipment locations. The Phase 1 portion of the rehabilitation extended the same size grounding from the grounding electrode to the location indicated on the drawings.

Several days later, the Air Force acknowledged that "the absence of the UPS is creating problems,"and promised that those problems "have been addressed in a change order" that would "delete certain of the electrical work and allow the contract to proceed." An unnumbered change order, dated December 14, 1995, admitted that "the Government failed to procure the UPS system" and proposed the acquisition of a "temporary feeder" to provide power until the UPS could be installed. It is unclear whether this change order was ever executed. Change order No. 3, apparently executed on December 20, 1996, and subsequently modified on March 10, 1997, instructed a subcontractor – Redux, Inc. – to install a temporary power source that was used to provide lighting in lieu of the UPS. On August 13, 1997, the Air Force advised Southern Comfort that temporary power was available at the site, and informed Southern Comfort that all remaining electrical work must be completed within 37 days.

The UPS was finally installed in the summer of 1998, 913 days after the original date for start of performance. The Air Force notified Southern Comfort of the installation orally on July 1, 1998 and in writing, on July 7, 1998. The written notice referred to the August 13 letter of the previous year and reiterated that 37 days of electrical work remained to be done, yielding a completion date for electrical work of August 13, 1998. Substantial completion of all work actually occurred on March 19, 1999.

**D. Course of Proceedings**

On July 30, 1999, Southern Comfort filed a request for equitable adjustment seeking $266,954 for costs incurred by the allegedly out-of-scope requirements to install VFDs and grounding, and for expenses and overhead incurred because of claimed government-caused delay. The Air Force denied that request on March 27, 2000. On May 10, 2000, Southern Comfort submitted a certified claim for equitable adjustment under the disputes clause of the Federal Acquisition Regulations (48 C.F.R. § 52.233), formally requesting that the contracting officer "render a 'Final Decision' in accordance with the Disputes Clause." The Air Force issued a final decision denying that claim on November 6, 2000.

Southern Comfort filed a complaint in this court on December 15, 2000, alleging that: (i) the contract specifications were defective in that they failed to identify clearly the requirement that the contractor install the VFDs and the grounding system, thereby imposing costs on Southern Comfort and its subcontractor Chrome Electric when they were ordered to provide these items; (ii) the Air Force's failure to provide the UPS caused a constructive suspension of Southern Comfort's work and subjected Southern Comfort to a differing site condition, causing added costs and delays and disruptions to Southern Comfort's work on the contract; (iii) the Air Force engaged in improper contract administration, by failing properly to coordinate plaintiff's work with another contractor's, giving rise to a breach of the government's covenant of good faith and fair dealing; and, finally, (iv) the Air Force, because of the delays and extra costs it had caused plaintiff to incur, is liable to plaintiff on Chrome's pass-through claims.

On February 12, 2001, defendant filed its answer. On August 2, 2002, defendant amended its answer to assert several affirmative defenses based on alleged fraud committed by Southern Comfort and also asserting counterclaims for fraud under the Forfeiture of Fraudulent Claims Act, 28 U.S.C. §2514, the False Claims Act, 31 U.S.C. §3729(a), and the fraud provisions of the Contract Disputes Act, 41 U.S.C. §604. In particular, defendant alleges that Southern Comfort and its subcontractor knew that the VFDs were required by the contract and that Southern Comfort's claim was, therefore, fraudulent with respect to the VFD issue.

The case was reassigned to the undersigned on July 24, 2003. Trial was held from March 8-12, 2004, on the grounds of Patrick Air Force Base, Coco Beach, Florida. The testimony at trial conflicted on each of the critical issues before the court. For example, the parties' witnesses offered widely differing views as to whether the references to "variable speed motor controllers" in section 16481 indicated VFDs and as to whether the mechanical drawings at any point reflected the use of VFDs. Likewise, the parties disputed the proper interpretation of the hand-drawn lines on electrical drawing E34 in debating whether the grounding system shown there was marked "existing" or not, and whether the diagram, as drawn, was intelligible as a matter of electrical system design. With respect to the UPS, defendant did not dispute its obligation to provide the system or its delay in doing so, but it presented a critical path method (CPM) analysis suggesting that any project delay caused by the UPS issue was concurrent with delay caused by plaintiff's alleged failure to provide the VFDs and grounding.[7] Plaintiff did not provide a competing CPM analysis, but offered expert testimony suggesting that aspects of the VFD installation were dependent upon the availability of the UPS, and that, therefore, the UPS was the true source of project delay.

Defendant and plaintiff filed post-trial briefs on June 4, 2004, and June 23, 2004, respectively, and replies to those briefs on July 6, 2004, and July 8, 2004, respectively.

---

[7] Defendant introduced into evidence the report prepared by its expert, Mr. Paullin, of Contract Solutions LLC. This report concluded –

> The majority of delay to the project's critical path, 884 days, was concurrent delay. This delay was caused by three main issues . . . two of which [regarding the VFDs and grounding] are attributed to Southern Comfort and one of which [the UPS] is attributed to the Air Force. Consequently, we conclude that this delay is non-compensable, because it resulted from three concurrent delay issues. . . . The issue attributed to the Air Force (UPS Issue) was resolved several months before the other two issues, the VFD Issue and Fire alarm System Issue, which together determined the as-built critical path of the entire project.

Plaintiff's expert, Mr. Midgette, attempted to rebut this report in testifying that a 913-day delay was attributable to the Air Force. In his view, "there was no concurrent delay" because, in part, "Southern Comfort did not delay the project completion date at all."

## II. DISCUSSION

Plaintiff presents two issues regarding what it claims were defective specifications in the contract, involving the VFDs and the electrical grounding, respectively. It also raises issues concerning the extent of the damages that were associated with defendant's failure to install, on a timely basis, the UPS. For its part, defendant raises fraud-based defenses and counterclaims predicated largely on three separate statutes: the Forfeiture of Fraudulent Claims Act (FFCA), 28 U.S.C. §2514, the False Claims Act (FCA), 31 U.S.C. §3729(a), and the fraud provisions of the Contract Disputes Act (CDA), 41 U.S.C. §604. The court will consider these sets of issues *seriatim*.

### A. Defective Specifications

We begin with common ground. Government-issued contract specifications carry "an implied warranty that satisfactory contract performance will result from adherence to the specifications," *Franklin Pavkov Constr. Co. v. Roche*, 279 F.3d 989, 995 (Fed. Cir. 2002), that is, that the specifications "are free from errors," *E.L. Hamm & Assoc., Inc. v. England*, 379 F.3d 1334, 1338 (Fed. Cir. 2004). If such specifications are defective, "the contractor is entitled to recover costs proximately flowing from the breach" of that warranty. *Franklin Pavkov Constr.*, 279 F.3d at 995. This so-called "*Spearin* doctrine," which takes its name from *United States v. Spearin*, 248 U.S. 132 (1918), places the risk of defective specifications on the government. To recover under the *Spearin* doctrine, however, a contractor must demonstrate that it was "misled" by the defect; that, in turn, requires the contractor to show "both that it relied on the defect and that the defect was not an obvious omission, inconsistency or discrepancy of significance – in other words, a patent defect – that would have made such reliance unreasonable." *E.L. Hamm,* 379 F.3d at 1339.

But, does this case really involve defective specifications, or does it, instead, involve ambiguities in the specifications? Although some cases have melded these concepts, the Federal Circuit recently has distinguished between them, holding that an "ambiguity" involves a circumstance in which the contract or specification is "susceptible of two different and reasonable interpretations, each of which is found to be consistent with the contract language." *Cmty. Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993); *see also E.L. Hamm*, 379 F.3d at 1341; *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004); *Jowett v. United States*, 234 F.3d 1365, 1368 n.2 (Fed. Cir. 2000); *Metric Constr., Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999). "To show an ambiguity it is not enough that the parties differ in their respective interpretations of a contract term;" instead, "both interpretations must fall within a 'zone of reasonableness.'" *Metric Constr.*, 169 F.3d at 751; *see also NVT Technologies, Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004). If, instead, the contract or specification is susceptible only to a single reasonable reading, then there is no ambiguity, and the court is in the realm of determining whether the specification is defective. *See E.L. Hamm*, 379 F.3d at 1342.

In determining whether a specification is ambiguous, several interpretational principles guide our path. Primary among these is that "[c]ontract interpretation begins with the language of the written agreement." *NVT Technologies*, 370 F.3d at 1159; *see also Coast Federal Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003); *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993). "When interpreting the contract," the Federal Circuit has emphasized, "the document must be considered as a whole and interpreted so as to harmonize and give reasonable meaning to all of its parts." *NVT Technologies*, 370 F.3d at 1159; *see also McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434-35 (Fed. Cir. 1996); *Record Steel & Constr. Co., Inc v. United States*, 62 Fed. Cl. 508, 514 (2004). Accordingly, an interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous. *Gould, Inc. v. United States*, 935 F.3d 1271, 1274 (Fed. Cir. 1991). In determining whether an ambiguity exists, the court may, with certain limitations, receive and consider evidence of trade practices and custom. *See HPI/GSA-3C*, 364 F.3d at 1334; *Jowett*, 234 F.3d at 1368; *Metric Constr*., 169 F.3d at 753. However, "a contracting party cannot . . . invoke trade practice and custom to create an ambiguity where a contract was not reasonably susceptible of differing interpretations at the time of contracting." *Metric Constr*., 169 F.3d at 752.

Though they could have been clearer, the contract specifications and drawings in the contract *sub judice* required the installation of VFDs. Plaintiff admits, as it must, that section 15 in the mechanical portion of the specifications refers explicitly to VFDs: paragraph 1.4C of section 15855 lists, as required equipment, "Variable Air Volume Air Handling Units with Variable Frequency Drive," and paragraph 2.4J of that same section, in describing the process of balancing fan section assemblies, also refers to "variable frequency drives." Further evidence that such drives were required may be found in drawing M13, which included the phrase "variable frequency" in a schedule describing capacity controls for the HVAC system's chilled water air handling units. Moreover, the testimony of several witnesses at trial convincingly demonstrated that there are only two possible mechanisms for controlling air flow within the sort of HVAC system that was to be installed at the XY Building and that one of those mechanisms, a device known as "inlet guide veins," was not indicated anywhere in the documents. Accordingly, despite the fact that the specifications failed to provide locations and power tie-ins for those devices,[8] the only possible interpretation of the contract documents is what the language of the specifications explicitly reveals: that VFDs were to be installed.

Nonetheless, plaintiff complains that VFDs were not mentioned in the electrical portion of the specifications and asserts that a reasonable electrical subcontractor would not have known, based upon a reading only of that segment, that VFDs were required. It contends that it used different subcontractors for divisions 15 and 16 of the contract and that its subcontractors did

---

[8] While plaintiff emphasizes this omission, several witnesses offered credible testimony indicating that details involving the placement of the VFDs were the sort that would not be controlled by the drawings, but instead would be left to the discretion of the contractor, subject potentially to consultation with the agency.

"not have time . . . to research each others [sic] responsibilities." Certainly, this might explain why the electrical subcontractor was unaware of the VFD requirement; but it does not explain why the mechanical subcontractor turned a blind eye to the portions of the mechanical specifications that clearly required the installation of VFDs and somehow concluded that it was not responsible for performing this task.[9] Moreover, the critical question is not what a given subcontractors knew or thought, but whether the contract, as a whole, imposed upon plaintiff the requirement that VFDs be installed. Whether plaintiff chose to perform that task directly or through a subcontractor is of no moment – it simply cannot be that the contract meant two different things depending on whether the contractor decided to hire subcontractors.

Plaintiff stresses that, prior to the submission of its bid, it neither had the time to review the entire contract nor to ensure that its subcontractors had fully explored the work in preparing their bids. This contention, however, misses the mark for at least three reasons: First, it is factually erroneous – not only did plaintiff have nearly a month to review the contract documents before making its proposal, but it had a second opportunity to review the specifications when it was asked by the Air Force to verify its bid.[10] Second, it is axiomatic that a contractor is charged with knowledge of the contents of contract documents, whether or not it chooses to read them. *See, e.g., Comtrol, Inc. v. United States*, 294 F.3d 1357, 1365 (Fed. Cir. 2002); *Maxima Corp. v. United States*, 847 F.2d 1549, 1556 (Fed. Cir. 1988); *R.P. Wallace, Inc. v. United States*, 63 Fed. Cl. 402, 415 n.21 (2004); *see also United Med. Supply Co. v. United States*, 63 Fed. Cl. 430, 439 n.8 (2005). If plaintiff did not have time to review adequately the contract's requirements, it should not have bid . *See Cole Constr. Co.*, Inc. 96-2 B.C.A. ¶ 28,579, 1996 WL 571623 (1996) (noting, in comparable circumstances, the contractor "had a choice to enter the contract, or not to enter the contract, based on the information presented by the contract terms proffered"). Finally, the drawing and specifications here were directed to the prime contractor, and it was plaintiff, and not its subcontractors, which was responsible for ensuring that all the work in the contract would be performed. That requirement derives not only from the contract terms, which, in its general notes, explicitly required plaintiff to coordinate between the electrical and mechanical requirements, but also from the decisional law. *See, e.g.*, *Sunshine Constr. & Eng'g, Inc. v. United States*, 2005 WL 503728 at * 19 (Fed. Cl. Mar. 4, 2005) ("as the general contractor, plaintiff was responsible for ensuring that its subcontractors appropriately addressed the [project] requirements"); *Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 406 (1993) (same). Indeed, contrary to plaintiff's importunings, numerous cases hold that the government is not responsible

---

[9] Notably, while Mr. Scott of One Contractor, plaintiff's mechanical subcontractor, testified that VFDs were ordinarily part of the electrical specifications, he admitted that his firm had installed such drives in the past.

[10] After receiving Southern Comfort's bid, the contracting officer requested it to "thoroughly review[] all bidding documents, specifications, and drawings applicable" to the project. In response to this request, Southern Comfort signed the bid verification, stating that it had "reviewed and re-examined the Plans and Specifications, the terms of the Bid Invitation, all Drawings, and all of our work sheets pertaining to the above referenced Project."

for drafting segments of the specifications to be subcontractor-specific, and, correspondingly, that the contractor is not excused from performance simply because one or more of its subcontractors failed to include the work in their bids.[11]

Accordingly, the court finds that VFDs were required by the contract specifications and that plaintiff thus may not recover, as an equitable adjustment, costs associated with their installation. Indeed, assuming *arguendo*, plaintiff is correct that the cited specifications were

---

[11] For example, in *R.A. Burch Constr. Co.*, 90-1 B.C.A. ¶22,599, 1990 WL 14829, the prime contractor claimed that it should receive an equitable adjustment because the electrical drawings for the contract did not alert its electrical subcontractor to a given requirement. Making short shrift of this assertion, the Board stated:

> However, we are not called upon to determine whether Helix Electric was required to perform the disputed task under its subcontract. Our concern is whether the appellant under the terms of its prime contract with the Government, when that document is read as a whole, was required to perform the work for which it now seeks compensation.

*Id*; *see also W.B. Meredith II, Inc.*, 03-1 B.C.A. ¶32,166, 2003 WL 264372 ("where the contract read as a whole required the performance of certain work, the subcontractor's failure to include the work in its bid to the prime contractor does not excuse the work from being performed" by the prime); *Caddell Constr. Co., Inc.*, 93-3 B.C.A. ¶26,114, 1993 WL 160644 ("where work is omitted from certain drawings but shown in others, the prime contractor's duty to coordinate the work of its subcontractors will absolve the Government from liability. The Government is not required to write specifications so as to separate the work among the various trades"); *Santa Fe Engineers, Inc.*, 80-2 B.C.A. ¶14,763, 1980 WL 2736 ("as long as the prime contract as a whole identifies the specified work with reasonable clarity, the Government is not liable for the consequences of omitted information in provisions labeled as applicable to a particular trade, which is supplied by another provision in the instrument of which the prime . . . is reasonably on notice. . . . Selective reliance on particular provisions, disregarding others applicable to the same work, is inconsistent with well established principles of contract interpretation"); *Gall Landau Young Constr. Co., Inc.*, 77-1 B.C.A. ¶12,515, 1977 WL 2443 (although "it may be the custom in the construction industry for potential subcontractors to review only the portions of the contract documents pertaining to their specialities . . . that custom does not fragment the general contractor's responsibilities and does not require the Federal Government to write or interpret its specifications in such a manner"); *see generally,* John Cibinic, Jr. & John Nash, Jr. Administration of Government Contracts 363 (describing a contractor's "duty of coordination"). At trial, several representatives of plaintiff's subcontractors testified that it was standard industry practice that they would only review the portion of the specifications and drawings that related to their specialties. None of these witnesses, however, suggested that it was standard industry practice to absolve a general contractor from ensuring that all the tasks covered by the contract are performed by someone.

ambiguous, that ambiguity most certainly would be "patent" and thus preclude plaintiff from recovering, because it did not clarify this matter with the Air Force prior to bidding.[12]

This last point is a good place to embark upon consideration of the second issue under this heading, concerning the electrical grounding. To be sure, even less so than in the case of the VFDs, the specifications and drawings were not a picture of clarity in requiring that such grounding be installed. Nonetheless, electrical drawing E34 included the following plain instruction: "INSTALL 2-500 MCM THHN GROUND CONDUCTORS IN 3" EMT (TYP) BUSH CONDUIT ENDS AT EACH PLATE."[13] The placement of the grounding is further suggested by a solid line on that drawing that runs through a number of rooms and shows attachment points that include what witnesses described as grounding plates; the general legend for the drawings indicates that such solid lines reflect "new" construction. On the other hand, these lines were depicted only on a drawing entitled "FIRE ALARM INSTALLATION," and not on any of the other numerous electrical drawings. Moreover, there was nothing in the specifications regarding this particular electrical grounding, except for generic language in section 16111, ¶ 3.2A. and section 16452, that described the grounding requirements applicable to the overall project.[14]

Both parties offered testimony regarding the proper interpretation of the drawings. On plaintiff's behalf, Mr. Butcher testified that because the ground conductor instruction appeared on a fire alarm schematic, he did not believe that it required him to install the specified ground conductors. When asked by plaintiff's counsel whether "anything on this drawing indicate[s] grounding to be installed," Mr. Butcher replied that it did not, because a grounding "has to tie to something, or else it's useless." In this regard, he explained that, in his view, the schematic did

---

[12] Indeed, on brief, plaintiff admits that there was a patent ambiguity in the contract relating to the VFDs, namely, that the specifications referred to a section 16480, that was missing (the reference should have been to section 16481). Yet, plaintiff seemingly ignores the import of this admission – that if the absence of section 16480 created such an ambiguity, plaintiff was obliged to raise the matter in advance of bidding. Of course, it did not do so.

[13] At trial, Mr. Butcher, the owner and president of Chrome Electric, translated the details in this instruction. According to him, "2-500 MCM THHN" means that the contract requires a big, insulated cable; the reference to "3" EMT" was to a three-inch conduit, with a bushing on the end of it; and "(TYP)" refers to "typical." Further translation of this instruction was provided by Mr. Doran of Contract Solutions, who indicated that "MCM" stands for "thousand circular mills" and that "THNN" is an insulated conductor.

[14] The court would give greater emphasis to the fact that the specifications prescribed grounding requirements were it not for the fact that these specifications were applicable to other forms of grounding required by the contract, including the grounding of electrical equipment. Thus, their mere presence in the specifications does not support defendant's construction of drawing E34.

not show the solid wire to be attached to anything but a grounding plate– an arrangement that, according to Mr. Butcher, would not be a proper ground. However, Mr. Rice, who drafted E34, testified that the drawing shows a solid, continuous line – again, representing new construction – leading to, among other things, dashed lines representing an existing ground plate and an existing ground conductor. Because the grounding was to be connected to an existing system, Mr. Rice said, there was no need to show a specific ground point in the drawing.

Based upon the record, the court finds that, in drawing E34, the contract indicated that ground conductors should be installed – indeed, as verified by various witnesses, there is no other reasonable construction of the instruction requiring the contractor to "INSTALL . . . GROUND CONDUCTORS . . . AT EACH PLATE." In the court's view, that this instruction appeared on the fire alarm schematic does not undercut its plain meaning. To be sure, there is room for debate as to whether the drawing provided enough detail to explain how the grounding should be installed. In the court's view, this lack of specificity likely gave rise to a defective specification – at least, an incomplete one. But, this neither entitled plaintiff nor its subcontractors to ignore the explicit requirement to install ground conductors. Indeed, whether the lack of detail in the specifications drawing is viewed as an ambiguity or a defective specification, the deficiency was "patent" and obliged plaintiff to contact the Air Force for clarification.

A few words of elaboration on the latter point are warranted. Although the Federal Circuit in *E.L. Hamm*, *supra*, carefully distinguished between ambiguities and defective specifications, it identified "similarities in the law" regarding their treatment, explaining –

> A contractor may not recover for a patent ambiguity, but may recover for a latent ambiguity. . . . Similarly, a contractor may not recover for a patent defect, but may – implicitly – recover for a latent defect. . . . In other words, just as a contractor may recover for a latent ambiguity, a contractor may recover for a latent defect; just as a contractor may not recover for a patent ambiguity, a contractor may not recover for a patent defect.

*Id*. at 1342 (citations omitted). As further discussed by the Federal Circuit in *E.L. Hamm*, *id*. at 1339, where a patent ambiguity or defect exists in the contract solicitation, a contractor is under a duty to attempt to resolve the problem prior to bidding if it subsequently wishes to recover based upon the ambiguity or defect.[15] If the contractor fails to make such an inquiry, its "interpretation

---

[15] *See also Interwest Constr. v. Brown*, 29 F.3d 611, 617 (Fed. Cir. 1994) ("[a] patent ambiguity places a duty of inquiry upon the contractor"); *Johnson Controls, Inc. v. United States*, 671 F.2d 1312, 1319 (Ct. Cl. 1982) ("since plaintiff was aware of [the defect] at the time it entered into the contract . . . it is not entitled to recover . . . based upon" that defect); *Wickham Contracting Co. v. United States*, 546 F.2d 395, 397-400 (Ct. Cl. 1976) ("if a contractor enters into a contract aware of . . . defective specifications, it is not entitled to recover on a claim based on these defective specifications"). Other cases make clear that these rules apply if the ambiguity or defect was obvious, whether or not the contractor actually noticed it. *See, e.g., Chris Berg,*

will fail." *NVT Techs*, 370 F.3d at 1162; *see also Sunshine Constr. & Eng'g, Inc.*, 2005 WL 503728 at * 10.

While courts may employ slightly different analyses for determining whether a "patent" ambiguity versus a "patent" defective specification is involved,[16] there is broad agreement that either an ambiguity or defect is "patent" if, on the face of the contract documents, it is glaring or obvious. A defect is patent, for example, if it was "an obvious omission, inconsistency or discrepancy of significance" that would have made the contractor's reliance on the requirement unreasonable. *E.L. Hamm*, 379 F.3d at 1339; *see also L.W. Foster Sportswear Co. v. United States*, 405 F.2d 1285, 1290 (Ct. Cl. 1969) (Where a contractor "ought to know" that a specification is defective, "he cannot argue that he has been misled or that he had any right to make his bid on the basis of the specifications which he knew (or should have realized) were not correct."). Likewise, an ambiguity will not give rise to an equitable adjustment "if it was . . . obvious on the face of the solicitation," with a "patent ambiguity" thus being one that is "'obvious, gross, [or] glaring, so that plaintiff contractor had a duty to inquire about it at the start.'" *NVT Techs.*, 370 F.3d at 1162 (quoting *H&M Moving, Inc. v. United States*, 499 F.2d 660, 671 (Ct. Cl. 1974)); *see also Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1381 (Fed. Cir. 2000) ("A patent ambiguity is present when the contract contains facially inconsistent provisions that would place a reasonable contractor on notice and prompt the contractor to rectify the inconsistency by inquiring of the appropriate parties."); *Ryan Co. v. United States*, 43 Fed. Cl. 646, 654 (1999).[17]

On the facts of this case, any defect in the grounding specifications was obvious on the face of the contract documents and thus was patent – the drawing indicated that the grounding was to be installed, showed the location of the grounding wire and corresponding channel, and indicated that the grounding was new; it was arguably defective only in failing to show the point

---

*Inc. v. United States*, 455 F.2d 1037, 1045 (Ct. Cl. 1972) ("it is not the actual knowledge of the contractor, but the obviousness of the discrepancy which imposes the duty of inquiry").

[16] *See* Ralph C. Nash & John Cibinic, "Patent Defects vs. Patent Ambiguities: There's a Big Difference," 18 No. 10 Nash & Cibinic Rep. 45 (2004).

[17] That the standards governing defective specifications and ambiguities should converge on this point should come as no surprise. In both instances, the "patent" doctrine imposes a duty of inquiry to prevent contractors from taking advantage of situations by adopting limiting assumptions in preparing their bids and then, after the award, seeking equitable adjustments to perform the additional work the government actually wanted. *See Interwest Constr. v. Brown*, 29 F.3d at 615-16; *S.O.G. of Ark. v. United States*, 546 F.2d 367, 370-71 (Ct. Cl. 1976). "That objective is particularly important in government contracts," the Federal Circuit has stated, "in which significant post-award modifications are limited by the government's obligation to use competitive bidding procedures and by the risk of prejudice to other potential contractors." *Triax Pac. Inc. v. West*, 130 F.3d 1469, 1475 (Fed. Cir. 1997).

at which the wire was to be attached to a ground. Having failed to raise this issue with the Air Force prior to bidding, and particularly given the fact that the other requirements for installing the ground are plain on the face of the drawings, plaintiff cannot obtain an equitable adjustment on account of this issue. *See, e.g., NVT Techs*, 370 F.3d at 1162. And, as suggested above, the same result would obtain, even if the failure to specify the attachment point rendered the grounding requirement ambiguous because such an ambiguity, in the court's view, would also be patent.

Accordingly, the court finds that plaintiff is not entitled to recover with respect either to the VFDs or the grounding.

**B. Compensable Delay – Uninterruptible Power Supply**

Defendant flatly admits that it was required to provide an uninterruptible power supply or UPS, but failed to do so on a timely basis. In seeking a recovery, plaintiff characterizes this failure in a variety of ways, arguing principally that it amounted to a differing site condition, but also asserting, at various points, that it constituted a constructive suspension of work, a failure of the government's implied duty to cooperate, or a failure timely to provide government-furnished equipment. While each of these theories, in appropriate cases, can give rise to compensable damages, such damages are recoverable only if plaintiff shows that the failure timely to provide the UPS proximately caused the delay which resulted in the damages, *i.e.*, that the delay affected activities on the critical path. *See, e.g.*, *Sauer, Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000); *George Sollitt Const. Co. v. United States*, 2005 WL 433617 at * 6 (2005); *Ryco Constr., Inc. v. United States*, 55 Fed. Cl. 184, 192 (2002); *see also* FAR 52.242-14(b), 52.245-2(a)(4). As this court recently held, this causation requirement cannot be met to the extent both parties – the contractor and the government – are responsible for a given period of delay. *See R.P. Wallace, Inc. v. United States*, 63 Fed. Cl. 402, 410 (2004); *see also Essex Electro Engineers v. Danzig*, 224 F.3d 1283, 1295-96 (Fed. Cir. 2000).[18]

Supported by its damages expert, defendant argues that although the UPS and the VFDs both became critical path items on May 9, 1996, the UPS issue was resolved first – on October 23, 1998 – and so the period from May 9, 1996 to October 23, 1998, constitutes concurrent delay,

---

[18] In *R.P. Wallace*, 63 Fed. Cl. at 410, this court held that, unlike sequential delays, damages associated with concurrent delays are not allocable, either based upon some concept of relative fault or otherwise. In support of this conclusion, this court cited *Essex Electro Engineers*, 224 F.3d at 1295 (internal quotations omitted), in which the Federal Circuit stated that a contractor "generally cannot recover for concurrent delays for the simple reason that no causal link can be shown: A government act that delays part of the contract performance does not delay the general progress of the work when the prosecution of the work as a whole would have been delayed regardless of the government's act." *See R.P. Wallace*, 63 Fed. Cl. at 410; *see also Kinetic Builder's, Inc. v. Peters*, 226 F.3d 1307, 1316-17 (Fed. Cir. 2000). This rule has a rich provenance. *See R.P. Wallace*, 63 Fed. Cl. at 410 n.12.

while the period from October 23, 1998 to February 12, 1999 – the date on which the HVAC system was finally balanced and tested with the VFDs in place – was solely the responsibility of the plaintiff. Plaintiff did not provide its own critical path analysis, although plaintiff and its expert attempted to undercut several of the "critical" observations made by defendant's expert. In this regard, plaintiff asserts that the VFDs were not critical path items because the HVAC system could not have been tested and balanced, as required by the contract, until the UPS was installed. Plaintiff also contends that the VFDs only became critical in defendant's path analysis because the Air Force delayed, for nearly five months, approving Submittal 19A. But for this delay, plaintiff asseverates, the VFDs would have been installed prior to the installation of the UPS, rendering the UPS the only outstanding critical path item.

In the court's view, defendant's assertions are borne out by the record; plaintiff's are not. First, the record refutes plaintiff's claim that it could not test and balance the HVAC system until the UPS was installed. Uncontroverted evidence introduced at trial demonstrated that the voltage necessary to balance the AHUs was available on the site throughout the project, and that the AHUs, in fact, were in operation long before the UPS was supplied. The first of these points may be seen in electrical drawing E4, which shows that an existing electrical supply provided the necessary 480 volts to the AHUs. And uncontroverted testimony from defendant's expert reveals that the AHUs "ran without testing and balancing . . . with the fan at full speed for several years" prior to installation of the VFDs, thereby confirming, contrary to plaintiff's contentions, that the electricity needed to test and balance the AHUs was available regardless of the availability of the UPS. In the absence of additional evidence supporting plaintiff's assertion that such testing and balancing could not have been performed, the court must conclude that plaintiff has failed to meet its burden of proof with respect to this argument.

Second, it does not appear that the Air Force unduly delayed approving Submittal 19A. Plaintiff made that submittal, which concerned the VFDs, on October 27, 1997, but with the important caveat that "Chrome Electric will not be responsible for exchanging and/or providing additional equipment to correct any problem that may arise due to equipment compatibility." On November 19, 1997, the Air Force approved Submittal 19A, but rejected plaintiff's not-so-minor gloss, advising the contractor that "the Variable Frequency Drives must be 100% compatible with the motors installed by you under the contract" and that the contractor, and not the Air Force, was responsible for ensuring that compatibility. Although this was technically an approval of the submittal, plaintiff resubmitted Submittal 19A, on January 22, 1998, apparently seeking confirmation from the Air Force that the VFDs and motors listed were compatible. Despite its prior statements squarely placing compatibility issues on the shoulders of the contractor, the Air Force undertook to confirm that the equipment specified in the submittal was compatible, a process that took several months. Critically, in the end, the Air Forced determined that the proposed VFDs were incompatible with the already installed air-handling units. Accordingly, on July 2, 1998, the Air Force disapproved Submittal 19A. However, Air Force technical personnel identified a different VFD that they believed was compatible with the air-handling units that had been installed. On August 18, 1998, plaintiff made a new submittal, 19B,

which incorporated this VFD. That submittal was approved by the Air Force on August 26, 1998.

Based on the foregoing, the court finds that the Air Force did not unduly delay the approval of the submittal. Indeed, had the Air Force not performed an extensive review of the submittal, plaintiff would have installed VFDs that were incompatible with the AHUs. As a result, plaintiff should not be heard to complain that delay in the approval of its submittal caused the VFDs to be installed later than they should have. Rather, by all appearances, plaintiff has only itself to blame for the length of time it took the Air Force to approve Submittal 19B.

As a result, the damages that plaintiff seeks on account of the Air Force's delay in installing the UPS all relate to a period of concurrent delay.[19] Consequently, under the decisional law, those damages are not recoverable.[20]

### C. Fraud

On August 2, 2002, defendant filed an amended answer to raise affirmative defenses and counterclaims based upon its allegation that plaintiff's claim regarding the VFDs was fraudulently made.[21] As noted above, defendant bases its counterclaims on three separate statutes: the Forfeiture of Fraudulent Claims Act (FFCA), 28 U.S.C. §2514, the False Claims Act (FCA), 31 U.S.C. §3729(a), and the fraud provisions of the Contract Disputes Act (CDA), 41 U.S.C. §604.

The FFCA essentially requires that a false or fraudulent claim be presented and that the contractor knew the claim was fraudulent or false. See *Young-Montenay, Inc. v. United States*, 15 F.3d 1040, 1042 (Fed. Cir. 1994). As to the FFCA, the government is "required to establish by clear and convincing evidence that the contractor knew that its submitted claims were false

[19] This is true, as well, of plaintiff's assertion that the Air Force's delay in installing the UPS prevented it from installing certain other electrical equipment that was designed to work with the UPS. A review of the record reveals that the concurrent delay experienced with respect to the VFDs also covers any delays associated with the installation of this equipment.

[20] In its complaint and pretrial memorandum, plaintiff raised several other claims, including one involving improper contract administration and several pass-through claims that it asserted on behalf of its subcontractor, Chrome Electric. The issue involving improper contract administration was not pursued at trial and thus was waived. The pass-through claims either depended upon plaintiff recovering on one of the theories rejected above – which it has not – or were based on issues not adequately developed at trial. Accordingly, all these claims are denied.

[21] In its amended answer defendant also asserted an affirmative defense based on accord and satisfaction, but it did not refer to this claim in its pretrial memorandum of law and did not offer evidence regarding it at trial. Accordingly, the court deems this claim waived.

and that it intended to defraud the government by submitting those claims." *Commercial Contractors, Inc. v. United States*, 154 F.3d 1357, 1362 (Fed. Cir. 1998).

Striving to prove that Mr. Ellis knew that his claim regarding the VFDs was fraudulent or false under the FFCA, defendant relied upon three forms of evidence: (i) demonstrations that it was clear from the contract that the VFDs were required; (ii) testimony and other documentary evidence indicating that Mr. Ellis was told by others that the VFDs were required; and (iii) testimony that Mr. Ellis, on several occasions prior to submitting his claim, himself admitted that the VFDs were required by the contract. In the court's view, under the FFCA, the first category of evidence supplied by defendant, while perhaps a predicate for defendant's other claims, is not independently relevant, as it does not bear on whether Mr. Ellis subjectively viewed his claim as being false or fraudulent or acted in deliberate ignorance or reckless disregard of the truth or falsity of his claim. The court finds the latter two categories of evidence offered by defendant unconvincing. While this evidence certainly indicates that Mr. Ellis eventually understood that the ***Air Force*** believed the VFDs were required by the contract, it fails to demonstrate that ***he*** ever abandoned his belief that the installation was not required by the original specifications.[22] Indeed, various documents and the testimony of at least one witness, Mr. Butcher, directly support the conclusion that Mr. Ellis was steadfast in his view that the original specifications did not require VFDs.[23] As a whole, the court finds that this evidence does not support a finding that Mr. Ellis knew that his claim regarding the VFDs was fraudulent or false.

Defendant, however, asserts that it need not demonstrate that Mr. Ellis knew his claim was fraudulent or false in order to recover under either the FCA or CDA, but only need prove, by a

---

[22] Defendant makes much of a note written by Mr. Ellis to Chrome Electric indicating that "VFD's To Be Supplied by Electrical Contractor." Defendant alleges that this note predates the government's first instructions about the VFDs and thus indicates that, independent of those instructions, Mr. Ellis understood that the contract required the installation of the VFDs. Although the document on which it is inscribed is dated November 7, 1995, the record does not reveal the date on which Mr. Ellis actually wrote this note. Nor does it indicate when the document was actually faxed to Chrome Electric. Accordingly, this court does not view the note as the "poignant" admission defendant claims.

[23] For example, in his letter instructing Chrome Electric to install the VFDs, Mr. Ellis indicated that he understood Chrome's position that "the prints and specifications are vague and have ambiguities" and that he would "support any efforts" Chrome might make to receive an equitable adjustment. In arguing to the contrary, defendant relies on evidence indicating that Mr. Ellis agreed that the VFDs were required by the "contract," but without clarifying what he meant by that reference. It appears that when Mr. Ellis referred to what was required by the contract, he simply was referring to the fact that the Air Force had demanded that the VFDs be installed and never meant that he would not seek an equitable adjustment to cover the cost of that demand.

preponderance of the evidence,[24] that the VFDs clearly were required by the original contract specifications. In support of this assertion, it cites *Commercial Contractors, Inc., supra*, in which the Federal Circuit upheld the imposition of FCA and CDA penalties against a contractor which defended against those penalties by asserting that its interpretations of various contract provisions were reasonable and that its claims thus were submitted in good faith. Notably, contrary to defendant's assertions, this court, in upholding the government's counterclaims under the FCA and CDA, did not rely solely upon the contractor's faulty interpretation of the contract, but also found several other indications that the contractor intended to deceive or mislead the government.[25] Moreover, although the court handily rejected the contractor's claims that its interpretations of the contract were reasonable, the Federal Circuit went to great pains to emphasize that it was not upholding the government's counterclaims solely on that basis, stating –

> CCI argues that it cannot be held liable for its . . . claims because the effect of such a decision would be to expose any contractor who submits claims under an erroneous contract interpretation to liability under the FCA or the CDA, even if the contractor did not deliberately conceal or misstate any facts to the government. The FCA, however, holds a contractor liable only if he knowingly submits false claims, and the CDA holds a contractor liable only if he acts with intent to deceive or mislead the government. The question for the court in cases involving issues of contract interpretation is whether the contractor's asserted interpretation is so plainly lacking in merit that the requisite state of mind can be inferred.

154 F.3d at 1366. The latter inference regarding the contractor's state of mind does not arise, the Federal Circuit concluded, if the contractor submits a claim "based upon a plausible but erroneous contract interpretation," but rather arises only "when the contractor's purported interpretation of the contract borders on the frivolous." *Id.*; *see also United States v. Newport Shipbuilding, Inc.,* 276 F. Supp. 2d 539, 564 (E.D. Va. 2003) (construing *Commercial Contractors*).

In the case *sub judice*, the court does not believe that the standard has been met – while plaintiff's interpretation of the contract regarding the VFDs is, in this court's view, weak, it does not border on the frivolous. Moreover, it bears emphasis that the subject of the VFDs was debated by plaintiff and the Air Force extensively before the filing of plaintiff's claim, further

---

[24] Both the FCA and CDA require the government to prove an alleged fraud by a preponderance of the evidence. *See* 31 U.S.C. § 3731(c) (FCA); *Commercial Contractors, Inc.*, 154 F.3d at 1362 (CDA).

[25] Among other things, as referenced by the Federal Circuit in its opinion, this court found that the contractor knowingly billed for backfill quantities not placed and that he backfilled with prohibited material. 154 F.3d at 1363-67. This court also found that the contractor improperly heated concrete test cylinders so that it would appear that the concrete met the required strength earlier than it actually did to allow the contractor to move his concrete forms quicker. *See id.* at 1370-71.

undercutting the notion that plaintiff here intended to deceive or mislead the government. In the court's view, to impose penalties under the FCA or the CDA here would be to do exactly what the Federal Circuit, in *Commercial Contractors*, *supra*, refused to do – namely, to invoke the penalties under those provisions simply because a contractor submitted a claim based upon an erroneous interpretation of the contract. That, this court will not do.

## III. Conclusion

This court need go no further. Based on the foregoing, it concludes that neither plaintiff nor defendant is entitled to recover in this matter. The Clerk shall dismiss the complaint. No costs.

**IT IS SO ORDERED**.

s/ Francis M. Allegra
Francis M. Allegra
Judge